IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 2017-CV-_____

LIST INTERACTIVE, LTD. D/B/A UKNIGHT INTERACTIVE,
LEONARD S. LABRIOLA

      Plaintiffs,

v.

KNIGHTS OF COLUMBUS,
THOMAS P. SMITH, JR.
MATTHEW A. ST. JOHN,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Jeffrey S. Vail
VAIL LAW LLC
5299 DTC Blvd., Suite 1101
Greenwood Village, CO 80111
Tel. (303) 800-8237
Fax. (303) 800-8237
ATTORNEY FOR PLAINTIFFS

Dated:  January 24, 2017.

# TABLE OF CONTENTS

NATURE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

GENERAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

FIRST CLAIM FOR RELIEF
(Violation of 18 U.S.C. § 1962, Racketeer Influenced and Corrupt Organizations Act) . . . . . . 21

SECOND CLAIM FOR RELIEF
(Breach of Contract) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

THIRD CLAIM FOR RELIEF
(Promissory Estoppel) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

FOURTH CLAIM FOR RELIEF
(Misappropriation of Trade Secrets) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

FIFTH CLAIM FOR RELIEF
(Intentional Interference) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

SIXTH CLAIM FOR RELIEF
(Fraudulent Misrepresentation) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

SEVENTH CLAIM FOR RELIEF
(Negligent Misrepresentation) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

EIGHTH CLAIM FOR RELIEF
(Defamation) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

RELIEF REQUESTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

DEMAND FOR JURY TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Plaintiffs List Interactive, Ltd., d/b/a UKnight Interactive ("UKnight") and Leonard S. Labriola ("Labriola"), for their Complaint against Defendants Knights of Columbus Supreme Council, Thomas P. Smith, Jr. ("Smith"), and Matthew A. St. John ("St. John") (collectively, "Defendants"), state as follows:

## I.   NATURE OF ACTION

1.      This case involves an elaborate scheme of racketeering, fraud, deception, theft, and broken promises by the Knights of Columbus Supreme Council and two of their senior executives, Thomas Smith and Matthew St. John, which destroyed UKnight's business and has cost Plaintiffs millions of dollars in losses.  Defendants, who ostensibly run the country's largest Catholic charitable fraternity, but in fact operate a highly-lucrative insurance company, have systematically deceived their insured-members and Plaintiffs in order to prop up the viability of their enterprise and derive substantial economic benefit to themselves.

2.      Plaintiffs seek compensatory damages in excess of $100 million.

## II.   PARTIES

3.      Plaintiff UKnight is a Colorado limited liability company with its principal place of business located at 1434 Spruce St., #100, Boulder, Colorado.  The members of UKnight include Terry Clark, a citizen of Texas, Leonard Labriola, a citizen of Colorado, and Jonathan Michlik, a citizen of Texas.  Accordingly, for diversity purposes, UKnight is a citizen of the States of Colorado and Texas.

4.      Plaintiff Leonard S. Labriola is an individual, a member and manager of UKnight, and a resident of the State of Colorado who resides at 179 Salina St., Lafayette, Colorado.

5.     Defendant Knights of Columbus Supreme Council[1] ("KC Supreme") is a 501(c)(8) tax-exempt fraternal organization registered in the State of Connecticut.  Its principal place of business is 1 Columbus Plaza, New Haven, Connecticut.  In this Complaint, "KC Supreme" refers to the Defendant national headquarters council and insurance company located in New Haven, Connecticut, whereas "Knights of Columbus" refers to the broader fraternal order generally, including all of its constituent local councils, assemblies, independent general insurance agents, and members.

6.     Defendant Thomas P. Smith, Jr. is an individual and employee of KC Supreme in New Haven, Connecticut.  Upon information and belief, Mr. Smith is a resident of the State of Connecticut.  Mr. Smith is the Executive Vice President and Chief Insurance Officer of KC Supreme.

7.     Defendant Matthew A. St. John is an individual and employee of KC Supreme in New Haven, Connecticut.  Upon information and belief, Mr. St. John is a resident of the State of Connecticut.  Mr. St. John is the Director of Insurance Marketing for KC Supreme.

III.   **JURISDICTION AND VENUE**

8.     This Court has subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331 and 18 U.S.C. § 1962.  This Court has supplemental jurisdiction over Plaintiffs'

---

[1] Defendant KC Supreme refers to the parent 501(c)(8) entity of the Knights of Columbus lodge system.  The thousands of local and state councils are, under IRS guidance, independent lodges that fall under KC Supreme's 501(c)(8) tax-exempt status, but that must obtain their own EINs and file their own tax returns.  Knights of Columbus local councils, assemblies, and general agents are separate legal entities which can bring suit and be sued, raise and control their own monies, own their own property, etc.  They are essentially licensees of the "Knights of Columbus" name, which license can be revoked by KC Supreme, but are not subsidiaries or part of the same corporate family tree as Defendant.

state law claims pursuant to 28 U.S.C. § 1367(a). Plaintiffs' federal and state law claims arise from the same events and transactions, involve substantially identical issues of fact and law, and are so related to each other that they form part of the same case or controversy under Article III of the United States Constitution.

9.      Additionally, this Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332, as all Plaintiffs are diverse from all Defendants, and the amount in controversy is in excess of $75,000.

10.     This Court has personal jurisdiction over Defendants KC Supreme, Thomas Smith, and Matthew St. John as each has been directly involved in transacting business in the District of Colorado with Plaintiffs, from which transactions this lawsuit directly arises. Additionally, all Defendants have regular and ongoing business contacts with the numerous Knights of Columbus councils, members, and insurance agents in the District of Colorado, as well as market and sell insurance products into the District of Colorado, subjecting each to general jurisdiction within this District.

11.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2). As outlined in this Complaint, a substantial portion of the events and omissions that give rise to Plaintiffs' claims, including the ongoing course of business between the parties, and many of the fraudulent schemes and communications outlined herein, occurred within and were directed at Plaintiffs within the District of Colorado.

IV.     **GENERAL ALLEGATIONS**

      A.      **KC Supreme Contracts With UKnight For Their Digital Platform**

12.     Plaintiff UKnight is a small Colorado company that specifically designed a complex interactive system underlying easy-to-use website templates that link together and serve the specific needs of the multi-tiered, multi-chapter, international organization the Knights of Columbus.  UKnight's platform can dramatically enhance that organization's ability to attract new members, activate current members, increase fundraising, and increase sales of related financial products.

13.     The Knights of Columbus is an international fraternal benefit society, and KC Supreme is its leadership council and captive insurance company that coordinates with over 15,000 independent "councils," or local groups, worldwide with a purported 1.9 million members.  It is associated with the Catholic Church and is engaged in charitable work.

14.     KC Supreme was originally founded in 1882 as a Catholic mutual benefit society. It is now a tax-exempt fraternal insurance company, legally permitted to sell financial products and services to Knights of Columbus members only.  As an insurance company, it announced $8.4 billion in sales in 2016, and has over $105 billion in life insurance policies in force.  It is currently ranked by Fortune Magazine as the 925th largest company in the world.

15.     In 2009, UKnight began designing and implementing websites for local Knights of Columbus councils in the Dallas, Texas area.  UKnight's work was so successful at helping local councils increase membership, improve communication with members, and increase sales of insurance products that it was encouraged to make a proposal directly to KC Supreme for adoption by the entire Knights of Columbus fraternity.

