IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 2017-CV-210-RBJ

LIST INTERACTIVE, LTD. D/B/A UKNIGHT INTERACTIVE,

     Plaintiff,

v.

KNIGHTS OF COLUMBUS,
DAVID J. KAUTTER, IN HIS OFFICIAL CAPACITY AS (ACTING)
COMMISSIONER OF THE INTERNAL REVENUE SERVICE

     Defendants.

---

## SECOND AMENDED COMPLAINT AND JURY DEMAND

---

Jeffrey S. Vail
VAIL LAW LLC
5299 DTC Blvd., Suite 1101
Greenwood Village, CO 80111
Tel. (303) 800-8237
Fax. (303) 800-8237
ATTORNEY FOR PLAINTIFF

Dated:  January 11, 2018.

# TABLE OF CONTENTS

NATURE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

GENERAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

FIRST CLAIM FOR RELIEF
(Violation of 18 U.S.C. § 1961, *et seq.*, Racketeer Influenced Corrupt Organizations Act) . . .27

SECOND CLAIM FOR RELIEF
(Injunctive Relief Concerning Knights of Columbus' Tax-Exempt Status) . . . . . . . . . . . . . . . 46

THIRD CLAIM FOR RELIEF
(Breach of Contract) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

FOURTH CLAIM FOR RELIEF
(Promissory Estoppel) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

FIFTH CLAIM FOR RELIEF
(Misappropriation of Trade Secrets) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .61

SIXTH CLAIM FOR RELIEF
(Intentional Interference) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

SEVENTH CLAIM FOR RELIEF
(Fraudulent Misrepresentation) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

EIGHTH CLAIM FOR RELIEF
(Negligent Misrepresentation) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

RELIEF REQUESTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

DEMAND FOR JURY TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Plaintiff List Interactive, Ltd., d/b/a UKnight Interactive ("UKnight"), for its Second Amended Complaint against Defendants Knights of Columbus, and David J. Kautter, in his official capacity as the (Acting) Commissioner of the Internal Revenue Service, states as follows:

## I.   NATURE OF ACTION

1.      This case involves a scheme of racketeering, fraud, deception, theft, and broken promises by the Knights of Columbus ("KC") which destroyed UKnight's business and has cost Plaintiff millions of dollars in losses.  Defendant, who ostensibly runs the country's largest Catholic charitable fraternity, but in fact operates a highly-lucrative insurance company, has systematically deceived its insured-members and Plaintiff in order to prop up the viability of its business and derive substantial economic benefit to itself.

2.      Additionally, this case involves a challenge to the KC's fraudulently-maintained tax-exempt status under 26 U.S.C. § 501(c)(8) directed against the Commissioner of the Internal Revenue Service, as UKnight has been damaged by the enhanced competitive environment created by KC's fraudulent tax exemption, and because this fraudulent tax exemption has permitted KC to escape RICO liability by claiming an organizational unity for which it does not qualify.

3.      Plaintiff seeks compensatory damages in excess of $100 million from KC and an Order from this Court enjoining Mr. Kautter to invalidate KC's tax-exempt status pursuant to 26 U.S.C. § 501(c)(8).

## II.   PARTIES

4.      Plaintiff UKnight is a Colorado limited liability company with its principal place of business located at 1434 Spruce Street, Suite 100, Boulder, Colorado.  The members of

UKnight include Terry Clark, a citizen of Texas, Leonard Labriola, a citizen of Colorado, and Jonathan Michlik, a citizen of Texas. Accordingly, for diversity purposes, UKnight is a citizen of the States of Colorado and Texas.

5.     Defendant Knights of Columbus[1] ("KC") purports to be a 501(c)(8) tax-exempt fraternal organization registered in the State of Connecticut. Its principal place of business is 1 Columbus Plaza, New Haven, Connecticut. In this Complaint, "KC" refers to the Defendant corporation located in New Haven, Connecticut, whereas the "Order" refers to the broader international fraternity of the Knights of Columbus, including all affiliated local councils, assemblies, independent general insurance agents, field agents, and members.

6.     Defendant David J. Kautter, in his official capacity as the (Acting) Commissioner of the Internal Revenue Service, is a representative of the United States federal government, and is located at 1111 Constitution Avenue Northwest, Washington, District of Columbia.

## III.   JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 and 18 U.S.C. § 1962, and because the United States is a defendant. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

---

[1] Defendant KC refers to the parent of the purported 501(c)(8) entity of the Knights of Columbus lodge system (*see* Second Claim for Relief, *infra*), registered with the Connecticut Secretary of State as "Business ID 0257375." The thousands of local councils are independent entities that KC purports fall under its claimed 501(c)(8) tax-exempt status, but that must obtain their own EINs and file their own tax returns. The Knights of Columbus fraternity as a whole (the "Order"), is comprised of KC, local councils, assemblies, field agents, and independent general agents, which are all separate legal entities which can bring suit and be sued, raise and control their own monies, own their own property, etc. These independent components of the Order are distinct legal entities that control themselves, have a purely contractual relationship with KC, and are not subsidiaries of or part of the same corporate family tree as Defendant.

Plaintiff's federal and state law claims arise from the same events and transactions, involve substantially identical issues of fact and law, and are so related to each other that they form part of the same case or controversy under Article III of the United States Constitution.

8.     Additionally, this Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332, as Plaintiff (a citizen of Colorado and Texas) is diverse from Defendant (a citizen of Connecticut), and the amount in controversy is in excess of $75,000.

9.     This Court has personal jurisdiction over Defendant KC as it conducts systematic and continual business in the District of Colorado with Plaintiff, as well as with thousands of Colorado citizens who purchase its insurance, from which transactions this lawsuit directly arises.   Accordingly, Defendant KC is subject to general jurisdiction within this District.

10.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2).   As outlined in this Complaint, a substantial portion of the events and omissions that give rise to Plaintiff's claims, including the ongoing course of business between the parties, and many of the fraudulent schemes and communications outlined herein, occurred within and were directed at Plaintiff within the District of Colorado.

## IV.   GENERAL ALLEGATIONS

### A.     KC Contracts With UKnight For Their Digital Platform

11.     Plaintiff UKnight is a small Colorado company that specifically designed a complex interactive system underlying easy-to-use website templates that link together and serve the specific needs of KC.   UKnight's platform dramatically enhances Defendant's ability to

attract new members to the Order, activate current members, increase fundraising, and increase sales of related financial products.

12.      KC is the parent entity of the Order under IRS guidance as well as a Fortune 1000 insurance company that coordinates with approximately 15,000 independent "councils," or local groups, worldwide with a purported 1.9 million members.  It is associated with the Catholic Church and is engaged in charitable work.

13.      KC was originally founded in 1882 as a Catholic mutual benefit society.  It now purports to be a tax-exempt fraternal insurance company, legally permitted to sell financial products and services to Knights of Columbus members only.  As an insurance company, it announced $8.4 billion in insurance policy sales (benefit value) in 2016, and has over $105 billion in life insurance policies in force.  It is currently ranked by Fortune Magazine as the 925th largest company in the world.

14.      In 2009, UKnight began designing and implementing websites for independent, local Knights of Columbus councils in the Dallas, Texas area.  UKnight's work was so successful at helping local councils increase membership, improve communication with members, and increase sales of insurance products that it was encouraged to make a proposal directly to KC for adoption by the entire Order.

15.      On August 5, 2011, Mr. Labriola sent an email to Denise Serafini, then the Director of eBusiness for KC, outlining UKnight's product and basic proposal for a relationship.  He highlighted the capabilities and functions of UKnight and how its interactive system could bring together the many, fractionated parts of the Order on one online platform,

significantly increase the Order's membership, and increase sales of KC's financial products.

16.     Shortly after receiving the emailed proposal, Ms. Serafini contacted UKnight and invited the company to New Haven, Connecticut for three days of high-level meetings beginning September 8, 2011.  The meetings could not have been more productive because, to the great surprise of KC, UKnight was not only prepared to deliver far more than they had expected, but was also prepared to deliver these services for a price that was less than half of what KC already considered the best price available for far fewer services.

17.     After meetings between executives of KC and UKnight over two days, on September 10, 2011 KC told UKnight that it was their choice as designated vendor for the entire Knights of Columbus fraternity and offered to formally announce UKnight as such in exchange for UKnight accommodating certain requests (such as adding legal disclaimers to the websites) made by the KC legal department and UKnight allowing KC to make certain graphic design changes to its platform.  UKnight accepted this offer, and a contract was formed.  Ms. Serafini even stated that she would like to see this program rolled out by February 2012. Alternatively, subsequent to this meeting the course of dealing between KC and UKnight demonstrated that a contract implied in fact was formed between the parties.  The KC legal department approved the modifications it had requested in June 2012.  The new graphic design and rollout plan were given final approval by KC in August 2012.  UKnight had done everything it had promised, and all that was left was KC's obligations to make the announcement and instruct the Knights of Columbus to adopt the UKnight system.  However,

because of the unexpected resignation of the Pope and other internal issues, KC repeatedly asked, and UKnight repeatedly agreed, to delay this announcement until KC was ready.

18.     Between the agreement made on September 10, 2011 and the completion of graphic design changes and legal approval, Defendant KC could not have been more clear that an agreement *had been reached* and that UKnight had already been selected as the designated vendor.

19.     Both KC's words and their course of dealing with UKnight repeatedly confirmed that the deal was done. Ms. Serafini stated by email on September 12, 2011 that "[w]e're already rolling." KC ceased their efforts to interview any potential alternative designated vendors, ceased in-house efforts to develop the functionalities that UKnight was designated to provide, and paid to have portions of UKnight's graphic interface redesigned to meet their needs, all clearly demonstrating that KC understood that an agreement had already been reached. KC then programmed a member list function specifically designed to interface with the UKnight system to make it easier for local council subscribers to download their membership lists into the UKnight database. KC sent UKnight the necessary data files to bring the claimed 15,392 local councils onto the UKnight network. KC's Director of Insurance, Thomas Smith, Matthew St. John, its Director of Insurance Marketing, and Lynne Toomey, Vice President of Specialized Products all began encouraging insurance agents to subscribe to the UKnight network.

20.     KC had only minimal performance obligations under its contract with UKnight:  formally designate UKnight as the sole approved vendor for the Knights of Columbus fraternity as a whole, and instruct all 15,000+ local councils and assemblies to implement the

system.  Notably, Defendant KC was not required to make any payment to UKnight. Rather, fees for subscriptions to UKnight's services would be paid individually by each subscribing insurance agent, local council, assembly, and others.  KC could have completed its performance obligations in a single day.  Indeed, KC was so pleased with its partnership with UKnight that they immediately proposed the parties expand and deepen this relationship, and the parties began negotiating a *second-stage contract* for a product called the "Supreme Admin Center" which would further integrate UKnight's systems into the broader Order.

C.    **KC Delays Announcement, But Makes Repeated Promises and Assurances**

21.    Despite the clear agreement between the parties on September 10, 2011 that KC would announce UKnight as the designated vendor to all of the Order's local councils, assemblies, and independent agents, the announcement did not come.  Ms. Serafini continued to express repeatedly on behalf of KC that everything was on track, stating: "we are almost there," "the Supreme Knight (CEO of KC) thought this [announcement] was done last year," "the Supreme Knight is very frustrated and wants this [announcement] made yesterday," and that the announcement of UKnight as the designated vendor was imminent.

22.    During this time, UKnight remained committed to providing the best possible service and dedication to KC and the Order as a whole.  Additionally, based on *KC's own numbers and projections* communicated to UKnight, UKnight was anticipating earning annual subscription fees of $300 from roughly 85% of the approximately 12,500 councils and 1,500 general agents and field agents in the US and Canada in the immediate future (over $3.5 million/year), not to mention significantly larger future revenues from advertising through council websites, market centers, and other current and future cooperative fundraising efforts.