16.     On August 5, 2011, Mr. Labriola sent an email to Denise Serafini, the Director of eBusiness for KC Supreme, outlining UKnight's product and basic proposal for a relationship.

He highlighted the capabilities and functions of UKnight and how its interactive system could bring together the many, fractionated parts of the Knights of Columbus fraternity on one online platform, significantly increase the fraternity's membership, and increase sales of KC Supreme financial products.

17.     Shortly after receiving the emailed proposal, Ms. Serafini contacted UKnight and invited the company to New Haven, Connecticut for three days of high-level meetings beginning September 8, 2011.  The meetings could not have been more productive because, to the great surprise of KC Supreme, UKnight was not only prepared to deliver far more than they had expected, but was also prepared to deliver these services for a price that was less than half of what KC Supreme already considered the best price available for far fewer services.

18.     After meetings between executives of KC Supreme and UKnight over two days, on September 10, 2011 KC Supreme told UKnight that it was their choice as designated vendor for the entire Knights of Columbus fraternity and offered to formally announce UKnight as such in exchange for UKnight accommodating certain requests (such as adding legal disclaimers to the websites) made by the KC Supreme legal department and UKnight allowing KC Supreme to make certain graphic design changes to its platform.  UKnight accepted this offer, and a contract was formed.  The KC Supreme legal department approved the modifications it had requested in June 2012.  The new graphic design and rollout plan were given final approval by KC Supreme in August 2012.  UKnight had done everything it had promised, and all that was left was KC Supreme's obligations to make the announcement and instruct the Knights of Columbus to adopt the UKnight system.

19.     Between the agreement made on September 10, 2011 and the completion of graphic design changes and legal approval, Defendant KC Supreme could not have been more clear that an agreement *had been reached* and that UKnight had already been selected as the designated vendor.

20.     Both KC Supreme's words and their course of dealing with UKnight repeatedly confirmed that the deal was done.  Ms. Serafini stated by email on September 12, 2011 that "[w]e're already rolling."  KC Supreme ceased their efforts to interview any potential alternative designated vendors, ceased in-house efforts to develop the functionalities that UKnight was designated to provide, and paid to have portions of UKnight's graphic interface redesigned to meet their needs, all clearly demonstrating that KC Supreme understood that an agreement had already been reached.  KC Supreme then programmed a member list function specifically designed to interface with the UKnight system to make it easier for local council subscribers to download their membership lists into the UKnight database.  KC Supreme sent UKnight the necessary data files to bring all 15,392 local councils onto the UKnight network.  Defendants Thomas Smith, KC Supreme's Chief Insurance Officer, Matthew St. John, Director of Insurance Marketing, and Lynne Toomey, Vice President of Specialized Products all began encouraging insurance agents to subscribe to the UKnight network.

21.     KC Supreme had only minimal performance obligations under its contract with UKnight:  formally designate UKnight as the sole approved vendor for the Knights of Columbus fraternity as a whole, and instruct all 15,000+ local councils and assemblies to implement the system.  Notably, Defendant KC Supreme was not required to make any payment to UKnight.  Rather, fees for subscriptions to UKnight's services would be paid individually by each

subscribing insurance agent, local council, assembly, and others.  KC Supreme could have completed its performance obligations in a single day.  Indeed, KC Supreme was so pleased with their partnership with UKnight that they immediately proposed the parties expand and deepen this relationship, and the parties began negotiating a *second-stage contract* for a product called the "Supreme Admin Center" which would further integrate UKnight's systems into the broader Knights of Columbus fraternity.

C.    **KC Supreme Delays Announcement, But Makes Repeated Promises and Assurances**

22.    Despite the clear agreement between the parties on September 10, 2011 that KC Supreme would announce UKnight as the designated vendor to all of the Knights of Columbus' local councils, assemblies, and independent agents, the announcement did not come.  Ms. Serafini continued to express repeatedly on behalf of KC Supreme that everything was on track, stating: "we are almost there," "the Supreme Knight (CEO of KC Supreme) thought this [announcement] was done last year," "the Supreme Knight is very frustrated and wants this [announcement] made yesterday," and that the announcement of UKnight as the designated vendor was imminent.

23.    During this time, UKnight remained committed to providing the best possible service and dedication to KC Supreme and the Knights of Columbus fraternity.  Additionally, based on *KC Supreme's own projections* communicated to UKnight, UKnight was anticipating earning annual subscription fees of $300 from roughly 85% of the approximately 12,500 councils and 1,500 general agents and field agents in the US and Canada in the immediate future (over $3.5 million/year), not to mention significantly larger future revenues from advertising

through council websites, market centers, and other current and future cooperative fundraising efforts.

24.     Accordingly, in contrast to its original business plan of serving a wide range of clients each under a separate "_____ Interactive" trade name (e.g. "Rotary Interactive," "Elks Interactive," etc.), UKnight turned away substantial firm offers for outside business and ceased marketing to potential additional clients outside of the Knights of Columbus, all to ensure it would be able to dedicate its full attention and resources to serving the Knights of Columbus as soon as the designated vendor announcement was made.  UKnight member and Plaintiff Leonard Labriola put several other businesses on hold to focus himself full-time on UKnight.  Similarly, UKnight member Terry Clark allowed all of his existing technology consulting client contracts to lapse in anticipation of needing to dedicate his attention full-time to UKnight following the designated vendor announcement.

25.     After all legal and graphic design approvals were final in August of 2012, the announcement still did not come, this time due to "scheduling" issues within KC Supreme. Finally, in July of 2013, UKnight was called to a meeting in New Haven where Andrew Walther, KC Supreme Communications Director, reaffirmed unequivocally that (1) UKnight had been selected as the designated vendor; (2) that the announcement of UKnight as the designated vendor would take place at the International State Deputy Meeting that November in Quebec; (3) that every state council in the US and Canada would be required to use the UKnight system; and (4) that KC Supreme would instruct all US and Canadian councils and agents to begin using the UKnight system immediately.  When UKnight asked if it could help with preparations for the

announcement, Mr. Walther further assured UKnight that all preparation had already been completed for the announcement scheduled in November.

26.     At this time, KC Supreme provided UKnight with their standard vendor contract template to structure plans for the new "Supreme Admin Center" product.  By the end of July 2013, KC Supreme and UKnight had tailored the document, which also recognized the existence of the original September 2011 agreement.  By mid-August the KC Supreme legal department had approved the document, including the recognition of the former agreement, and it was sent to Supreme Knight Carl Anderson for signature.  Mr. Anderson then promised that he would make the much-anticipated designated vendor announcement personally, and that he wanted to make sure his announcement made a "big splash."

27.     Again, time passed and UKnight received neither a signed version of the formalized contract nor additional information on the announcement.  In response to repeated inquiries by UKnight, KC Supreme repeatedly assured them that despite the lack of a signed document the deal was done, with Ms. Serafini even telling Mr. Labriola that the lack of a signed, formalized agreement didn't matter as the agreement was already "etched in stone."

28.     In reliance on KC Supreme's repeated reassurances that the deal was "etched in stone," that all preparations had already been made for the upcoming announcement, and in anticipation of the upcoming November announcement, UKnight spent thousands of dollars bolstering its email capabilities, enhancing its server hardware, and increasing its electronic ACH payment limit to enable it to accept thousands of new council subscriptions at once.

29.     Again, the announcement did not come. KC Supreme Director of Communications Andrew Walther told Ms. Serafini that the announcement could not be made at

the November meeting as KC Supreme had to focus on humanitarian needs following the recent typhoon in the Philippines, which information was relayed to UKnight.  UKnight only later learned that this was a lie told to string Plaintiff along.