Indeed, KC's own internal business analysis unit placed the value to UKnight of this subscription business alone at over $23 million.

23.     Accordingly, in contrast to its original business plan of serving a wide range of clients each under a separate "_____ Interactive" trade name (e.g. "Rotary Interactive," "Elks Interactive," etc.), UKnight turned away substantial firm offers for outside business and ceased marketing to potential additional clients outside of the Knights of Columbus, all to ensure it would be able to dedicate its full attention and resources to serving the Knights of Columbus as soon as the designated vendor announcement was made.  UKnight member Leonard Labriola put several other businesses on hold to focus himself full-time on UKnight.  Similarly, UKnight member Terry Clark allowed all of his existing technology consulting client contracts to lapse in anticipation of needing to dedicate his attention full-time to UKnight following the designated vendor announcement.

24.     After all legal and graphic design approvals were final in August of 2012, the announcement still did not come, this time due to "scheduling" issues within KC, the unexpected resignation of Pope Benedict, and other internal matters.   In each case, KC sought and received approval for these delays with UKnight.  Finally, in July of 2013, UKnight was called to a meeting in New Haven where Andrew Walther, KC Communications Director, reaffirmed unequivocally that (1) UKnight had been selected as the designated vendor; (2) that the announcement of UKnight as the designated vendor would take place at the International State Deputy Meeting that November in Quebec; (3) that every state council in the US and Canada would be required to use the UKnight system; and (4) that KC would instruct all US and Canadian councils and agents to begin using the UKnight system

immediately.  When UKnight asked if it could help with preparations for the announcement, Mr. Walther further assured UKnight that all preparation had already been completed for the announcement scheduled in November.

25.     At this time, KC provided UKnight with their standard vendor contract template to structure plans for the supplemental "Supreme Admin Center" product.  By the end of July 2013, KC Supreme and UKnight had tailored the document, which also recognized the existence of the original September 2011 agreement.   By mid-August the KC legal department had approved the document, including the recognition of the former agreement, and it was sent to Supreme Knight Carl Anderson for signature.  Mr. Anderson then promised that he would make the much-anticipated designated vendor announcement personally, and that he wanted to make sure his announcement made a "big splash."

26.     Again, time passed and UKnight received neither a signed version of the formalized contract nor additional information on the announcement.  In response to repeated inquiries by UKnight, KC repeatedly assured them that despite the lack of a signed document the deal was done, with Ms. Serafini even telling Mr. Labriola that the lack of a signed, formalized agreement didn't matter as the agreement was already "etched in stone."

27.     In reliance on KC's repeated reassurances that the deal was "etched in stone," that all preparations had already been made for the upcoming announcement, and in anticipation of the upcoming November announcement, UKnight spent thousands of dollars bolstering its email capabilities, enhancing its server hardware, and increasing its electronic ACH payment limit to enable it to accept thousands of new council subscriptions at once.

28.     Again, the announcement did not come. KC Director of Communications Andrew Walther told Ms. Serafini after the fact that the announcement could not be made at the November meeting as KC had to focus on humanitarian needs following the recent typhoon in the Philippines, which information was relayed to UKnight.  UKnight only later learned that this was a lie told to string it along.

29.     In December 2013, Mr. Labriola sent a heartfelt email to Ms. Serafini explaining the tremendous hardship these delays had caused to UKnight and to his family personally.  He explained that he and Mr. Clark had not drawn a paycheck in over 30 months, and told her that the vast majority of local councils and agents were awaiting the formal announcement from KC before signing up for UKnight.  He asked directly if the delays in the announcement were any indication that KC wanted out of the deal in any way.  And, again, he was reassured by Ms. Serafini in her email reply that all was on track, that recent delays had merely been the result of unexpected staff resignations, and that "we can get back to business in the next few days."

### D.     Meanwhile, KC Conspires To Fraudulently Inflate Membership Numbers and Characteristics Of Its Insurance Risk Pool

30.     During this same period that UKnight's and KC's relationship was developing, KC, its independent local councils, and outside ratings agencies and software companies worked together to artificially inflate the Knights of Columbus' insurable membership numbers, to artificially improve the demographic structure of this risk-pool, and to conceal this scheme.

31.     While at the local level the Knights of Columbus members are engaged in substantial volunteer and charitable work, KC generates billions of dollars tax-free every year selling life insurance and other financial products.  As a result of these revenues, KC

and its executives, in contrast to the local councils, sit among the world's elite power brokers, with its Supreme Knight (CEO) Carl Anderson drawing a seven-figure salary and recently sitting on the board of the Institute for the Works of Religion ("Vatican Bank").  KC's insurance products are sold exclusively to members of the Knights of Columbus local councils in the United States and Canada only (not to other international members).  KC is only legally permitted to sell its insurance products to members of the Knights of Columbus fraternity. Accordingly, the size and demographic structure of Knights of Columbus membership in the US and Canada is also the size and demographic structure of its insurance risk-pool.  As with any such risk-pool, a shrinking membership and aging demographic would severely threaten its insurance rating as payouts to members' families upon death depend on a steady stream of new premiums and payments from younger members.  Indeed, because KC currently has over $105 billion of insurance in force written against only $22 billion in assets, its insurance program must demonstrate that the Order's membership is growing and that its demographic is not aging in order to maintain the perception of viability to meet its future payout obligations.

32.     However, KC's own financial reporting reflects a very different picture. While KC has earned on average less than 5% returns on its $22 billion invested, the number of death benefits paid out has increased 5.67% year-on-year, demonstrating both a downward financial spiral and the effect of its rapidly-aging demographic:



33.     Additionally, KC's financial losses have been deepening year-on-year, demonstrating the fundamental non-viability of their current insurance model, and their need to both fraudulently inflate their claimed membership numbers as well as to seek substantial income from sectors outside their tax-exempt purpose:



34.     KC recognizes the imperative of growth of the Order to the viability of its insurance program, and is strongly motivated to demonstrate that it continues to be a growing, vibrant organization.  For example, in 2016 Supreme Knight Carl Anderson stated that "[o]ur responsibility as the leaders of the Knights of Columbus is to assure the continued growth and sustainability of our Order.  This is our first and primary responsibility."

35.     And, indeed, KC, including its Supreme Knight Carl Anderson, its Chief Insurance Officer Thomas Smith, and its Director of Insurance Marketing Matthew St. John have carefully maintained just such an illusion of growing membership and stable demographics. Unfortunately for the hundreds of thousands of Knights of Columbus members it insures, these numbers are only an illusion—the end result of an extensive scheme to fraudulently mischaracterize its own risk-pool.  In fact, and in direct contradiction to the representations it

makes to its vendors like UKnight, members, agents, ratings agencies, and reinsurers, the KC insurance risk-pool is actually significantly *shrinking and aging*.

36.     Additionally, by fraudulently inflating the size and vitality of its membership, Defendant deceived UKnight about the potential profits it stands to make from serving, advertising to, and fundraising with the Order.  In the process, KC fraudulently induced UKnight into its business decision to focus its efforts solely on what it has now learned is an unstable, shrinking organization.

37.     KC perpetrated this fraud by preventing local Knights of Columbus councils from dropping members from their rolls.  If a new member joins, and then quits, Defendant requires local councils to maintain these "phantom" members on their membership rolls and to continue paying nominal dues for them.  This is done by instituting cumbersome and byzantine processes[2] to drop members from rolls, and even by instituting requirements that a council cannot drop a member until it has a new member to replace him, or by limiting the total number of members by which any given council can decrease each year.  Numerous agents and former

---

[2] Even following KC's official policy for dropping members, it takes roughly a year to process a member that has quit out of the organization, ensuring a substantial membership inflation even without the additional malfeasance stated in this Complaint.  KC's official guidance is to not even begin processing suspensions of membership until September 15th of each calendar year (*see, e.g.*, http://floridakofc.org/site-page/membership#tab-A7).  At that point, if the three prior required mailings to the member have been completed, a Form 1845 "Notice of Intent to Suspend" is sent to the member and KC.  If the delinquent member does not pay his dues within 60 days of the mailing of that form, then they can be suspended, but the form automatically becomes null after 90 days, and KC maintains the member "under the assumption the council has been successful in retaining the member."  Additionally, members must send personally signed correspondence to KC formally requesting they be dropped from membership.  However, KC uses any excuse to reject these requests as well.  As one former agent stated, they tried to create a form letter that members could then personally sign to request withdrawal from the Order, but KC rejected this despite the fact that it was personally signed because the form letter made the process too easy.

agents of the Knights of Columbus have reported to Plaintiff that most councils have *at least* 15 to 20 members they would like to drop but are not permitted to by KC, suggesting that there are more than 300,000 "phantom members" in existing councils in the US and Canada.

38.     KC specifically uses the legal separateness and independence of the local councils to facilitate this fraud.  Local councils' Grand Knight and three trustees are responsible for certifying the number of members in each council—which they inflate under direct guidance and extreme financial and ecumenical pressure from KC.  However, KC then reports these numbers as *independently certified* by virtue of the fact that they are attested to by the independent local councils.  Accordingly, this legal separation between KC and the local councils both facilitates this fraud and helps to conceal it.

39.     For example, in one local council in New Jersey, the council reports to KC that it has 316 members, but council members report to UKnight that the actual number is only 54 (an overstatement of 585%), and that it is not allowed by Defendant to report the true numbers.  In Dallas, a local council which reported approximately 300 members to KC attempted to remove over 80 long-delinquent members from its rolls.  But, after months of pleading, Defendant only permitted 8 members to be removed, leaving over 70 "phantom" members on the rolls.  And another council in Texas reports that of its 400 "reported" members, it has been actively trying to drop a full 200 who are no longer actual members but has been unable.

40.     Additionally, KC creates entire "phantom councils" to house members who have either died or quit the order.  As one agent explained, "Home Office (KC) put together a phantom council where you could move people . . . ."  While the exact number of such

"phantom councils" is unknown to Plaintiff at this time, one such council "exists" in the rural farming community of Georgetown, Illinois. This "phantom council" serves only to house numerous non-existent members of the Knights of Columbus that pad its membership numbers. When one former Knights of Columbus field agent attempted to contact the listed "members" of this council, he found it odd that most of them lived hundreds of miles away in Chicago. Even more concerning, when he attempted to contact each of the "members" of this council, he found that all were either deceased or were shocked to learn that they were listed as they believed they had quit the Knights of Columbus years ago. He was unable to locate *any actual* members of this council on KC's official list of its members. Further, because there were no officers or members of this council to report these inaccuracies, this fraud has gone undetected for years. Numerous other former Knights of Columbus agents have reported similar "phantom councils" in other states, with one agent reporting at least 8 such "phantom councils" within his territory— in total, more than half of the agents contacted in researching this Complaint report the existence of phantom councils in their territories, often-times with more than 100+ "phantom members," suggesting that as many as 1000 such councils exist nationwide.

41.     When this former Illinois agent reported these suspicious activities to KC and Mr. Smith, Mr. Smith refused to address the issue and the agent was fired due to false charges manufactured by Mr. Smith and his General Agent shortly thereafter.

42.     KC also counts foreign councils—whose members cannot purchase insurance—as part of its *insurable* members in the US and Canada. For example, another General Agent noticed that the members from a council in the Philippines were being included in the membership count for his district. He repeatedly complained because these members could

not purchase insurance and were harming his ability to meet his quotas.  When KC finally removed these foreign members from this agent's count, they claimed it was merely an administrative error.  However, the agent soon learned that KC simply transferred these foreign members to another General Agent in his same state—ensuring they continued to be fraudulently counted as "insurable" members.