30.     In December 2013, Mr. Labriola sent a heartfelt email to Ms. Serafini explaining the tremendous hardship these delays had caused to UKnight and to his family personally.  He explained that he and Mr. Clark had not drawn a paycheck in over 30 months, and told her that the vast majority of local councils and agents were awaiting the formal announcement from KC Supreme before signing up for UKnight.  He asked directly if the delays in the announcement were any indication that KC Supreme wanted out of the deal in any way.  And, again, he was reassured by Ms. Serafini in her email reply that all was on track, that recent delays had merely been the result of unexpected staff resignations, and that "we can get back to business in the next few days."

**D.      Meanwhile, KC Supreme Conspires To Fraudulently Inflate Membership Numbers and Characteristics Of Their Insurance Risk Pool**

31.     During this same period that UKnight's and KC Supreme's relationship was developing, KC Supreme and several of its senior leadership, including Mr. Smith and Mr. St. John, were engaged in an elaborate conspiracy to artificially inflate the Knights of Columbus' insurable membership numbers and artificially improve the demographic structure of this risk-pool.

32.     While at the local level the Knights of Columbus members are engaged in substantial volunteer and charitable work, KC Supreme generates billions of dollars tax-free every year selling life insurance and other financial products.  As a result of these revenues, KC Supreme and its executives, in contrast to the local councils, sit among the world's elite power

brokers, with its Supreme Knight (CEO) Carl Anderson drawing a seven-figure salary and sitting on the board of the Vatican Bank.  KC Supreme's insurance products are sold exclusively to members of the Knights of Columbus local councils in the United States and Canada only (not to other international members).  KC Supreme is only legally permitted to sell its insurance products to members of the Knights of Columbus fraternity.  Accordingly, the size and demographic structure of its membership in the US and Canada is also the size and demographic structure of its insurance risk-pool.  As with any such risk-pool, a shrinking membership and aging demographic would severely threaten its insurance rating as payouts to members' families upon death depend on a steady stream of new premiums and payments from younger members. Indeed, the KC Supreme insurance program is only one step removed from a classic Ponzi scheme—with over $105 billion of insurance in force written against only $22 billion in assets, the KC Supreme insurance program must demonstrate that its membership is growing and that its demographic is not aging in order to maintain the perception of viability to meet its future payout obligations.

33.     KC Supreme recognizes the imperative of growth to the viability of its insurance program, and is strongly motivated to demonstrate that it continues to be a growing, vibrant organization.  For example, in 2016 Supreme Knight Carl Anderson stated that "[o]ur responsibility as the leaders of the Knights of Columbus is to assure the continued growth and sustainability of our Order. This is our first and primary responsibility."

34.     And, indeed, KC Supreme as well as its Chief Insurance Officer Thomas Smith and Director of Insurance Marketing Matthew St. John have carefully maintained just such an illusion of growing membership and steady age-demographic.  Unfortunately for the hundreds of

thousands of Knights of Columbus members it insures, these numbers are only an illusion—the end result of an elaborate and extensive scheme to fraudulently mischaracterize its own risk-pool.  In fact, and in direct contradiction to the representations it makes to members, agents, ratings agencies, and reinsurers, the KC Supreme insurance risk-pool is actually *shrinking and aging*.  This is a terminal condition.

35.     Additionally, by fraudulently inflating the size and vitality of their membership, Defendants have deceived UKnight about the potential profits it stands to make from serving, advertising to, and fundraising with this fraternity.   In the process, Defendants fraudulently induced UKnight into its business decision to focus its efforts solely on what it has now learned is an unstable, shrinking organization.

36.     KC Supreme, Mr. Smith, and Mr. St. John have perpetrated this fraud by preventing local Knights of Columbus councils from dropping members from their rolls.  If a new member joins, and then quits, Defendants require local councils to maintain these "phantom" members on their membership rolls and to continue paying nominal dues for them. This is done by instituting cumbersome and byzantine processes to drop members from rolls, and even by instituting requirements that a council cannot drop a member until it has a new member to replace him, or by limiting the total number of members by which any given council can decrease each year.

37.     For example, in one local council in New Jersey, the council reports to KC Supreme that it has 316 members, but council members report to UKnight that the actual number is only 54 (an overstatement of 585%), and that it is not allowed by Defendants to report the true numbers.   In another example in Dallas, a local council which reported approximately 300

members to KC Supreme attempted to remove over 80 long-delinquent members from its rolls. But, after months of pleading, Defendants only permitted 8 members to be removed, leaving over 70 "phantom" members on the rolls.

38.     The vast majority of these "phantom" members are younger members who join and then quit due to the demands of careers and raising children in families where often both parents work, while aging, retired members tend to remain active.   The fact that Defendants fraudulently report inflated numbers of younger members *artificially drops* the average age of Knights of Columbus members *to 59 years of age*, a critical factor in evaluation of their insurance risk-pool.

39.     As a result of this fraud, Defendant KC Supreme falsely reports that its membership numbers have been increasing year-on-year.   The KC Supreme website states that "our membership grew for the 44th consecutive year to a record high of 1,918,122 brother Knights.   Soon, we will number more than 2 million men."   In fact, the true membership of the Knights of Columbus without these "phantom" members is only about 1.4 million—their published number represents an approximate 36% overstatement!   At a recent meeting held by KC Supreme to educate its insurance agents, a representative of KC Supreme explained to the agents present separate numbers for the various membership categories, including 'insured members' and 'uninsured members.'   At least two of the agents noticed, and one of them asked why the numbers didn't add up to the published numbers—they were 400,000 to 500,000 short of published numbers.   No explanation was ever offered, and the group was quickly and awkwardly moved on to a new topic.

40.     Additionally, while the Knights of Columbus fraternal membership has been growing rapidly in new territories such as South Korea, Mexico, the Philippines, Poland, Lithuania, and the Ukraine,[2] insurance products are only sold to members in the United States and Canada.  In order to fraudulently disguise the drop in its number of potential *insurable* members, KC Supreme intentionally does not disclose a membership breakdown by country. Instead, it fraudulently presents only that its *overall* membership is increasing as evidence that its insurance risk-pool is healthy.

41.     Defendants self-report these deceptive membership and demographic numbers to the insurance rating industry each year.  Despite accepting KC Supreme's fraudulent, self-reported membership numbers and demographic status as true, on September 9, 2016 insurance rating agency A.M. Best still revised its outlook on KC Supreme to "negative," citing its "decline in first-year single premiums"—a symptom of a decreasing and aging membership.  If A.M. Best received the true numbers and trends of KC Supreme's risk-pool, their credit rating would plunge.

42.     As a result of this ongoing, fraudulent scheme, KC Supreme is able to deceive members into believing it deserves its high insurance rating, obtains reinsurance at reduced rates, and induces partner companies like UKnight into focusing on what they are falsely led to believe is a large and growing membership pool.  UKnight certainly would not have focused solely on serving the Knights of Columbus at the expense of other organizations if it had been told the

---

[2] At the 134th Supreme Convention in 2016, Supreme Knight Carl Anderson announced (as reported on KC Supreme's website) that "the Knights of Columbus has seen impressive membership growth in new areas such as Ukraine, Lithuania and Poland."

truth:  the entire Knights of Columbus organization may very well be on the verge of financial collapse.