43.   Numerous members and officers of Knights of Columbus local councils have also contacted Plaintiff and have stated that this membership fraud is exceptionally widespread.  For example:

a.   One local council officer stated that they have at least 40 members who have not paid dues in over two years.  Because the local councils are required to pay "per capita" fees for each member to KC, this officer stated that "[i]nflated member numbers hurt the council by taking dollars away that would go to local charities."  This same officer noted that, when he attended the Supreme convention in San Antonio a few years ago, KC "flatly refused to allow us to drop anyone.  They wanted bragging rights for having our (false) state membership number exceed 100,000." (parentheticals in original).  He believes that "[t]he Knights of Columbus is using their position of trust to sell billions of dollars of insurance to families who will base their financial security on information KofC [KC] knows is false."

b.   Another local council officer stated that 81 of their 426 members had not paid dues in over two years, but could not be dropped.

c.   Another local council officer stated that "around 125" of their 300 members had not paid dues in over two years, but could not be dropped.  He noted that "this is cooking the books," that "[w]e have grown into a profit center versus a charity organization."

d.   One state level officer of KC stated, with regard to Defendant's fraudulent inflation of membership numbers, that "people know it's happening, but no one has the balls to speak up."

e.   One former agent stated he was instructed by KC to repeatedly generate multiple insurance applications for the same person to "churn" the number of applications to help meet quotas.  When he refused to do this, he was demoted.

44.     The majority of these "phantom" members are younger members who join and then quit due to the demands of careers and raising children in families where often both parents work, while aging, retired members tend to remain active.  The fact that Defendant fraudulently reports inflated numbers of younger members *artificially drops* the average age of Knights of Columbus members *to 59 years of age*, a critical factor in evaluation of their insurance risk-pool.[3]

45.     As a result of this fraud, Defendant KC falsely reports that its membership numbers have been increasing year-on-year.  The KC website states that "our membership grew for the 44th consecutive year to a record high of 1,918,122 brother Knights.  Soon, we will number more than 2 million men."  In fact, the true membership of the Knights of Columbus without these "phantom" members is only about 1.4 million—KC's published number represents an approximate 36% overstatement!  At a recent meeting held by KC to educate its insurance agents, a representative of KC explained to the agents present separate numbers for the various membership categories, including 'insured members' and 'uninsured members.'  At least two of the agents noticed, and one of them asked, why the numbers didn't add up to the published numbers—they were 400,000 to 500,000 short of the claimed total of 1.9 million.  No explanation was ever offered, and the group was quickly and awkwardly moved on to a new topic.

46.     Additionally, while the Knights of Columbus fraternal membership has been growing rapidly in new territories such as South Korea, Mexico, the Philippines, Poland,

---

[3] Many KC insurance products cannot be sold to those over 65 years of age, so the Order's average age is a key figure in determining the number of members who could potentially purchase insurance in the future, thereby keeping KC's insurance business afloat.

Lithuania, and the Ukraine,[4] insurance products are only sold to members in the United States and Canada.  In order to fraudulently disguise the drop in its number of *insurable* members, KC intentionally does not disclose a membership breakdown by country.  Instead, it fraudulently presents only that its *overall* membership is increasing as evidence that its insurance risk-pool is healthy.  In fact, its number of insurable members is declining.

47.     This inflation is not limited to members—KC's self-reported number of 1,500 field agents is also falsely inflated to maintain the appearance that it has strong prospects of continuing to sell insurance products to its membership.  As one Knights of Columbus field agent reports, KC frequently instructs its general agents in each state to keep field agents that have quit on the books through the end of a reporting year, to generate false applications to make it appear that former agents remain active, and even to hire new "warm bodies" just before the end of a year and then fire them at the start of the next year to inflate their agent numbers.

48.     Defendant self-reports these false membership, agent, and demographic numbers to the insurance rating industry each year.  Despite accepting KC's fraudulent, self-reported membership numbers and demographics as true, on September 9, 2016 insurance rating agency A.M. Best still revised its outlook on KC to "negative," citing its "decline in first-year single premiums"—a sign of a decreasing and aging membership.  If A.M. Best received the true numbers and trends of KC's risk-pool, their rating would plunge.

49.     Additionally, KC has been fraudulently misrepresenting its Standard & Poors insurance rating as "AAA" for nearly six years.  On July 28, 2011, S&P had already been

---

[4] At the 134th Supreme Convention in 2016, Supreme Knight Carl Anderson announced (as reported on KC Supreme's website) that "the Knights of Columbus has seen impressive membership growth in new areas such as Ukraine, Lithuania and Poland."

informed that S&P had issued a negative market outlook advisory and was going to downgrade its rating within 90 days to "AA+" when it posted to its website the intentionally false and misleading statement that "Standard & Poor's has once again given the Knights of Columbus its top rating of 'AAA' . . . [for the] 19th consecutive year."  Not only did KC know that this statement was false when made, but KC intentionally issued its press release at this time, and has continued to maintain this statement on its website for nearly six years, to deceive its customers that it continues to have an "AAA" rating.  Meanwhile, other top-rated insurers such as New York Life and USAA accepted and published their downgrades on August 8, 2011, allowing KC to fraudulently sell insurance products and enjoy an artificial market advantage over the past five plus years by continuing to claim that it enjoys a "AAA" rating from S&P.

50.    As a result of this ongoing, fraudulent scheme, KC is able to deceive members into believing it deserves its high insurance rating, obtains reinsurance at reduced rates, and induces partner companies like UKnight into focusing on what they are falsely led to believe is a large and growing number of members and councils to which it could sell its services. UKnight certainly would not have focused solely on serving the Knights of Columbus at the expense of other organizations if it had been told the truth:  KC may very well be on the verge of financial collapse.

### E.    KC Breaches Agreement With UKnight And Steals Trade Secrets

51.    Meanwhile, at some point KC's Chief Insurance Officer Thomas Smith, despite having never met or spoken with Mr. Labriola, purported to develop an extreme personal animosity against him.  This animosity increased until, on January 24, 2014, in a meeting with

the KC's Operations Committee in New Haven, Connecticut, Mr. Smith falsely told the committed that Mr. Labriola had lied *to him and to his agents* about money.

52.     This very same meeting with the KC's Operations Committee was supposed to include the long-awaited formal announcement that UKnight was its designated vendor.  Mr. Smith, however, succeeded in scuttling this announcement with his false statement about Mr. Labriola, and refused to allow the announcement to go forward at this meeting.  Later events reveal that Mr. Smith and other senior officers of KC were manufacturing reasons to delay the announcement so that they could replicate UKnight's product themselves and prevent UKnight's system from exposing the extent of their membership number fraud.

53.     Instead of making the announcement as promised, Mr. Smith demanded that UKnight agree in writing that Mr. Labriola would never again speak with UKnight's most important customers, specifically (1) anyone at KC in New Haven, (2) any general agent of the Knights of Columbus, or (3) any state council officer.  By separating Mr. Labriola from relationships he had made over several years, KC would gradually be able to take control of the platform UKnight developed, provided that it could learn the inner workings of the UKnight system.

54.     Without understanding why Mr. Smith was expressing such animosity toward Mr. Labriola, but in an effort to maintain their business relationship, UKnight agreed to these demands by corporate resolution.

55.     After intentionally delaying the designated vendor announcement, KC retained technology consulting firm Information Design Inc. ("IDI") and its CEO Ian Kinkade to evaluate the UKnight system.  Mr. Kinkade's initial comments back to the Supreme Council

were favorable, and this report motivated the KC Operations Committee to again vote to move the project forward.  However, the Committee reversed its decision the next day and instead called for a complete survey of all current UKnight subscribers.

56.     Again, in an effort to appease KC and move the process forward, UKnight provided a complete and unvetted list of every single UKnight subscriber.  The survey responses overwhelmingly confirmed that UKnight was an outstanding tool—it noted that UKnight was easy to use, effective, had very responsive customer service, and helped to increase local council membership and participation.  Additionally, the survey revealed that the UKnight system was directly responsible for significant increases in sales of insurance products among subscribing general agents.

57.     With these survey results in hand by the summer of 2014, UKnight again waited to be contacted about the formal announcement of its designated vendor status, and again they were given repeated assurances by KC that the announcement was imminent.  Reasonably believing that the leadership of the world's largest Catholic charitable fraternity would not be misleading them, UKnight continued its exclusive focus on serving the Knights of Columbus and waited.  But there was no announcement.

58.     Then, at an insurance sales conference in early 2015, Supreme Knight Carl Anderson saw a presentation on the effectiveness of UKnight's membership invitation program.  The Supreme Knight again instructed that UKnight be put on the front burner, and again IDI and Mr. Kinkade were retained by KC to work with UKnight.

59.     Mr. Kinkade traveled to Dallas with members of the KC Operations Committee to meet with UKnight partner and technology manager Terry Clark.  However, when

the members of the committee left, Mr. St. John specifically instructed Mr. Kinkade to stay behind to work with Mr. Clark and dive deeper into the inner workings of the UKnight system. During one of their days of meetings the true intent of KC became clear.  At approximately 1:30 p.m. on June 2, 2015, Mr. Kinkade received an email on his laptop which was open in front of him.  He then told Mr. Clark that this email was "really bad, and I don't want you to think I had anything to do with it."  With that, he showed Mr. Clark the email that had just come in from Matthew St. John, KC's Director of Insurance Marketing.  In the email, Mr. St. John expressly instructed Mr. Kinkade to get the specs for at least two of UKnight's proprietary systems *so that Mr. St. John could have another developer build the system for them*!  One of these systems was the member invitation program that his Supreme Knight, Carl Anderson, had found so valuable.

60.     As discussions continued, UKnight proposed that it follow industry-standard protocol to protect its proprietary information and asked that Mr. St. John send it a "scope of work" document.  Mr. St. John repeatedly refused. Unaware that Mr. Kinkade had shown UKnight his prior email, Mr. St. John then demanded that UKnight provide him with all of UKnight's strategies, design data, and internal system information—essentially all of UKnight's trade secrets.  In a clear attempt to deceive UKnight, Mr. St. John falsely stated to Mr. Clark and Mr. Labriola that he only needed this information to make sure KC understood exactly what UKnight planned to do and how they planned to do it so that he could approve going forward. UKnight, of course, declined this request, and instead continued to propose that its technology manager Mr. Clark and director Mr. Labriola fly to New Haven to work collaboratively with Mr. St. John's team to resolve any concerns.

61.     This proposal was ignored.   On December 31, 2015, KC's Director of eBusiness Denise Serafini, who had been working closest with UKnight and had repeatedly advocated for UKnight within her organization, retired.  On the *very next business day*, January 4, 2016, Mr. St. John emailed Mr. Labriola and Mr. Clark.  To the shock of UKnight's management, this email now fraudulently claimed that the parties "have not had any contractual relationship," and that "the Knights of Columbus has never conferred official or preferred vendor status on UKnight."  These lies were a transparent attempt to get UKnight to simply fade off into the sunset.  Then, Mr. St. John revealed that "[KC] has chosen to enlarge its exploration of potential website vendors," and that UKnight could no longer use the Knights of Columbus name in offering its product to any potential new council or agent subscribers.

62.     Then, KC contracted with IDI to have Mr. Kinkade to become its new Director of eBusiness—the very person they had sent to investigate the inner workings of UKnight's system.  Finally, in April of 2016, KC sent a Request for Proposal (RFP) to several other potential vendors, which included specific design elements and internal workings of the system UKnight had developed for the Knights of Columbus and that were observed by Mr. Kinkade or disclosed by UKnight in reliance on KC's repeated promises that UKnight had already been selected as its designated vendor.

63.     KC took these actions despite having previously and unequivocally stated that UKnight had always been very cooperative and accommodating, that its customer Knights of Columbus councils were very satisfied with every aspect of UKnight's services, that it had helped their insurance agents become more successful, and that they felt UKnight was

underpricing its services and should actually *double* the fees it charged each Knights of Columbus subscribing council given the value that UKnight provided.