### E.    KC Supreme Breach Agreement With UKnight And Steal Trade Secrets

43.    Meanwhile, at some point Defendant Thomas Smith, despite having never met or spoken with Mr. Labriola, purported to develop an extreme personal animosity against him.  This animosity increased until, on January 24, 2014, in a meeting with the KC Supreme Operations Committee in New Haven, Connecticut, Mr. Smith told the committed that Mr. Labriola had lied *to him and to his agents* about money.  These statements were false, and Mr. Smith knew them to be false when he made them to the committee.

44.    This very same meeting with the KC Supreme Operations Committee was supposed to include the long-awaited formal announcement by KC Supreme that UKnight was its designated vendor.  However, in his role as Chief Insurance Officer, Defendant Smith's defamatory statements against Mr. Labriola, and by association UKnight, poisoned the atmosphere against UKnight.  Mr. Smith proceeded to refuse to allow the announcement to go forward at this meeting.  Later events reveal that Mr. Smith and the other Defendants were manufacturing reasons to delay the announcement so that they could replicate UKnight's product themselves and prevent UKnight's system from exposing the extent of their membership number fraud.

45.    Instead of making the announcement as promised, Mr. Smith demanded that UKnight agree in writing that Mr. Labriola would never again speak with UKnight's most important customers, specifically (1) anyone at KC Supreme in New Haven, (2) any general agent of the Knights of Columbus, or (3) any Knights of Columbus state council officer.  By

separating Mr. Labriola from relationships he had made over several years, Mr. Smith and Mr. St. John would gradually be able to take control of the platform UKnight developed, provided that they could learn the inner workings of the UKnight system.

46.     Without understanding why Mr. Smith was expressing such animosity toward Mr. Labriola, but in an effort to maintain their business relationship, UKnight agreed to these demands by corporate resolution.

47.     After Mr. Smith's defamatory statements had created doubt in the mind of the KC Supreme leadership, KC Supreme retained technology consultant Ian Kinkade to evaluate the UKnight system.  Mr. Kinkade's comments back to the Supreme Council were favorable, and his report motivated the KC Supreme Operations Committee to again vote to move the project forward.  However, the Committee reversed its decision the next day and instead called for a complete survey of all current UKnight subscribers.

48.     Again, in an effort to appease KC Supreme and move the process forward, UKnight provided a complete and unvetted list of every single UKnight subscriber.  The survey responses overwhelmingly confirmed that UKnight was an outstanding tool—it noted that UKnight was easy to use, effective, had very responsive customer service, and helped to increase local council membership and participation.  Additionally, the survey revealed that the UKnight system was directly responsible for significant increases in sales of insurance products among subscribing general agents.

49.     With these survey results in hand by the summer of 2014, UKnight again waited to be contacted about the formal announcement of its designated vendor status, and again they were given repeated assurances by KC Supreme that the announcement was imminent.

Reasonably believing that the leadership of the world's largest Catholic charitable fraternity would not be misleading them, UKnight and its management continued their commitment to serve the Knights of Columbus and waited.  But there was no announcement.

50.     Then, at an insurance sales conference in early 2015, Supreme Knight Carl Anderson saw a presentation on the effectiveness of UKnight's membership invitation program. The Supreme Knight again instructed that UKnight be put on the front burner, and again Mr. Kinkade was retained by KC Supreme to work with UKnight.

51.     Mr. Kinkade traveled to Dallas with members of the KC Supreme Operations Committee to meet with UKnight partner and technology manager Terry Clark.  However, when the members of the committee left, Mr. St. John specifically instructed Mr. Kinkade to stay behind to work with Mr. Clark and dive deeper into the inner workings of the UKnight system. During one of their days of meetings the true intent of KC Supreme became clear.   At approximately 1:30 p.m. on June 2, 2015, Mr. Kinkade received an email on his laptop which was open in front of him.  He then told Mr. Clark that this email was "really bad, and I don't want you to think I had anything to do with it."  With that, he showed Mr. Clark the email that had just come in from Matthew St. John, KC Supreme's Director of Insurance Marketing.  In the email, Mr. St. John expressly instructed Mr. Kinkade to get the specs for at least two of UKnight's proprietary systems *so that Mr. St. John could have another developer build the system for them*!  One of these systems was the member invitation program that his Supreme Knight, Carl Anderson, had found so valuable.

52.     As discussions continued, UKnight proposed that it follow industry-standard protocol to protect its proprietary information and asked that Mr. St. John send it a "scope of

work" document.   Mr. St. John repeatedly refused.  Unaware that Mr. Kinkade had shown UKnight his prior email, Mr. St. John then demanded that UKnight provide him with all of UKnight's strategies, design data, and internal system information—essentially all of UKnight's trade secrets.  In a clear attempt to deceive UKnight, Mr. St. John falsely stated to Mr. Clark and Mr. Labriola that he only needed this information to make sure KC Supreme understood exactly what UKnight planned to do and how they planned to do it so that he could approve going forward.   UKnight, of course, declined this request, and instead continued to propose that its technology manager Mr. Clark and director Mr. Labriola fly to New Haven to work collaboratively with Mr. St. John's team to resolve any concerns.

53.     This proposal was ignored.  On December 31, 2015, KC Supreme's Director of eBusiness Denise Serafini, who had been working closest with UKnight and had repeatedly advocated for UKnight within her organization, retired.  On the *very next business day*, January 4, 2016, Mr. St. John emailed Mr. Labriola and Mr. Clark.   To the shock of UKnight's management, this email now fraudulently claimed that the parties "have not had any contractual relationship," and that "the Knights of Columbus has never conferred official or preferred vendor status on UKnight."  These lies were a transparent attempt to get UKnight to simply fade off into the sunset.  Then, Mr. St. John revealed that "[KC Supreme] has chosen to enlarge its exploration of potential website vendors," and that UKnight could no longer use the Knights of Columbus name in offering its product to any potential new council or agent subscribers.

54.     Then, KC Supreme hired Mr. Kinkade to become their new Director of eBusiness—the very person they had sent to investigate the inner workings of UKnight's system. Finally, in April of 2016, KC Supreme sent a Request for Proposal (RFP) to several other

potential vendors, which included specific design elements and internal workings of the system UKnight had developed for the Knights of Columbus and that were observed by Mr. Kinkade or disclosed by UKnight in reliance on KC Supreme's repeated promises that UKnight had already been selected as its designated vendor.

55.     Defendants took these actions despite having previously and unequivocally stated to UKnight that it had always been very cooperative and accommodating, that its customer Knights of Columbus councils were very satisfied with every aspect of UKnight's services, that it had helped their insurance agents become more successful, and that they felt UKnight was underpricing its services and should actually *double* the fees it charged each Knights of Columbus subscribing council given the value that UKnight provided.

56.     Defendants KC Supreme, Mr. Smith, and Mr. St. John, as outlined in this complaint, acted willfully, wantonly, and maliciously with the *knowledge* that their actions would destroy UKnight as a company, and with the *specific intent* to achieve exactly that result so that UKnight's system would not uncover and reveal Defendants' fraud.


## FIRST CLAIM FOR RELIEF
**(Violation of 18 U.S.C. § 1962(c) – By UKnight Against All Defendants)**


57.     Plaintiffs incorporate all of the allegations of this Complaint as if fully rewritten herein.

58.     Here, all Defendants are RICO persons within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

59.     At all relevant times, the Knights of Columbus fraternity as a whole, including the KC Supreme council, its officers and directors, the state councils, local councils, assemblies, independent insurance agents, and members constituted an "association-in-fact" enterprise as defined in 18 U.S.C. § 1861(4), consisting of thousands of individuals and separate legal entities. At all relevant times, this enterprise has been engaged in, and its activities affected, interstate and foreign commerce.   Such enterprise furnished the vehicle for the commission of a pattern of racketeering activity by Defendants.