64.     Defendant KC, as outlined in this complaint, acted willfully, wantonly, and maliciously with the *knowledge* that its actions would destroy UKnight as a company, and with the *specific intent* to achieve exactly that result so that UKnight's system would not uncover and reveal Defendant's fraud.

## FIRST CLAIM FOR RELIEF
### (Violation of 18 U.S.C. §§ 1962(c) and (d) – By UKnight Against Defendant KC)

65.     Plaintiff incorporates all of the allegations of this Complaint as if fully rewritten herein.

66.     Here, Defendant KC is a RICO persons within the meaning of 18 U.S.C. §     § 1961(3) and 1964(c).

**The Knights of Columbus Enterprise**

67.     At all relevant times, the Order of the Knights of Columbus fraternity as a whole, including KC, its officers and directors, the state councils, local councils, assemblies, independent insurance agents, and members, constituted an "association-in-fact" enterprise (the "Knights of Columbus Enterprise") as defined in 18 U.S.C. § 1861(4), consisting of thousands of individuals and separate legal entities.   KC knowingly and intentionally used the legal separateness of its local councils to "independently" certify its membership numbers as the vehicle for its fraudulent scheme.   At all relevant times, this enterprise has been engaged in, and its activities affected, interstate and foreign commerce.   Such enterprise furnished the vehicle for

the commission of a pattern of racketeering activity by Defendant. The relationship between KC and the legally and functionally distinct local councils which certified the membership numbers enhanced the enterprise's ability to thrive and avoid detection.

68.     The Knights of Columbus Enterprise has a unifying purpose: to bring together "Practical Catholic men in union with the Holy See" who are 18 years or older, and to engage in charitable work and giving. The enterprise has a relationship among those associated with it in that each is engaged in charitable work, fraternity, and mutual benefit, or a council of such men coming together to fulfill the purpose of the enterprise as a whole. The enterprise, established in 1882 and in continuous operation since that time, has sufficient longevity to permit these associates to pursue the enterprise's purpose. Additionally, the enterprise has an ascertainable structure consisting of KC and local councils and its focus on charitable giving and volunteer work that is wholly distinct from that inherent in the fraudulent scheme evidenced by Defendant's conduct of the pattern of racketeering activity described below.

69.     The local councils play a critical and central role in the enterprise's ability to thrive and avoid detection because these local councils "independently certify" the membership numbers, and then pay dues on those numbers to KC, creating the perception in the minds of ratings agencies and consumers that these numbers must be valid and accurate. (However, as alleged below, these numbers are inflated as a result of *extortion* by KC). Because the local councils have an economic motive not to inflate their member numbers (as they must pay dues to KC on each member reported), and because the local councils are self-governing and not controlled by KC, the numbers they report are *assumed* to be valid *because of this separate governance and economic incentive*. Indeed, because KC purports to only "aggregate" these

membership numbers generated independently by thousands of local councils, the legal and practical separateness of these local councils from KC directly leads to the ability of Defendant to perpetrate the pattern of racketeering activity through the enterprise. This would not be possible—or at a minimum, would be far more difficult to accomplish and conceal—if KC itself generated the membership numbers for each local council, as their clear self-interest in reporting growing membership numbers would make both ratings agencies and consumers more likely to question the validity of these figures.

**The Insurance Fraud Enterprise**

70.     Alternatively, at all relevant times, the Order of the Knights of Columbus fraternity as a whole, including KC, its officers and directors, the state councils, local councils, assemblies, independent insurance agents, members, as set forth above, as well as the ratings agency AM Best and the software company IDI constituted an "association-in-fact" enterprise (the "Insurance Fraud Enterprise") as defined in 18 U.S.C. § 1861(4), consisting of numerous wholly separate legal entities. AM Best and IDI are both entirely separate businesses from Defendant KC and from the Order as a whole.

71.     KC knowingly and intentionally used the legal separateness of its local councils to "independently" certify its membership numbers as the vehicle for its fraudulent scheme.

72.     KC also knowingly and intentionally used the ongoing relationship with AM Best by providing false membership numbers and demographic data over at least five years. AM Best was an ongoing participant in this enterprise by accepting funds from KC gathered from fraudulent membership levies to generate repeated fraudulent insurance ratings for KC's

products, making AM Best both part of the vehicle for *and* a victim of the pattern of racketeering activity.

73.     Additionally, KC used its ongoing relationship with IDI to conceal this fraudulent scheme and to steal UKnight's trade secrets.  Over several years, IDI participated in this enterprise by providing consulting reports and consultants, including Ian Kinkade, to permit KC to stall the deployment of UKnight's system while IDI actively participated in the theft of UKnight's trade secrets in order to facilitate the replication of this system internally and the concealment of the fraudulent scheme.

74.     At all relevant times, the Insurance Fraud Enterprise has been engaged in, and its activities affected, interstate and foreign commerce.  Such enterprise furnished the vehicle for the commission of a pattern of racketeering activity by Defendant.

75.     The Insurance Fraud Enterprise has a continuous and ongoing a unifying purpose: to make money by selling fraudulently rated and endorsed life insurance products.  Much like any criminal enterprise involved in the sale and distribution of illegal products, each component of the Insurance Fraud Enterprise plays a critical role in the overall objective of obtaining illicit profit.  KC issues the fraudulent life insurance policies; legally separate and independent local councils certify the fraudulent membership numbers; AM Best receives payments from KC  (from these illicitly obtained funds) to provide artificially high ratings for these life insurance products; and IDI receives payments from KC (from these illicitly obtained funds) in exchange for generating false reports about UKnight to delay its deployment and assisting in stealing UKnight's trade secrets to both conceal the scheme and ensure its continued operation.  The enterprise has a relationship among those associated with it in that each acts as a vehicle to

facilitate the sale of fraudulent insurance products.  The relationship between KC, the local councils, AM Best, and IDI enhanced the enterprise's ability to thrive and avoid detection.

76.     The Insurance Fraud Enterprise has been in continuous operation since at least 2011, has sufficient longevity to permit these associates to pursue the enterprise's purpose, and threatens to continue its activity indefinitely.

77.     Additionally, the Insurance Fraud Enterprise has an ascertainable structure consisting of leadership by KC and its officers, a network of subordinate local councils and independent insurance agents, and an ongoing network of contractual and financial relationships between KC and IDI and AM Best that is wholly distinct from that inherent in the fraudulent scheme evidenced by Defendant's conduct of the pattern of racketeering activity described below.

78.     Defendant KC is associated with, manages, and coordinates the central operations and insurance activities for both the Knights of Columbus Enterprise and the Insurance Fraud Enterprise.  KC has and continues to conduct and/or participate in the conduct of each Enterprise's affairs, directly or indirectly, through a pattern of racketeering activity as outlined in this Complaint.

79.     KC is separate and distinct from the Knights of Columbus Enterprise.  KC is a separate legal entity from the Order as a whole (itself comprised of over 15,000 distinct legal entities), and is functionally distinct in that it is the only portion of the Order that issues insurance policies.  KC is an insurance company and the 925th largest company in the world.  In contrast, the individual local councils of the Knights of Columbus are distinct legal entities engaged primarily in volunteer work and charitable fundraising.  Outside of this litigation, KC

repeatedly and expressly states that the local councils and agents are separate and distinct from it.  For example, in the contract language KC provides to local councils for rental of their halls, the contract states "Subordinate Unit [the local council], corporation [the entity owning the hall], and Knights of Columbus [KC] are all *separate and distinct entities*."  Similarly, KC's own organizational chart, as submitted to the Connecticut Department of Insurance, does not list any of the local councils as part of its organization, but rather lists only several subsidiary LLCs and corporations it uses as holding companies for its assets.  KC's own Constitution further states that local council officers are "agents of the members thereof and not of [KC], and "no act or failure to act by the [local] council or any officer or member thereof shall create or be construed to create any liability on the part of [KC]."  Likewise, general agents and field agents are not in fact legal "agents" of KC, because the language of their contract specifically states that agents "shall have no authority to bind the Order," and they have a purely contractual (not agency) relationship with KC.

80.     KC uses the legal and functional separateness of the local councils, which certify the membership numbers of each, to create the perception that its fraudulent membership numbers are "independently certified" as a vehicle and means to facilitate and conceal this fraud. Additionally, KC uses the legal and functional separateness of its independent General Agents and Field Agents, which sell the insurance policies, to create the perception that its financial products are sold by independent agents as a vehicle and means to facilitate and conceal this fraud.  Indeed, as alleged below, KC engages in long-running and ongoing extortion *of the local councils*—it is logically impossible for KC to extort an enterprise that is not distinct from itself.  Additionally, because KC is a sham 501(c)(8) entity, as argued below, it

should not be considered unified with its local councils, agents, or members for purposes of evaluating its distinctiveness from the Knights of Columbus Enterprise.

81.    KC is also separate and distinct from the Insurance Fraud Enterprise, which, in addition to the distinctions mentioned above, includes two wholly separate legal entities, AM Best and IDI, which functional and legal separateness serves as both a vehicle and means to facilitate and conceal this fraud.

82.    As outlined below, Defendant engaged in an ongoing pattern of numerous predicate acts of racketeering as defined in 18 U.S.C. § 1961:

### A.    Extortion

83.    Defendant illegally engaged in the extortion of monies from thousands of its local councils in violation of 18 U.S.C. § 1951, *wrongfully taking more than $2.5 million per year from councils*, $2.5 million that should have remained in the hands of council volunteers for local charitable causes.

84.    Local councils must forward to KC *per capita* dues they collect from every active member on their membership rolls.  As part of the benefit provided by KC, every member of the local councils is entitled to "Fraternal Benefits," among which are specified accidental death benefits and child death benefits—often in the thousands of dollars each. However, these benefits are only available to members, ". . . provided that the member's council is in good standing"—meaning that they are not more than 3 months and ten days in arrears in paying the amount of dues required by KC based on the number of members *KC determines belong to each council*.

85.     Because KC maintains a count of members for each local council, and requires that each council pay *per capita* dues on this number and not the actual number, the theoretical ability of each local council to certify its own membership numbers is in fact overshadowed by the need for each council to pay dues on the number *as determined by KC* Otherwise these councils will fall out of "good standing" and their members will not receive death benefits!

86.     Accordingly, when members die, move to a different council (which results in their double counting), or simply stop paying dues and drop out of the order, the local councils must, in reality, get permission from KC to remove these members from the quota upon which they must pay dues.   In fact, when a member fails to pay dues, pursuant to the Constitution of the Order they automatically and immediately forfeit their membership *ipso facto*.   KC repeatedly, wrongfully, and intentionally denies this permission to remove members, even in clear-cut cases where members have failed to pay dues, have failed to remain a Practical Catholic, or affirmatively renounced their Catholic Faith entirely.

87.     As a result, KC uses the economic fear of wrongfully withholding death benefits from members of the local councils to extort from them the consent to "independently" certify the membership numbers that KC wants to see, and to pay KC excessive *per capita* dues on these inflated member numbers amounting to more than $2.5 million per year.

88.     This pattern of extortion of local councils has been occurring at least for the roughly six years that UKnight has been providing services to the order, and is a central part of the pattern of racketeering activity stated herein as this extortion is what allows KC to

achieve inflated membership numbers despite the clear economic incentive of local councils not to report inflated numbers.

**B.     Theft And Attempted Theft Of Trade Secrets**

89.     Defendant illegally engaged in the racketeering acts of attempting to steal and stealing UKnight's trade secrets, in violation of 18 U.S.C. § 1832.

90.     The proprietary system designed by UKnight and offered for subscription to the Order of the Knights of Columbus constitutes a protected trade secret, as explained below, intended for use in interstate and international commerce pursuant to 18 U.S.C. § 1832.