60.     The enterprise, consisting of the Knights of Columbus fraternity as a whole, has a unifying purpose:   to bring together "practical Catholic men" for the mutual benefit of its members in fraternity, and to engage in charitable work and giving.   The enterprise has a relationship among those associated with it in that each is a Catholic man engaged in charitable work, fraternity, and mutual benefit, or a council of such men coming together to fulfill the purpose of the enterprise as a whole.   The enterprise, established in 1882 and in continuous operation since that time, has sufficient longevity to permit these associates to pursue the enterprise's purpose.   Additionally, the enterprise has an ascertainable structure consisting of its Catholic faith, its lodge-system, its fraternal nature, and its focus on charitable giving and volunteer work that is wholly distinct from that inherent in the fraudulent scheme evidenced by Defendants' conduct of the pattern of racketeering activity described below.

61.     Defendant KC Supreme is associated with the enterprise and manages its central operations and insurance activities.   Defendants Smith and St. John are also associated with the enterprise as officers and directors of KC Supreme, and assisted in the management and operations of the affairs of the enterprise including its insurance activities.   All Defendants

conducted and/or participated in the conduct of the Enterprise's affairs, directly or indirectly, through a pattern of racketeering activity as outlined in this Complaint.  These Defendants are separate and distinct from the enterprise itself.  KC Supreme is a separate legal entity from the Knights of Columbus fraternity (itself comprised of over 15,000 distinct legal entities), and is the only portion of the Knights of Columbus system that issues insurance policies.  KC Supreme is an insurance company and the 925th largest company in the world.  In contrast, the individual local councils of the Knights of Columbus are distinct legal entities engaged primarily in volunteer work and charitable fundraising, and their members are simply "practical catholic men over the age of 18."  Defendants Smith and St. John are distinct from the enterprise itself as they are individuals and officers/directors of KC Supreme.

62.    Alternatively, Defendants Smith and St. John conducted and/or participated in the conduct of the Enterprise's affairs, directly or indirectly, through a pattern of racketeering activity as outlined in this Complaint.  They are distinct from the enterprise themselves as they are individuals and officers/directors of KC Supreme.

63.    As outlined below, Defendants engaged in an ongoing pattern of numerous predicate acts of racketeering as defined in 18 U.S.C. § 1961:

**A.    Theft And Attempted Theft Of Trade Secrets**

64.    Defendants illegally engaged in the racketeering acts of attempting to steal and stealing UKnight's trade secrets, in violation of 18 U.S.C. § 1832.

65.    The proprietary system designed by UKnight and offered for subscription to the Knights of Columbus constitutes a protected trade secret, as explained in Paragraphs 108-110, *infra*, intended for use in interstate and international commerce pursuant to 18 U.S.C. § 1832.

66.     Defendants KC Supreme, Thomas Smith, and Matthew St. John, for their economic benefit, and intending and knowing that their actions would injure UKnight, stole, appropriated without authorization, and by fraud and deception obtained UKnight's trade secrets.

67.     Mr. Smith, acting as an officer of KC Supreme, knowingly, intentionally, and repeatedly sabotaged the announcement of UKnight as designated vendor to permit Defendants to steal these trade secrets for themselves.

68.     Mr. Smith additionally fabricated the need for technical evaluations of UKnight's proprietary system to create a pretense to allow his agent Mr. Kinkaid to gain access to UKnight's trade secrets.

69.     Mr. St. John, acting as an officer and employee of KC Supreme, instructed his agent Mr. Kinkade to steal UKnight's trade secrets.

70.     KC Supreme, Mr. Smith, and Mr. St. John then conspired to hire Mr. Kinkade to acquire his knowledge of UKnight's trade secrets.

71.     Mr. St. John then demanded UKnight send all of its trade secrets to him under the fraudulent pretense of needing this information to approve the announcement of UKnight as designated vendor, constituting an attempt to steal whatever portions of UKnight's trade secrets Mr. Kinkade had not already acquired.

72.     Mr. St. John and KC Supreme then transferred these trade secrets to third parties by issuing an RFP for other companies to reproduce UKnight's proprietary system based on this stolen information, and, upon information and belief, by hiring one of these companies to develop a system for KC Supreme based directly upon UKnight's trade secrets.  The basis for Plaintiff's belief is that Defendants, during settlement negotiations, sought to have Plaintiff

indemnify an unnamed third-party developer, the only reasonable explanation for which is that KC Supreme communicated the stolen trade secrets to this third party.

73.     Through this theft of UKnight's trade secrets, Defendants have enabled the enterprise to avoid the sum total of all monies potentially paid by and through the Knights of Columbus fraternity to UKnight.

**B.     Interstate Transport Of Stolen Goods**

74.     Defendants illegally engaged in the racketeering acts of transporting UKnight's stolen trades secrets across state borders in violation of 18 U.S.C. §§ 2314 and 2315.

75.     Defendants sent Mr. Kinkade to Dallas, Texas to steal UKnight's trade secrets, arranged for his travel back to New Haven, Connecticut, and subsequently hired him to work for KC Supreme in New Haven.  In so doing, Defendants transported these stolen wares, which are valued at well in excess of $1 million, across state lines in violation of 18 U.S.C. § 2314.

76.     Defendants additionally transported UKnight's trade secrets across state lines by sending this information to other software developers outside Connecticut as part of their RFP process, and, upon information and belief, sending this information to their new development partner to copy, all in violation of 18 U.S.C. § 2314.

77.     Finally, by receiving in Connecticut this stolen information Mr. Kinkade obtained in Texas, Defendants have received stolen wares valued well in excess of $1 million from across state lines in violation of 18 U.S.C. § 2315.

78.     Through this theft of UKnight's trade secrets, Defendants have enabled the enterprise to avoid the sum total of all monies potentially paid by and through the Knights of Columbus fraternity to UKnight.

**C.      Wire Fraud**

79.      Defendants illegally engaged in the racketeering acts of wire fraud in violation of 18 U.S.C. § 1343.

80.      Defendants devised and executed a scheme to defraud vendors such as UKnight, to defraud and obtain money from insurance customers, and to defraud reinsurers and ratings agencies by fraudulently inflating the size and demographic structure of their member insurance risk-pool.

81.      Defendants used the US interstate wire system in furtherance of this scheme to defraud by:

    a.      Continuously marketing KC insurance products online, such as by KC Supreme publishing on its website the materials at http://www.kofc.org/un/en/insurance/index.html to market insurance products continuously to hundreds of thousands of member-visitors.

    b.      Continuously attempting to induce its members to purchase KC Supreme insurance products by falsely stating on its website that "[w]hile other companies were making ethically questionable and unnecessarily risky decisions, we were not." Unquestionably, the intentional deception of its own customers as to the risk of the insurance products sold by KC Supreme is an unethical decision.

    c.      Continuously advertising false and misleading membership numbers online to its members while intentionally failing to disclose the number of *insurable* members in the US and Canada in order to fraudulently induce members to purchase insurance products, such as at their website where KC Supreme falsely clams that "[m]ore than 1.9 million men in over a dozen countries across the globe are proud to call themselves Knights." In fact, after accounting for "phantom" members in the US and Canada, the Knights of Columbus membership numbers are materially lower than stated, and the number of insurable members in the US and Canada are a *shrinking* portion of this membership.

     d.     Similarly, on a May 5, 2010 press release on the KC Supreme website (that has remained continually published on the KC Supreme website through the date of this filing), Defendants state that the Knights of Columbus saw over 45,000 *new* members in 2010 (not net membership *growth*), while intentionally omitting the large number of members who died or withdrew in the US during that same time.  In fact, after addressing phantom members, withdrawals, and deaths the net membership numbers shrank during this period.

     e.     Using the interstate wires to submit these false membership numbers and trends to insurance rating agencies such as A.M. Best on an annual basis, which resulted in KC Supreme fraudulently obtaining A.M. Best's A++ rating.