91.     Defendant KC, for its economic benefit, and intending and knowing that its actions would injure UKnight, attempted to steal, stole, appropriated without authorization, and by fraud and deception obtained UKnight's trade secrets.

92.     KC, through its officers Mr. Smith and Mr. St. John, conspired with and instructed IDI and Mr. Kinkade to steal UKnight's trade secrets.

93.     KC then hired IDI and its consultant Mr. Kinkade in order to acquire his knowledge of UKnight's trade secrets.

94.     KC then demanded UKnight send all of its trade secrets to it under the fraudulent pretense of needing this information to approve the announcement of UKnight as designated vendor, constituting an attempt to steal whatever portions of UKnight's trade secrets Mr. Kinkade had not already acquired.

95.     KC then transferred these trade secrets to third parties by issuing an RFP for other companies to reproduce UKnight's proprietary system based on this stolen information, and by, upon information and belief, working with one of these companies to develop a system

for KC based directly upon UKnight's trade secrets. The basis for Plaintiff's belief is that Defendant, during settlement negotiations, sought to have Plaintiff indemnify an unnamed third-party developer, the only reasonable explanation for which is that KC communicated the stolen trade secrets to this third party.

96.     Through this theft of UKnight's trade secrets, Defendant has enabled the enterprise(s) to avoid the sum total of all monies potentially paid by and through the Knights of Columbus fraternity to UKnight.

### C.     Interstate Transport Of Stolen Goods

97.     Defendant illegally engaged in the racketeering acts of transporting UKnight's stolen trades secrets across state borders in violation of 18 U.S.C. §§ 2314 and 2315.

98.     Defendant sent IDI's consultant Mr. Kinkade to Dallas, Texas to steal UKnight's trade secrets, arranged for his travel back to New Haven, Connecticut, and subsequently hired him to work for KC as a consultant in New Haven. In so doing, Defendant transported these stolen wares, which are valued at well in excess of $1 million, across state lines in violation of 18 U.S.C. § 2314.

99.     Defendant additionally transported UKnight's trade secrets across state and international borders by sending this information to other software developers outside Connecticut, including two developers in Canada, as part of their RFP process, all in violation of 18 U.S.C. § 2314.

100.     Finally, by receiving in Connecticut this stolen information that IDI and Mr. Kinkade obtained in Texas, Defendant received stolen wares valued well in excess of $1 million from across state lines in violation of 18 U.S.C. § 2315.

101.    Through this theft of UKnight's trade secrets, Defendant has enabled the enterprise(s) to avoid the sum total of all monies potentially paid by and through the Knights of Columbus fraternity to UKnight.

**D.    Wire Fraud**

102.    Defendant illegally engaged in the racketeering acts of wire fraud in violation of 18 U.S.C. § 1343.

103.    Defendant devised and executed a scheme to defraud vendors such as UKnight, to defraud and obtain money from insurance customers, and to defraud reinsurers and ratings agencies by fraudulently inflating the size and demographic structure of its member insurance risk-pool.

104.    Defendant used the US interstate wire system in furtherance of this scheme to defraud by:

a.      Continuously marketing KC insurance products online, such as by KC publishing on its website the materials at http://www.kofc.org/un/en/insurance/index.html to market insurance products continuously to hundreds of thousands of member-visitors.

b.      Continuously advertising false and misleading membership numbers online to its members while intentionally failing to disclose the number of *insurable* members in the US and Canada in order to fraudulently induce members to purchase insurance products. For example, at their website (http://www.kofc.org/en/news/insurance/by-the-numbers-october.html) KC falsely clams that "[m]ore than 1.9 million men in over a dozen countries across the globe are proud to call themselves Knights." This false statement was published on 9/30/2016 and has been continually served to tens of thousands of website visitors since then. In fact, after accounting for "phantom" members in the US and Canada, KC knows that the Knights of Columbus membership numbers are materially lower than stated,

and the number of insurable members in the US and Canada are a *shrinking* portion of this membership.

c.  Similarly, on a May 5, 2010 press release on the KC website (that has remained continually published on the KC website through the date of this filing and has been delivered to tens of thousands of website visitors since then), Defendant states that the Knights of Columbus saw over 45,000 *new* members in 2010 (not net membership *growth*), while intentionally omitting the large number of members who died or withdrew in the US during that same time.   In fact, after addressing phantom members, withdrawals, and deaths the net membership numbers shrank during this period.

d.  Stating on its website on 9/30/2016 (and continuously published to tens of thousands of website visitors since then) that it has 1,500 field agents, when in fact KC knows that the actual number is materially lower than this.

e.  Stating         on      its      website       on        2/5/2015 (http://www.kofc.org/en/news/insurance/shield-strength.html   and continuously published to tens of thousands of website visitors since then) that it had over 1,400 "full time" field agents, when in fact KC knew that the actual number was materially lower than this, and that many agents were only part-time workers.

f.  Stating         on      its      website       on        9/2/2014 (http://www.kofc.org/en/news/insurance/kofc-surpasses-95billion.html and continually published to tens of thousands of website visitors since then) that it had over 1,500 agents, when in fact KC knew that the actual number was materially lower than this.

g.  Stating         on      its      website       on        5/5/2010 (http://www.kofc.org/en/news/releases/1point8_20100505.html and continually published to tens of thousands of website visitors since then) that it had over 1.8 million members at that time, when in fact KC knew that the actual number was materially lower than this.

h.  Stating         on      its      website       on        11/3/2015 (http://www.kofc.org/en/news/media/kofc-surpasses-100-billion-life-insurance-ma.html and continually published to tens of thousands of website visitors since then) that it had nearly 1.9

million members at that time, when in fact KC knew that the actual number was materially lower than this.

i.      Stating on its website on 8/6/2014 (http://www.kofc.org/en/news/media/canadian_knights_conv-ma.html and continually published to tens of thousands of website visitors since then) that it had over 1.9 million members at that time, when in fact KC knew that the actual number was materially lower than this.

j.      Stating on its website on 12/17/2015 (http://www.kofc.org/en/news/releases/pope-francis-meets-kofc-leaders.html and continually published to tens of thousands of website visitors since then) that it had 1.9 million members at that time, when in fact KC knew that the actual number was materially lower than this.

k.      Stating on its website on 7/30/2014 (http://www.kofc.org/en/news/media/132_international_convention-ma.html and continually published to tens of thousands of website visitors since then) that it had 1.8 million members at that time, when in fact KC knew that the actual number was materially lower than this.

l.      Stating on its website on 1/22/2009 (http://www.kofc.org/en/news/releases/548266.html and continuously published to tens of thousands of website visitors since then) that it had more than 1.75 million members at that time, when in fact KC knew that the actual number was materially lower than this.

m.      Using the interstate wires to submit these false membership numbers and trends to insurance rating agencies such as A.M. Best on an annual basis, which resulted in KC fraudulently obtaining A.M. Best's A++ rating.

n.      Continuing to state on its website (http://www.kofc.org/en/news/releases/standars_poors2011.html) that its insurance products have the highest possible "AAA" rating from Standard & Poors.  When this statement was made as of 7/28/2011 it was true, but *barely one week later* Standard & Poors downgraded Knights of Columbus insurance products to "AA+" on 8/8/2011—something KC likely knew was about to happen.  Because S&P releases draft version of ratings changes to its clients for comment, KC knew on 7/28/2011 when it issued

its press release that the information it contained was false and intentionally misleading.  Since that time KC has never issued a press release or otherwise updated their S&P rating information stated on their website, in an intentional effort to continue this deception.  Rather, the only S&P rating information available on their website remains this false statement of a "AAA" rating, which has been served as a current and affirmative misrepresentation to tens of thousands of website visitors since 8/8/2011 despite KC's affirmative duty to avoid any potential misrepresentation in the advertising of insurance products (such as its website).  Indeed, S&P states that a "company always needs to have the most current, recent ratings report on [its] website."  At least one member of the Knights of Columbus, Peter Droege, (but probably thousands more) was misled to purchase KC insurance based on his mistaken belief that as of 2017, "The program is rated AAA by Standard and Poor's because of the quality          and size      of      its      assets."  http:// www.denverpost.com/2017/01/24/lawsuit-knights-of-columbus-life-insurance-pool/?preview_id=2379634#comment-3119751169 (emphasis added).   Mr. Droege cited this exact 7/28/2011 press release as the basis for his belief that KC currently has an S&P "AAA" rating.

o.   Filing fraudulent tax returns with the Internal Revenue Service each year, from at least 2011 to present, by failing to report their activities that disqualify them from 501(c)(8) status as alleged in Plaintiff's Second Claim for Relief, *infra*.

105.   Defendant knew that the UKnight system worked and was effective at helping increase membership and sell insurance products—something they desperately needed.  However, they found themselves stuck between a rock and a hard place in light of their fraud noted above, because the UKnight system would have necessarily resulted in the identification and elimination of "phantom members" and duplicate members who had moved councils.  KC realized that broad deployment of the UKnight system would necessarily reveal their fraudulent inflation of membership numbers.  This would, in turn, lead to a cascading downgrade of KC's insurance ratings and increased difficulty to sell Defendant's insurance products to

their shrinking membership.  Defendant knew that it had to stall the UKnight system deployment until it could ultimately kill it and recreate its functionality under their own control in order to cover up its fraud while still deriving the benefits of the system it has already promised to the Order.  Accordingly, Defendant's fraudulent actions described herein were with the specific intent to defraud UKnight, and the damage caused to UKnight as described in this Complaint was the direct and proximate result of KC's need to continue and conceal this fraudulent scheme.

106.   Defendant additionally devised and executed a scheme to defraud UKnight into revealing its trade secrets, and into accepting repeated delays in announcing it as the designated vendor, using the US interstate wires in furtherance of this scheme by:

    a.    KC's Communication Director Andrew Walther's November 2013 statement relayed by Ms. Serafini to Mr. Labriola by phone falsely stating that the formal announcement of UKnight as designated vendor had to be postponed due to the recent typhoon in the Philippines, when Mr. Walther in fact knew that he was not prepared to make the announcement and it had not in fact been postponed at all because KC did not intend to make it.

    b.    KC's Director of eBusiness Denise Serafini's December 12, 2013 email reply to Mr. Labriola falsely stating that delays were caused by an unexpected staff resignation, and that "we can get back to business in the next few days," when KC in fact knew that no announcement was imminent, or at least that it did not know whether an announcement was imminent or whether it was possible to 'get back to business' at all.

    c.    Mr. St. John's June 2, 2015 email to IDI and Mr. Kinkade instructing them to obtain UKnight's trade secrets in furtherance of Defendant's scheme to defraud UKnight of their property.

    d.    Mr. St. John's June 2015 phone call with Terry Clark and Leonard Labriola where he demanded that UKnight send him all of their trade secret information under the false pretense that this was to approve their partnership going forward, when in fact the purpose

of this request was to steal the remainder of UKnight's trade secrets.

e.   Mr. St. John's July 10, 2015 phone conversation with Mr. Labriola where, despite ordering the theft of UKnight's trade secrets just a month prior, he reassured Mr. Labriola that he will tell all of the local councils "this [UKnight] is the only system they're going to get . . . with Supreme Council backing," and that "85% [of all councils] . . . you're going to get [to subscribe]."  In fact, at this time Mr. St. John already knew that KC was not going to announce UKnight as its designated vendor, and KC had already initiated its plan to steal UKnight's trade secrets and hire a third-party developer to produce a copy of UKnight's system for them.

f.   Mr. St. John's January 4, 2016 email to Mr. Labriola and Mr. Clark falsely stating that the parties "have not had any contractual relationship" and falsely stating that "[KC] never conferred official or preferred vendor status on UKnight" made for the purpose of furthering Defendant's scheme to defraud UKnight of its property.   In fact, Mr. St. John knew that a contractual relationship did exist between KC and UKnight, that UKnight was an official vendor of KC, and that KC had conferred preferred vendor status on UKnight (even if the formal announcement was never made).

g.   Mr. St. John's April 2016 RFP emailed to numerous potential vendors other than UKnight soliciting a developer to build a copy of UKnight's system based on its stolen trade secrets, which was in furtherance of Defendant's scheme to defraud UKnight of its property.