82.     Defendants knew that the UKnight system worked and was effective at helping increase membership and sell insurance products—something they desperately needed. However, they found themselves stuck between a rock and a hard place in light of their fraud noted above, because the UKnight system would have necessarily resulted in the identification and elimination of "phantom members" and duplicate members who had moved councils. Defendants knew that they had to stall the UKnight system deployment until they could ultimately kill it and recreate its functionality under their own control in order to cover up their fraud while still deriving the benefits of the system.  Accordingly, Defendants' fraudulent actions described herein were with the specific intent to defraud UKnight.

83.     Defendants additionally devised and executed a scheme to defraud UKnight into revealing its trade secrets, and into accepting repeated delays in announcing it as the designated vendor, using the US interstate wires in furtherance of this scheme by:

     a.     KC Supreme's Communication Director Andrew Walther's November 2013 statement relayed by Ms. Serafini to Mr. Labriola by phone falsely stating that the formal announcement of UKnight as designated vendor had to be postponed due to the recent

typhoon in the Philippines, when he in fact knew that he was not prepared to make the announcement.

b. KC Supreme's Director of eBusiness Denise Serafini's December 12, 2013 email reply to Mr. Labriola falsely stating that delays were caused by an unexpected staff resignation, and that "we can get back to business in the next few days," when KC Supreme in fact knew that no announcement was imminent, or at least that it did not know whether an announcement was imminent or whether it was possible to 'get back to business' at all.

c. Mr. St. John's June 2nd, 2015 email to Mr. Kinkade instructing him to obtain UKnight's trade secrets in furtherance of Defendants' scheme to defraud UKnight of their property.

d. Mr. St. John's June 2015 phone call with Terry Clark and Leonard Labriola where he demanded that UKnight send him all of their trade secret information under the false pretense that this was to approve their partnership going forward, when in fact the purpose of this request was to steal the remainder of UKnight's trade secrets.

e. Mr. St. John's July 10, 2015 phone conversation with Mr. Labriola where, despite ordering the theft of UKnight's trade secrets just a month prior, he reassured Mr. Labriola that he will tell all of the local councils "this [UKnight] is the only system they're going to get . . . with Supreme Council backing," and that "85% [of all councils] . . . you're going to get [to subscribe]." In fact, at this time Mr. St. John already knew that KC Supreme was not going to announce UKnight as its designated vendor, and he and the other Defendants had already initiated their plan to steal UKnight's trade secrets and hire a third-party developer to produce a copy of UKnight's system for them.

f. Mr. St. John's January 4, 2016 email to Mr. Labriola and Mr. Clark falsely stating that the parties "have not had any contractual relationship" and falsely stating that "[KC Supreme] never conferred official or preferred vendor status on UKnight" made for the purpose of furthering Defendants' scheme to defraud UKnight of its property. In fact, Mr. St. John knew that a contractual relationship did exist between KC Supreme and UKnight, that UKnight was an official vendor of KC Supreme, and that KC Supreme had conferred preferred vendor status on UKnight (even if the formal announcement was never made).

g.      Mr. St. John's April 2016 RFP emailed to numerous potential vendors other than UKnight soliciting a developer to build a copy of UKnight's system based on its stolen trade secrets, which was in furtherance of Defendants' scheme to defraud UKnight of its property.

**D.      Receipt Of Funds Obtained By Fraud**

84.      Defendants engaged in the racketeering acts of receiving funds obtained by fraud in violation of 18 U.S.C. § 2314.

85.      As a result of their scheme to fraudulently skew the size and demographic structure of their insurance member risk-pool, as described above, Defendants fraudulently induced hundreds of thousands of members of the Knights of Columbus to send monthly insurance premium payments from all 50 states and Canada to KC Supreme in Connecticut, in the aggregate amount of hundreds of millions of dollars per year.

**E.      Financial Institution Fraud**

86.      Defendants engaged in the racketeering acts of financial institution fraud in violation of 18 U.S.C. § 1344 by obtaining funds under the custody & control of financial institutions through a fraudulent scheme.

87.      As outlined above, Defendants engaged in a scheme to fraudulently induce members of the Knights of Columbus to purchase life insurance products from KC Supreme and to make and continue making monthly payments in furtherance thereof.

88.      As a result of this scheme to defraud, hundreds of thousands of members of the Knights of Columbus make monthly payments to KC Supreme from their personal checking accounts, which monies come out of the custody or control of countless banks throughout the United States and Canada and are obtained by KC Supreme.

89.     Defendants maintain sole custody and control of the vast majority of the details surrounding their fraudulent statements, and have intentionally concealed information and data that will, upon information and belief, further support and expand the allegations of fraud contained above.

### F.     Racketeering Acts Comprise A Pattern Of Racketeering Activity

90.     The racketeering acts engaged in by Defendants form a pattern because they are related in nature, continued over a period of at least five years, and will continue for the foreseeable future.

91.     The racketeering acts listed above are related because they served a similar purpose and have similar results:  to artificially inflate the membership ranks and artificially skew the demographic structure of the Knights of Columbus insurance risk-pool, and to wrongfully bring under the control of Defendants the tools developed by UKnight to prevent this system from revealing their fraud and to enhance their ability to effectively continue this fraud. These acts are further related because they have the same participants—Defendants KC Supreme, Mr. Smith, and Mr. St. John, as well as the personnel within the Knights of Columbus involved in the reporting of member numbers and demographics.  And these acts are additionally related as they have the same set of victims and methods of commission:  member insurance customers, reinsurers, and vendors such as UKnight are fraudulently deceived as to the size and vibrancy of the Knights of Columbus membership in order to induce them to rely on Defendants. This pattern protects the financial position of and enriches the Defendants.

92.     The racketeering activity engaged in by Defendants has continued unabated for at least the more than five years that UKnight was directly involved with them.  During this entire

period Defendants have engaged in racketeering activity to artificially inflate the insurable membership numbers of the Knights of Columbus, and have used these inflated numbers to induce members to purchase insurance and to induce UKnight to remain committed to KC Supreme while Defendants conspired to steal from UKnight the technology needed to further control and manipulate their membership data.   This pattern also threatens to continue for an indefinite duration, as it has become the regular method (even if known only to the select few Defendants) for the enterprise to conduct this critical aspect of its business.   Defendants show no intention of stopping their practice of fraudulently inflating their insurable membership numbers—in fact, all of the above internet representations listed in this Complaint remain on KC Supreme's website as of the time of this filing.   Additionally, because KC Supreme is actively seeking a new vendor to implement an internal system using UKnight's stolen trade secrets, this activity is ongoing.