**E.   Receipt Of Funds Obtained By Fraud**

107.   Defendant engaged in the racketeering act of receiving funds obtained by fraud in violation of 18 U.S.C. § 2314.

108.   As a result of its scheme to fraudulently skew the size and demographic structure of its insurance member risk-pool, as described above, Defendant fraudulently induced hundreds of thousands of members of the Knights of Columbus to send monthly insurance premium

payments from all 50 states and Canada to KC in Connecticut, in the aggregate amount of hundreds of millions of dollars per year.

### F.      Financial Institution Fraud

109.    Defendant engaged in the racketeering acts of financial institution fraud in violation of 18 U.S.C. § 1344 by obtaining funds under the custody & control of financial institutions through a fraudulent scheme.

110.    As outlined above, Defendant engaged in a scheme to fraudulently induce members of the Knights of Columbus to purchase life insurance products from KC and to make and continue making monthly payments in furtherance thereof.

111.    As a result of this scheme to defraud, hundreds of thousands of members of the Knights of Columbus make monthly payments to KC from their personal checking accounts, which monies come out of the custody or control of countless banks throughout the United States and Canada and are obtained by KC.   KC specifically requests members make payments via Electronic Fund Transfer by including an EFT authorization form in each of its insurance applications, and thousands of Knights of Columbus members use this EFT process for payment each month.

112.    Defendant maintain sole custody and control of the vast majority of the details surrounding their fraudulent statements, and have intentionally concealed information and data that will, upon information and belief, further support and expand the allegations of fraud contained above.

### G.      Witness Tampering

113.   Defendant has also engaged in widespread witness tampering in violation of 18 U.S.C. § 1512.

114.   Following the filing of the instant Complaint, [Doc. No. 1], Defendant learned through a variety of sources that numerous knights and agents were providing helpful information to Plaintiff.  In an attempt to stop this, on February 10 at 3:12 p.m., Defendant KC sent an email to tens of thousands of its Grand Knights (local council leaders), state deputies, district deputies, financial secretaries, general agents, and field agents advising them of the instant lawsuit and stating, "please be aware, however, that if you choose to speak with [UKnight or its attorney] you may become a witness in this lawsuit."  This conduct, especially in light of Defendant's history of retaliatory action against those who have crossed it as set forth in this Amended Complaint, constitutes the attempt to intimidate, threaten, harass, and corruptly persuade these thousands of potential witnesses to delay, dissuade, or prevent their testimony in this case.

## H.     Racketeering Acts Comprise A Pattern Of Racketeering Activity

115.   Defendant controlled and managed the operation of the enterprise(s) in conducting a pattern of racketeering activity because this activity was related in nature, continued over a period of at least five years, and will continue for the foreseeable future.

116.   The racketeering acts listed above are related because they served a similar purpose and have similar results:  to artificially inflate the membership ranks and artificially skew the demographic structure of the Knights of Columbus insurance risk-pool, and to wrongfully bring under the control of Defendant the tools developed by UKnight to prevent this system from revealing their fraud and to enhance their ability to effectively continue this fraud.

These acts are further related because they have the same participants and victims—Defendant KC and its officers, local councils that "independently" certify the false membership numbers, independent agents that sell these financial products, members of the Knights of Columbus that purchase these products based on fraudulent information, the ratings agencies including AM Best that rate these products based on fraudulent information, and IDI which facilitated the concealment of this scheme.  This pattern protects the financial position of and enriches the Defendant.

117.    The racketeering activity engaged in by Defendant has continued unabated for at least the more than five years that UKnight worked with KC.  During this entire period Defendant has engaged in racketeering activity to artificially inflate the insurable membership numbers of the Knights of Columbus, and has used these inflated numbers to induce members to purchase insurance and to induce UKnight to remain committed to KC while it conspired to steal from UKnight the technology needed to further control and manipulate the Order's membership data.  This pattern also threatens to continue for an indefinite duration.  Defendant shows no intention of stopping this practice of fraudulently inflating its insurable membership numbers—in fact, all of the above internet representations listed in this Complaint remain on KC's website as of the time of this filing.  Additionally, because KC is actively seeking a new vendor to implement an internal system using UKnight's stolen trade secrets, this activity is ongoing.

### I.    Proximate Injury To Plaintiff UKnight

118.    As a result of Defendant's violations of 18 U.S.C. §§ 1962(c), Plaintiff UKnight has been directly, concretely, and proximately injured in its business and property as a result of

the foregoing overt acts in furtherance of the conspiracy, and as a result of the racketeering acts outlined above.  By Defendant's racketeering acts, UKnight was wrongfully induced to enter into a contractual relationship with KC by believing it was a stable, ethical, and growing company; was wrongfully induced to focus exclusively on KC and to endure its scheme of delays due to the potential for and promises of substantial (but illusory) business with councils and members that did not exist; all of which led to UKnight being set up and pilfered of its trades secrets by Defendants so that they could use UKnight's product to maintain and enhance their ability to continue their conspiracy.

119.   Plaintiff's damages as a result of Defendant's racketeering activity are in an amount to be determined at trial.

WHEREFORE, Plaintiff seeks relief as set forth at the end of this Complaint.

## SECOND CLAIM FOR RELIEF

**(Injunctive Relief – By Plaintiff UKnight Against David J. Kautter, In His Official Capacity As (Acting) Commissioner Of The Internal Revenue Service)**

120.   Plaintiff incorporates all of the allegations in the Complaint as if fully rewritten herein.

### A.   UKnight Has Standing To Bring This Claim For Relief

121.   As outlined below, KC operates as a sham 501(c)(8) fraternal beneficiary society as it fails to meet the statutory and regulatory requirements to qualify for this tax-exempt status.

122.   KC is a direct competitor with UKnight to provide web platform services to the local councils of the Order.  For example, prior to discussions with UKnight, KC attempted to create in-house web platform services roughly analogous to those offered by

UKnight and to provide them to local councils in exchange for a portion of the *per capita* fees paid by the local councils.

123.    Once KC realized that it could not permit UKnight to become the standard web platform provider to the Order as it would reveal its fraudulent scheme, but after it had committed to providing the services UKnight offered to the Order, KC decided to steal UKnight's trade secrets and replicate these services either directly in-house, or through a third-party vendor for in-house management and sale to local councils.

124.    Because the local councils would bear the vast majority of the cost of UKnight's services, KC knew that it would cost it far more to create similar services in-house for sale to the local councils.  However, as a direct result of the tax-free profits from its insurance sales it was able to retain due to its tax-exempt status, KC was able to afford to replicate these services itself, which allowed it to breach its obligations with and promises to UKnight.

125.    As a result, UKnight has suffered a concrete and particularized injury by KC's ability to leverage it's wrongful tax-exemption to unfairly obtain competitive advantage *vis-a-vis* UKnight to sell web platform services to the local councils.  KC <u>admits</u> that it is in competition with UKnight by virtue of its trademark and unfair competition counterclaims asserted against UKnight.  KC's unfair competitive advantage by virtue of its fraudulent tax-exemption has directly resulted in UKnight's loss of sales of it's services to thousands of local councils, amounting to millions of dollars of loss per year, and will continue to result in these losses of annual fees for the foreseeable future.

126.   This injury suffered by UKnight as a result of KC's wrongfully-claimed tax-exempt status is squarely within the zone of injury as contemplated by Congress when it outlined strict requirements for a corporation to qualify for tax-exempt status under Section 501.

127.   Additionally, UKnight has been injured by KC's wrongful claim of 501(c)(8) status as this status has permitted it to avail itself of the person-enterprise distinction defense in successfully arguing for dismissal of Plaintiff's RICO claim in the First Amended Complaint. As a result, absent the ability to disqualify KC from its claim of 501(c)(8) status, UKnight will be prospectively injured as KC will be able to avoid RICO liability for the racketeering injury suffered by UKnight due to this fraudulent claim.

128.   This injury suffered by UKnight as a result of KC's wrongfully-claimed 501(c)(8) status is squarely within the zone of injury as contemplated by Congress when it passed both Section 501 and 18 U.S.C. § 1961, *et seq*.

129.   Both of these injuries will be squarely redressed by a ruling and injunction in UKnight's favor on this claim.

**B.     KC's 501(c)(8) Status Should Be Revoked**

   **i.     <u>KC does not meet the "common tie" requirement for a fraternal benefit society under § 501(c)(8).</u>**

**C.**     Section 501(c)(8) requires that members of a fraternal beneficiary society all share a "common tie." Here, the Bylaws and Constitution of the Order of the Knights of Columbus defines the required common tie within that organization, stating that <u>all</u> members must be "Practical Catholic men, over the age of 18, in union with the Holy See and who are in good standing with the Church." These bylaws have been reaffirmed by KC every year, through 2017.

131.   The requirements to be a "Practical Catholic in union with the Holy See" are specific and objective precepts of the Church considered to be the absolute minimum actions required of Catholics as defined by the "Holy See."  They include, but are not limited to, that one must: attend mass on all Sundays and all six other holy days of obligation; must observe all prescribed days of fasting and abstinence; must not support abortion or the redefinition of marriage; must not marry a non-Catholic without special permission from the Bishop; and must have any prior marriage annulled in order to remarry.

132.   Initially, 36% of the purported members of this fraternity share no common tie at all, as they are "phantom members."  *See* ¶ 43, *supra*.

133.   Additionally, upon information and belief, more than half of the remaining "members" of the Order do not share the common tie of being "Practical Catholics in union with the Holy See."  The reasonable basis for this belief includes:

a.   Numerous local council leaders have complained to UKnight that even after they report to KC that a member is no longer a Practical Catholic (which in and of itself requires membership forfeiture), or even that they have renounced their Catholic Faith entirely, they are refused permission to remove this member from their membership rolls.

b.   Numerous local council leaders have reported to UKnight that a significant portion of their membership have impermissibly married outside the faith, have been divorced and remarried without annulment of their prior marriage (or marriages), or do not attend church regularly (let alone on all Sundays and the six other holy days of obligation).

c.   The Constitution of the Order requires that every prospective member be rigorously interviewed by a panel of seven members to ensure that they are, in fact, "Practical

Catholics in union with the Holy See," but numerous local officers report to UKnight that this never happens as their directive from KC is to increase membership, not enforce their bylaws and common tie, and because there is an understanding that such interviews would dramatically reduce membership. Indeed, as recently as July 31, 2017, KC's "Supreme Knight" Carl Anderson stated that recruitment is "job number one."

        d.     Recently, in direct contravention of its own bylaws, and in its effort to bolster flagging membership numbers, KC has even instituted an "E-Member" program where individuals can go online, pay $30, and "become" members of the Order and just so that they can purchase insurance without ever demonstrating their common tie or even attending a single local council meeting.

134.    Because more than half of their members do not share the required common tie, and because KC makes no effort (and indeed engages in *ultra vires* acts to the contrary) to enforce this claimed common tie, the 501(c)(8) status of KC should be revoked.

        ii.    **KC impermissibly provides benefits and services outside its purported fraternity in violation of § 501(c)(8) and the Commerciality Doctrine.**

135.    Additionally, to qualify as a 501(c)(8) corporation, KC must provide benefits exclusively to the members of its fraternity, and may not engage in any substantial non-exempt activity.