### G.   Proximate Injury To Plaintiff UKnight

93.   Plaintiff UKnight has been directly, concretely, and proximately injured in its business and property as a result of the foregoing overt acts in furtherance of the conspiracy, and as a result of the racketeering acts outlined above.   By Defendants' racketeering acts, UKnight was wrongfully induced to enter into a contractual relationship with KC Supreme, was wrongfully induced to focus exclusively on KC Supreme and to endure its scheme of delays due to the potential for and promises of substantial (but illusory) business, all of which led to UKnight being set up and pilfered of its trades secrets by Defendants so that they could use UKnight's product to maintain and enhance their ability to continue their conspiracy.

94.     Plaintiff's damages as a result of Defendants' racketeering activity are in an amount to be determined at trial.

WHEREFORE, Plaintiffs seek relief as set forth at the end of this Complaint.


## SECOND CLAIM FOR RELIEF
### (Breach of Contract – By Plaintiff UKnight Against Defendant Knights of Columbus)

95.     Plaintiff incorporates all of the allegations in this Complaint as if fully rewritten herein.

96.     KC Supreme and UKnight entered into an express contract on September 10, 2011, that could be performed in less than one year.  Indeed, KC Supreme's only performance obligation was to announce UKnight as its designated vendor and direct its state and local councils, assemblies, and agents to subscribe to the UKnight system.  This contract was confirmed by numerous emails, including from Denise Serafini stating that "the Supreme Knight thought this was done last year."

97.     In the alternative, a contract between KC Supreme and UKnight must be implied in fact here based on the course of dealing of the parties as outlined above.

98.     This contract contained adequate consideration in the form of mutual exchange of promises by both sides, including KC Supreme's promise to announce UKnight as its designated vendor, and UKnight's agreement to let KC Supreme redesign portions of the graphical interface and add legal disclaimers to their web platform to meet KC Supreme's specific wishes.

99.     Defendant failed to perform its obligation under that contract by never formally announcing that UKnight was its designated vendor, and never directing state and local councils, assemblies, and agents to subscribe to the UKnight system.

100.    Plaintiff substantially performed all of its obligations under the contract.

101.    Plaintiff suffered damages as a result of this breach by Defendant in the form of lost revenues and profits from subscription fees, its lost share of advertising and fundraising revenues, missed business opportunities while it focused on preparing exclusively to serve the Knights of Columbus, and other economic damages in an amount to be proven at trial.

WHEREFORE, Plaintiff seeks relief as set forth at the end of this Complaint.


**THIRD CLAIM FOR RELIEF**
**(Promissory Estoppel – By Plaintiff UKnight Against Defendant Knights of Columbus)**

102.    Plaintiffs incorporate all of the allegations in this Complaint as if fully rewritten herein.

103.    Defendant KC Supreme made numerous promises to UKnight, including:

a.      The promise by KC Supreme on September 10, 2011 that it would announce UKnight as its designated vendor and instruct all state and local councils to subscribe to the UKnight system.

b.      The promise by KC Supreme in September 2011 that the announcement of UKnight as designated vendor would take place in February 2012.

c.      Ms. Serafini's promise that KC Supreme was committed to the deal by stating that "the Supreme Knight thought this was done last year," that "he knows this (the announcement of UKnight as the designated vendor) is the right thing to do," and telling Mr. Labriola that the Supreme Knight had instructed that this was to be "done yesterday."

d.      Andrew Walther's promise in July of 2013 that UKnight had already been selected as the designated vendor, that all preparations were already completed for the announcement, and that the formal announcement would take place at the International State Deputy meeting in November 2013.

e.  Supreme Knight Carl Anderson's promise in mid-August 2013 that he would make the formal designated vendor announcement personally, and that it would make a "big splash."

f.  KC Supreme's promise, in response to inquiries about delays, that the deal was "etched in stone" and the announcement was imminent.

g.  Ms. Serafini's promise, on December 12, 2013, in response to Mr. Labriola's inquiry about whether KC Supreme was trying to back out of the deal, that this was not the case, and that "we can get back to business in the next few days."

104.    Defendant KC Supreme should have, and did, reasonably expected these promises would induce UKnight to take definite and substantial actions to its detriment by preparing for this increased workload, investing in their internal infrastructure, accepting delays, forbearing from accepting work from other potential customers, and forbearing from seeking out additional partners organizations.  UKnight did, in fact, reasonably rely on these promises to their detriment by taking such actions and forbearing from such actions.

105.    Indeed, in a July 28, 2015 phone conversation between Mr. St. John and Mr. Labriola, Mr. St. John confirmed that he understood that "[UKnight] are a company that solely exist for us [the Knights of Columbus]," acknowledging that the very existence of UKnight depended on Defendants keeping their promises.

106.    In the circumstances presented in this Complaint, Defendant's promises must be enforced to prevent injustice.

WHEREFORE, Plaintiffs seek relief as set forth at the end of this Complaint.

**FOURTH CLAIM FOR RELIEF**
**(Violation of C.R.S. § 7-74-101, *et seq*. – Misappropriation of Trade Secrets – By Plaintiff**
**UKnight Against Defendant Knights of Columbus and Matthew St. John)**

107.    Plaintiff incorporates all of the allegations in this Complaint as if fully rewritten herein.

108.    Plaintiff UKnight developed extensive trade secrets consisting of their platform's relational architecture, database relationships, information flow scheme, and the programming and code underpinning these elements of the platform's software, as well as the related hardware architecture design developed specifically to meet the unique needs of the Knights of Columbus organization over a period of over 8 years. These designs, technical information, processes, procedures, and architecture constitute protected trade secrets within the meaning of C.R.S. § 7-74-102.

109.    Plaintiff made reasonable commercial efforts under the circumstances to maintain the secrecy of these trade secrets, including (1) advising all partners within UKnight that this information constitutes trade secrets; (2) access to these trade secrets was strictly limited on a need-to-know basis with access limited exclusively to UKnight member and technology manager and designer Terry Clark and to his assistant Jim Goode who was required to sign a binding non-disclosure agreement before being given access to this information; (3) access to the computer systems containing the trade secrets was controlled by secure login and password known only to Mr. Clark.  Additionally, Plaintiff's trade secrets are novel, not generally known, and cannot be ascertained or reverse engineered without tremendous effort, expertise, and expense.  This is demonstrated by the fact that no other vendor was able to offer to KC Supreme a comparably capable system even at double the price, and ultimately KC Supreme chose to steal Plaintiff's

trade secrets rather than attempt to develop their own system or reverse engineer Plaintiff's from the publicly viewable façade of the system.

110.    Plaintiff's trade secrets have economic value in excess of $1 million, as demonstrated (1) by the fact that it took approximately 8 years of effort by UKnight's three partners to develop the trade secrets, including nearly full-time technical development by Mr. Clark over that time; and (2) these trade secrets granted UKnight substantial competitive advantage in the field, as shown by KC Supreme's immediate interest in their system and later KC Supreme's extraordinary efforts to steal these trade secrets rather than simply develop a comparable system on its own.

111.    As stated in detail in Paragraphs 64-83, above, KC Supreme and Matthew St. John knowingly, intentionally, fraudulently, and maliciously acquired Plaintiff's trade secrets by improper means and disclosed those improperly acquired trade secrets to a third-party without any consent from Plaintiff.  Defendants' improper means included, but were not limited to, theft, bribery, misrepresentation, and breach of a duty to UKnight to maintain secrecy.

112.    As a direct result of this misappropriation, Plaintiff suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiff seeks relief as set forth at the end of this Complaint.