136.    In direct violation of this requirement, KC, through its wholly-owned subsidiary Knights of Columbus Asset Advisors LLC, sells mutual funds for-profit on the open market to anyone regardless of whether they have any affiliation with the Order, the Catholic Church, or even a religious or charitable organization. According to one officer of Knghts of

Columbus Asset Advisors, these "profits get up-streamed to [KC]"   Indeed, KC's mutual funds are not even available to the rank-and-file members of the fraternity.   However, as Knights of Columbus Asset Advisors officer Thomas Duffy recently stated in an interview, "it was an easy step to open these funds to the public."   Indeed, Mr. Duffy directly compared their operations to Goldman Sachs.   KC sells these products using a separate sales force outside their membership.   KC even brags about the substantial nature of its Knights of Columbus Asset Advisors business and its place in the competitive, for-profit marketplace stating that "we are already among the top 200 asset advisors in the United States."   Accordingly, KC no longer primarily provides services to the members of its fraternity.

137.    Additionally, KC is a major partner in Boston Advisors, LLC, an expressly for-profit company that provides financial advisory services to the market at large.

138.    Each of these activities constitute wholly-commercial enterprises in violation of the Commerciality Doctrine because (1) they sell goods and services to the general public; (2) they are organized in direct competition with for-profit firms; (3) they do not offer "below-cost" pricing; (4) they utilize promotional materials including advertising websites to enhance sales; (5) they utilize paid employees; and (6) they do not solicit charitable contributions as part of these activities.

139.    These activities of KC are substantial because they generate millions of dollars in revenue per year, and they are non-incidental to the other exempt purposes of KC as they are wholly separate business endeavors that stand on their own, are separately structured, and are neither a required part of nor simply the result of the operations of KC's exempt purposes.   Further, the services provided by KC pursuant to these activities do not even

constitute "benefits" as permitted under 501(c)(8), and are not provided to members or their dependents.  The substantial, and in fact sole purpose of these activities is to provide investment vehicles and advisory services to the public-at-large unrelated to the "fraternity" of the Knights of Columbus—in other words, these activities constitute for-profit financial operations that market retail products to the public, exhibit a clear commercial hue, and that look like and do compete with other for-profit firms in these sectors.

140.    Further, these activities represent a clear intent by KC to diversify its income streams away from its fraternal benefit model (the sole basis for its tax-exemption) toward for-profit services to the public in general in order to make up for the deepening losses suffered in its fraternal insurance business (nearly $1 billion in negative net income in 2015).

141.    Additionally, these activities constitute operation outside the "lodge system," which is required of any valid 501(c)(8) corporation.  As a result of these services, a primary and unlimited focus of KC is the provision of services and benefits—for profit—to individuals and entities entirely unrelated to the fraternity itself.  Accordingly, KC is no longer primarily engaged in providing benefits to its own fraternity.  Additionally, the subsidiaries and joint-ventures through which KC conducts these activities are in direct contravention of the required "lodge system" structure comprised solely of a parent and subordinate lodges. Essentially, because KC recognizes the negative prospects for its membership numbers and fraternal insurance business, it is diversifying a substantial portion of its revenues outside of the fraternity to shore up its finances—this would be perfectly acceptable for a for-profit, taxable business, but is expressly impermissible for a tax-exempt 501(c)(8) corporation.

142.    As a result of these impermissible activities, KC's 501(c)(8) tax-exempt status should be revoked.

### iii.    KC's executive's compensation constitutes impermissible private inurement.

143.    Finally, KC provides unreasonable compensation to its top executives, and such compensation constitutes impermissible private inurement.  This is especially problematic because these same leaders are the ones who direct the fraudulent scheme outlined in this Complaint to boost "membership" numbers to enhance insurance revenues so that significant portions of these revenues can be funneled into their own pockets.

144.    In each of the years 2013, 2014 and 2015, the only years for which information is publicly available, three top executives, Carl Anderson, Tom Smith, and Anthony Minopoli, paid themselves over a half-million dollars each year in bonuses.

145.    In 2015, the most recent year for which information is available, even though total net revenue for KC *decreased* by $46,216,628 - a *decrease* of over 40% - these three executives still paid themselves bonuses totaling $593,350.

146.    In 2015, even though KC reported that fraternal membership and charitable giving only grew by slightly over 1%[5], 19 KC executives took 13% of *all net revenue* for themselves.

147.    For example, the CEO of KC is called the Supreme Knight, an office held since 2000 by Carl Anderson.  Over the last three years, Carl Anderson received annual cash compensation averaging $2 million per year, as well as lavish benefits including a dedicated

---

[5] The *reported* and unaudited membership, internationally, has been growing by a mere 1% annually ever since Carl Anderson became Supreme Knight in 2000.

limousine to drive him daily to and from work.  This compensation is unreasonable because it is dramatically higher than that of similarly situated executives in tax-exempt companies.

148.   When compared to the salaries received by CEOs of nine of the top tax-exempt organizations in the country, including the United Way, the American Red Cross, and Goodwill Industries, which revenues, size, and complexity are in most cases greater than that of KC, Mr. Anderson's salary is *at least three times that* of the average of other CEOs.

149.   In 2015 when three KC executives paid themselves $593,350 in *bonuses*, the <u>*total compensation*</u> for the Pres/CEO of the American Red Cross, founded 1881 with annual revenues of $3 billion, was $533,994; the Pres/CEO of World Vision, who managed operations in 100 countries with 46,000 staff members, was $555,535; and, the Pres/CEO of Feeding America, who increased the third largest charity in the U.S. by 6% last year, was $479,015.

150.   In 2014, compensation taken by the Supreme Knight, Carl Anderson, was $2,289,806.  In contrast, compensation for the Pres/CEO of the American Red Cross was $556,772; the Pres/CEO of World Vision was $536,755; and, the Pres/CEO of Feeding America was $651,083.  The compensation of Carl Anderson was 4x that of his peers, even though each manage far larger and more complex organizations.  Taking the number of employees as a measure of complexity, American Red Cross employs 35,000; World Vision employs 44,500 (2011); Feeding America employs 46,000; and, KC employs 903.

| Organization | 2014 Revenue | Employees | Supreme Knight / CEO Compensation | KC Multiple |
|---|---|---|---|---|
| Carl Anderson | $2.2 billion | 903 | $2,289,806 | Average 4x Peers |
| American Red Cross | $3 billion | 35,000 | $556,772 | x 4.11 |
| Feeding America | $2.2 billion | 46,000 agencies | $651,083 | x 3.52 |
| World Vision | $1.6 billion | 44,500 | $536,755 | x 4.27 |

151.    In 2013, Goodwill Industries operated 3,200 retail stores, employed approx. 115,000 and served more than 36 million people, generated revenues of $5.7 billion, and paid its Pres/CEO $639,085.  KC generates its revenue by contracting 143 independent businessmen to sell its insurance products to members of its own Catholic fraternity who mail in their insurance payments year after year.  For "managing" this tax-exempt company for the single year 2013, Supreme Knight Carl Anderson took home $2,063,818 – 3.23x that of his "peer".

152.    It has yet to be determined whether any of the other CEOs featured for this comparison are chauffeured by limousine to and from their office every day.

153.    Similarly, Thomas Smith, the Director of Insurance[6] for KC, receives cash compensation of over $970,000 per year, which is 2.6 times the second highest paid executives of comparably sized tax-exempt organizations.  Frankly, when evaluating the facts, it is hard to

---

[6] KC Insurance products are generally as expensive or more expensive than comparable products sold by other companies, including for-profit insurance companies.  When challenged on cost, salesmen are taught to direct customers to their Superior AM Best rating to justify the higher prices.  There appears to be no benefit whatsoever to the members of this 501(c)(8) fraternity because its associated insurance company enjoys a generous tax-exempt status.

understand how an objective committee could approve compensation of nearly $1 million per year for Mr. Smith who, despite what is claimed on their website, is actually only responsible for overseeing 143 independently contracted businessmen who assume all the risk of building their own company around the sale of KC insurance products.  *They* are responsible for hiring and training the salesmen who actually sell KC insurance products, *they* are the ones responsible for paying their salaries, called a draw, and *they* are the ones responsible for assuming all of the risk and paying all of the overhead associated with generating revenue for KC.

154.    Mr. Smith travels the world going to lavish resorts for "sales meetings", but he holds no college degree, nor does he have any experience, accomplishments or training outside of the KC cocoon.   Executives of other tax-exempt companies who receive the second highest level of compensation manage complex international food distribution organizations; direct nationwide charitable retail operations with over 100,000 employees; conduct medical research into treatment protocols for cancer, diabetes and other life-threatening diseases; and, coordinate emergency disaster relief that impact many millions of people around the world. Compared to these executives who are eminently more qualified, Mr. Smith's compensation is patently unreasonable.

| Organization | Revenue | Compensation | Experience |
|---|---|---|---|
| KC | $2.2 billion | $972,211 | Tom Smith, KC |
| American Red Cross | $3 billion | $553,086 | Harvard Business, President Biomedical Services, EVP Quest Int'l, ATT |
| United Way | $3.7 billion | $441,875 | Georgetown, MBA, Pres./CEO Fannie Mae Foundation, Pres. March of Dimes |
| City of Hope | $1.6 billion | $418,117 | Univ. Chicago Law, Pres./CEO CH Medical Foundation, Private Practice Law |
| Feeding America | $2.2 billion | $354,150 | BA Harvard, SVP US Foods, VP Optum, Inc. |
| World Vision | $1 billion | $315,245 | CPA, FASB Advisory Committee, SVP Finance Brown Forman ($3b sales, 4,600 emp) |
| Goodwill Industries | $5.6 billion | $302,918 | BA, VP Nat'l Industries for the Blind, COO Columbia Lighthouse for the Blind |
| Task Force for Global Health | $3.2 billion | $281,451 | Phd, Johns Hopkins, Founder PHII, Co-Chair Data for Health |
| Food for the Poor | $1.2 billion | $275,495 | MSc, Nova Univ., Educator |

155. Not counted in the analysis above, the ancillary benefits received by KC's top executives are even more egregious. For example, when compared with the United Way, the disclosed value of pension benefits paid to KC's executives is 2423% higher, and the value of "other benefits" is 4440% higher.

156. Additionally, KC provides executives with "non-qualified deferred compensation" designed to "make up for IRS limits." Participants not only receive additional compensation, but also payments for the income taxes due on that compensation. As buried on

page 146 of their 2014 tax filing as part of their reported compensation, among eight other executives this plan provided Carl Anderson with $1,035,86 and Thomas Smith $163,000.

157.    The appropriate sanction for each of these failures to meet the requirements of a 501(c)(8) corporation, independently, is revocation of KC's tax-exempt status.  However, the Internal Revenue Service and Defendant David J. Kautter, in his capacity as it's Commissioner, have failed to appropriately investigate or sanction KC for this impermissible conduct, directly resulting in the injuries to UKnight as outlined above.

158.    There is no adequate remedy at law for the injuries suffered by UKnight as a result of Mr. Kautter's and the IRS's failure to properly revoke KC's tax-exempt status, and absent an order from this Court forcing Mr. Kautter to revoke that status, UKnight will have suffered, and will continue to suffer, irreparable injury as outlined above.

WHEREFORE, Plaintiff seeks relief as set forth at the end of this Complaint.

### THIRD CLAIM FOR RELIEF
**(Breach of Contract – By Plaintiff UKnight Against Defendant KC)**

159.    Plaintiff incorporates all of the allegations in this Complaint as if fully rewritten herein.

160.    KC and UKnight entered into an express contract on September 10, 2011, that could be performed in less than one year.  Indeed, KC's only performance obligation was to announce UKnight as its designated vendor and direct its state and local councils, assemblies, and agents to subscribe to the UKnight system.  This contract was confirmed by numerous emails, including from Denise Serafini stating that "the Supreme Knight thought this was done last year."