### FIFTH CLAIM FOR RELIEF
**(Intentional Interference with Prospective Business Relations – By Plaintiff UKnight Against Defendant KC Supreme)**

113.    Plaintiffs incorporate all of the allegations in this Complaint as if fully rewritten herein.

114.    As a result of KC Supreme's contract with and promises made to UKnight, KC Supreme knew that UKnight had a reasonable expectation of entering into subscription business relationships with a high percentage of Knights of Columbus local councils, assemblies, and general agents.  In fact, Mr. St. John told Mr. Labriola that he expected "you're going to get . . . 85% [of all councils]."

115.    Defendant KC Supreme intentionally and improperly interfered with these prospective business relationships of UKnight by, among other things:

    a.    Inducing or otherwise causing the local councils, assemblies, and general agents to not subscribe to the UKnight system by defaming UKnight and Mr. Labriola;

    b.    Inducing or otherwise causing the local councils, assemblies, and general agents to not subscribe to the UKnight system by unreasonably and fraudulently postponing the announcement of UKnight as the designated vendor repeatedly over a period of four years;

    c.    Preventing UKnight from acquiring the prospective subscribers by falsely and wrongfully telling UKnight it was not an approved vendor for the Knights of Columbus, and falsely and wrongfully telling UKnight that it was not permitted or licensed to use the Knights of Columbus name in delivering its system to any new Knights of Columbus subscribers;

    d.    Stealing UKnight's trade secrets and engaging a third-party developer to create a copy of that system that KC Supreme would own so that it could provide these services directly in lieu of UKnight.

116.    These wrongful and intentional actions induced 10,000 or more councils, assemblies and general agents to not subscribe to the UKnight platform, causing economic damages to UKnight in an amount to be proven at trial.

WHEREFORE, Plaintiff seeks relief as set forth at the end of this Complaint.

**SIXTH CLAIM FOR RELIEF**

**(Fraudulent Misrepresentation – By Plaintiff UKnight Against Defendant KC Supreme)**

117.    Plaintiffs incorporate all of the allegations in this Complaint as if fully rewritten herein.

118.    Defendant made false representation of past or present facts to UKnight, including those listed in Paragraphs 78-83, above.

119.    Defendant additionally made fraudulent statements of future intention or promise despite knowing that it did not intend to keep the promise or did not intend to take the action promised in the future at the time the statement(s) were made, including those listed in Paragraph 103, above.

120.    Each of these fraudulent statements concerned a material fact, as a reasonable person under the circumstances would have regarded each of them as important in making business decisions and deciding on UKnight's future course of action.

121.    Each of these fraudulent statements was made by an employee, officer, or director of KC Supreme acting within the scope of their employment by Defendant.  Accordingly, Defendant is responsible for these statements.

122.    At the time each of the above misrepresentations was made, the Defendant knew that it was false or was aware that it did not know whether the representation was true or false. Defendant KC Supreme made each of the above representations with the intent that Plaintiff would rely on them to its detriment, and to the benefit of KC Supreme.

123.    Plaintiff in fact relied upon these representation by taking actions it would not have otherwise taken, or not taking actions it would have otherwise taken, as stated in this

Complaint.  Plaintiff's reliance on each of these misrepresentations was reasonable and justified under the circumstances.

124.    Plaintiff's reliance on each of these misrepresentations directly and proximately caused it economic damages, including lost revenues and profits, the economic burden of accepting delays without seeking other business in order to focus on serving the Knights of Columbus, the refusal of outside work and the business decision to not seek other clients, and other economic damages in an amount to be proven at trial.

WHEREFORE, Plaintiff seeks relief as set forth at the end of this Complaint.

### SEVENTH CLAIM FOR RELIEF
**(Negligent Misrepresentation – By Plaintiff UKnight Against Defendant KC Supreme)**

125.    Plaintiffs incorporate all of the allegations in this Complaint as if fully rewritten herein.

126.    Defendant, in the course of its business and in regards to a transaction in which it had a pecuniary interest, supplied false information for the guidance of Plaintiff in this business transaction, including the information contained in the statements listed at Paragraphs 79-83, and 103, above.

127.    Each of these false statements was made by an employee, officer, or director of KC Supreme acting within the scope of their employment by Defendant.  Accordingly, Defendant is responsible for these statements.  Defendant failed to exercise reasonable care as to the truth and accuracy of each of these statements in communicating them to Plaintiff.

128.    Plaintiff reasonably and justifiably relied on this information to its detriment as stated in this Complaint.

129.     Plaintiff's reliance on each of these misrepresentations directly and proximately caused it economic damages, including lost revenues and profits, the economic burden of accepting delays without seeking other business in order to focus on serving the Knights of Columbus, the refusal of outside work and the business decision to not seek other clients, and other economic damages in an amount to be proven at trial.

WHEREFORE, Plaintiff seeks relief as set forth at the end of this Complaint.


**EIGHTH CLAIM FOR RELIEF**
**(Defamation – Slander *Per Quod* – By Plaintiffs UKnight and Leonard Labriola against Defendants Thomas Smith and Knights of Columbus)**

130.     Plaintiffs incorporate all of the allegations in this Complaint as if fully rewritten herein.

131.     On January 24, 2014, in a meeting with the KC Supreme Operations Committee in New Haven, Connecticut, Defendant Thomas Smith told the committed that Mr. Labriola had *lied to him and to his insurance agents* about money.  This statement was false when made, and Mr. Smith knew it to be false when made.  Indeed, Mr. Smith made this statement with the intent of defaming Mr. Labriola and UKnight to prevent KC Supreme from adopting the UKnight system, which would have inevitably uncovered Defendants' fraudulent scheme as outlined in this Complaint.

132.     Defendant Thomas Smith made this statement both in his individual capacity and on behalf of Defendant KC Supreme as he was speaking within the scope of his duties as its officer.

133.    The statement was defamatory because it harmed Mr. Labriola's and UKnight's reputation in the estimation of at least a substantial and respectable minority of the potential subscriber base for UKnight, including state and local councils, assemblies, and insurance agents.

134.    Because this defamatory statement poisoned the relationship between Mr. Labriola and UKnight and many of its prospective customers causing them to not subscribe to the UKnight system, its publication directly and proximately caused monetary damages to Plaintiffs in an amount to be proven at trial.

WHEREFORE, Plaintiffs seek relief as set forth at the end of this Complaint.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request judgment in their favor, and against Defendants, jointly and severally, as follows:

A.    Economic damages to Plaintiffs in an amount to be proven at trial;

B.    Treble damages on Plaintiff's civil RICO claim pursuant to 18 U.S.C. § 1964;

C.    Statutory damages on Plaintiff's misappropriation of trade secrets claim pursuant to C.R.S. § 7-74-104(2);

D.    Reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c), and C.R.S. § 7-74-105;

E.    Costs of suit and pre- and post-judgment interest at the highest allowable legal rates; and

F.    Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  January 24, 2017.

/s/ Jeffrey S. Vail

_____

Jeffrey S. Vail
VAIL LAW LLC
5299 DTC Blvd., Suite 1101
Greenwood Village, CO 80111
Tel/Fax: (303) 800-8237
E-mail:  jvail@vail-law.com
ATTORNEY FOR PLAINTIFFS

Plaintiffs' Address:

List Interactive, Ltd.
1434 Spruce St., #100
Boulder, Colorado 80302

Leonard S. Labriola
179 Salina St.
Lafayette, Colorado 80026