161. In the alternative, a contract between KC and UKnight must be implied in fact here based on the course of dealing of the parties as outlined above.

162. This contract contained adequate consideration in the form of mutual exchange of promises by both sides, including KC's promise to announce UKnight as its designated vendor, and UKnight's agreement to let KC redesign portions of the graphical interface and add legal disclaimers to their web platform to meet KC's specific wishes.

163. Defendant failed to perform its obligation under that contract by never formally announcing that UKnight was its designated vendor, and never directing state and local councils, assemblies, and agents to subscribe to the UKnight system.

164. Plaintiff substantially performed all of its obligations under the contract.

165. Plaintiff suffered damages as a result of this breach by Defendant in the form of lost revenues and profits from subscription fees, its lost share of advertising and fundraising revenues, missed business opportunities while it focused on preparing exclusively to serve the Knights of Columbus, and other economic damages in an amount to be proven at trial.

WHEREFORE, Plaintiff seeks relief as set forth at the end of this Complaint.

## FOURTH CLAIM FOR RELIEF
### (Promissory Estoppel – By Plaintiff UKnight Against Defendant KC)

166. Plaintiff incorporates all of the allegations in this Complaint as if fully rewritten herein.

167. Defendant KC made numerous promises to UKnight, including:

a.      The promise by KC on September 10, 2011 that it would announce UKnight as its designated vendor and instruct all state and local councils to subscribe to the UKnight system.

b.      Ms. Serafini's 2014 promises that KC was committed to the deal by stating that "the Supreme Knight thought this was done last year," that "he knows this (the announcement of UKnight as the designated vendor) is the right thing to do," and telling Mr. Labriola that the Supreme Knight had instructed that this was to be "done yesterday."

c.      Andrew Walther's promise in July of 2013 that UKnight had already been selected as the designated vendor, that all preparations were already completed for the announcement, and that the formal announcement would take place at the International State Deputy meeting in November 2013.

d.      Supreme Knight Carl Anderson's promise in mid-August 2013 that he would make the formal designated vendor announcement personally, and that it would make a "big splash."

e.      KC's promise, in response to inquiries about delays, that the deal was "etched in stone" and the announcement was imminent.

f.      Ms. Serafini's promise, on December 12, 2013, in response to Mr. Labriola's inquiry about whether KC was trying to back out of the deal, that this was not the case, and that "we can get back to business in the next few days."

168.    Defendant KC should have, and did, reasonably expected these promises would induce UKnight to take definite and substantial actions to its detriment by preparing for this increased workload, investing in their internal infrastructure, accepting delays, forbearing from accepting work from other potential customers, and forbearing from seeking out additional partners organizations.  UKnight did, in fact, reasonably rely on these promises to their detriment by taking such actions and forbearing from such actions.

169.    Indeed, in a July 28, 2015 phone conversation between Mr. St. John and Mr. Labriola, Mr. St. John confirmed that he understood that "[UKnight] are a company that solely

exist for us [the Knights of Columbus]," acknowledging that the very existence of UKnight depended on Defendants keeping their promises.

170.    In the circumstances presented in this Complaint, Defendant's promises must be enforced to prevent injustice.

WHEREFORE, Plaintiff seeks relief as set forth at the end of this Complaint.


### FIFTH CLAIM FOR RELIEF
### (Violation of C.R.S. § 7-74-101, *et seq.* – Misappropriation of Trade Secrets – By Plaintiff UKnight Against Defendant KC)

171.    Plaintiff incorporates all of the allegations in this Complaint as if fully rewritten herein.

172.    Plaintiff UKnight developed extensive trade secrets consisting of their platform's relational architecture, database relationships, information flow scheme, and the programming and code underpinning these elements of the platform's software, as well as the related hardware architecture design developed specifically to meet the unique needs of the Knights of Columbus organization over a period of over 8 years. These designs, technical information, processes, procedures, and architecture constitute protected trade secrets within the meaning of C.R.S. § 7-74-102.  Plaintiff's trade secrets are novel, not generally known, and cannot be ascertained or reverse engineered without tremendous effort, expertise, and expense.  This is demonstrated by the fact that no other vendor was able to offer to KC a comparably capable system even at double the price.

173.    Plaintiff made reasonable commercial efforts under the circumstances to maintain the secrecy of these trade secrets, including (1) advising all partners within UKnight that this

information constitutes trade secrets; (2) access to these trade secrets was strictly limited on a

need-to-know basis with access limited exclusively to UKnight member and technology manager

and designer Terry Clark and to his assistant Jim Goode who was required to sign a binding non-

disclosure agreement before being given access to this information; (3) access to the computer

systems containing the trade secrets was controlled by secure login and password known only to

Mr. Clark.  Additionally, Plaintiff's trade secrets are novel, not generally known, and cannot be

ascertained or reverse engineered without tremendous effort, expertise, and expense.  This is

demonstrated by the fact that no other vendor was able to offer to KC a comparably capable

system even at double the price, and ultimately KC chose to steal Plaintiff's trade secrets rather

than attempt to develop their own system or reverse engineer Plaintiff's from the publicly

viewable façade of the system.

174.    Plaintiff's trade secrets have economic value in excess of $1 million, as

demonstrated (1) by the fact that it took approximately 8 years of effort by UKnight's three

partners to develop the trade secrets, including nearly full-time technical development by Mr.

Clark over that time; and (2) these trade secrets granted UKnight substantial competitive

advantage in the field, as shown by KC's immediate interest in their system and later KC's

extraordinary efforts to steal these trade secrets rather than simply develop a comparable system

on its own.

175.    As stated in detail above, KC knowingly, intentionally, fraudulently, and

maliciously acquired Plaintiff's trade secrets by improper means and disclosed those improperly

acquired trade secrets to a third-party without any consent from Plaintiff.  Defendants' improper

means included, but were not limited to, theft, bribery, misrepresentation, and breach of a duty to UKnight to maintain secrecy.

176.    As a direct result of this misappropriation, Plaintiff suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiff seeks relief as set forth at the end of this Complaint.


## SIXTH CLAIM FOR RELIEF
### (Intentional Interference with Prospective Business Relations – By Plaintiff UKnight Against Defendant KC)

177.    Plaintiff incorporates all of the allegations in this Complaint as if fully rewritten herein.

178.    As a result of KC's contract with and promises made to UKnight, KC knew that UKnight had a reasonable expectation of entering into subscription business relationships with a high percentage of Knights of Columbus local councils, assemblies, and general agents.  In fact, Mr. St. John told Mr. Labriola that he expected "you're going to get . . . 85% [of all councils]."

179.    Defendant KC intentionally and improperly interfered with these prospective business relationships of UKnight by, among other things:

     a.    Inducing or otherwise causing the local councils, assemblies, and general agents to not subscribe to the UKnight system by defaming UKnight and Mr. Labriola;

     b.    Inducing or otherwise causing the local councils, assemblies, and general agents to not subscribe to the UKnight system by unreasonably and fraudulently postponing the announcement of UKnight as the designated vendor repeatedly over a period of four years;

c.  Preventing UKnight from acquiring the prospective subscribers by falsely and wrongfully telling UKnight it was not an approved vendor for the Knights of Columbus, and falsely and wrongfully telling UKnight that it was not permitted or licensed to use the Knights of Columbus name in delivering its system to any new Knights of Columbus subscribers;

d.  Stealing UKnight's trade secrets and engaging a third-party developer to create a copy of that system that KC would own so that it could provide these services directly in lieu of UKnight.

180.  These wrongful and intentional actions induced 10,000 or more councils, assemblies and general agents to not subscribe to the UKnight platform, causing economic damages to UKnight in an amount to be proven at trial.

WHEREFORE, Plaintiff seeks relief as set forth at the end of this Complaint.

## SEVENTH CLAIM FOR RELIEF
### (Fraudulent Misrepresentation – By Plaintiff UKnight Against Defendant KC)

181.  Plaintiff incorporates all of the allegations in this Complaint as if fully rewritten herein.

182.  Defendant made false representation of past or present facts to UKnight, including those listed above.

183.  Defendant additionally made fraudulent statements of future intention or promise despite knowing that it did not intend to keep the promise or did not intend to take the action promised in the future at the time the statement(s) were made, including those listed above.

184.  Each of these fraudulent statements concerned a material fact, as a reasonable person under the circumstances would have regarded each of them as important in making business decisions and deciding on UKnight's future course of action.

185.     Each of these fraudulent statements was made by an employee, officer, or director of KC acting within the scope of their employment by Defendant.  Accordingly, Defendant is responsible for these statements.

186.     At the time each of the above misrepresentations was made, the Defendant knew that it was false or was aware that it did not know whether the representation was true or false. Defendant KC made each of the above representations with the intent that Plaintiff would rely on them to its detriment, and to the benefit of KC.

187.     Plaintiff in fact relied upon these representation by taking actions it would not have otherwise taken, or not taking actions it would have otherwise taken, as stated in this Complaint.  Plaintiff's reliance on each of these misrepresentations was reasonable and justified under the circumstances.

188.     Plaintiff's reliance on each of these misrepresentations directly and proximately caused it economic damages, including lost revenues and profits, the economic burden of accepting delays without seeking other business in order to focus on serving the Knights of Columbus, the refusal of outside work and the business decision to not seek other clients, and other economic damages in an amount to be proven at trial.

WHEREFORE, Plaintiff seeks relief as set forth at the end of this Complaint.

## EIGHTH CLAIM FOR RELIEF
**(Negligent Misrepresentation – By Plaintiff UKnight Against Defendant KC)**

189.     Plaintiff incorporates all of the allegations in this Complaint as if fully rewritten herein.

190.     Defendant, in the course of its business and in regards to a transaction in which it had a pecuniary interest, supplied false information for the guidance of Plaintiff in this business transaction, including the information contained in the statements listed above.

191.     Each of these false statements was made by an employee, officer, or director of KC acting within the scope of their employment by Defendant.  Accordingly, Defendant is responsible for these statements.  Defendant failed to exercise reasonable care as to the truth and accuracy of each of these statements in communicating them to Plaintiff.

192.     Plaintiff reasonably and justifiably relied on this information to its detriment as stated in this Complaint.

193.     Plaintiff's reliance on each of these misrepresentations directly and proximately caused it economic damages, including lost revenues and profits, the economic burden of accepting delays without seeking other business in order to focus on serving the Knights of Columbus, the refusal of outside work and the business decision to not seek other clients, and other economic damages in an amount to be proven at trial.

WHEREFORE, Plaintiff seeks relief as set forth at the end of this Complaint.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff requests judgment in its favor, and against Defendants, jointly and severally, as follows:

A.     Economic damages to Plaintiff in an amount to be proven at trial;

B.     A permanent injunction enjoining and ordering David J. Kautter, in his official capacity as the (Acting) Commissioner of the Internal Revenue Service, to revoke the 501(c)(8) tax-exempt status of Defendant Knights of Columbus.

C.      Treble damages on Plaintiff's civil RICO claim pursuant to 18 U.S.C. § 1964;

D.      Statutory damages on Plaintiff's misappropriation of trade secrets claim pursuant to C.R.S. § 7-74-104(2);

E.      Reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c), and C.R.S. § 7-74-105;

F.      Costs of suit and pre- and post-judgment interest at the highest allowable legal rates; and

G.      Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated:  January 11, 2018.


/s/ Jeffrey S. Vail
_____
Jeffrey S. Vail
VAIL LAW LLC
5299 DTC Blvd., Suite 1101
Greenwood Village, CO 80111
Tel/Fax: (303) 800-8237
E-mail:  jvail@vail-law.com
ATTORNEY FOR PLAINTIFF

Plaintiff's Addresses:
1434 Spruce Street, Suite 100
Boulder, Colorado