IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 17-cv-00210-RBJ

LIST INTERACTIVE, LTD. d/b/a Uknight Interactive, and
LEONARD LABRIOLA

      Plaintiffs,

v.

KNIGHTS OF COLUMBUS, and
DAVID J. KAUTTER, in his official capacity as Acting Commissioner of the Internal Revenue
Service,

      Defendants.

v.

KNIGHTS OF COLUMBUS

      Counterclaim Plaintiff,

v.

LIST INTERACTIVE, LTD. D/B/A UKNIGHT INTERACTIVE,
LEONARD S. LABRIOLA,
WEBSINC.COM, INC.,
STEPHEN MICHLIK,
JONATHAN MICHLIK, and
TERRY A. CLARK,

      Counterclaim Defendants.

---

## ORDER

---

      This matter is before the Court on five pending motions.  For the reasons discussed in this

order, the Court (1) denies plaintiffs' motion for a temporary restraining order, preliminary

injunction, and sanctions; (2) denies the Knights of Columbus' motion for a protective order; (3)

grants the Knights of Columbus' partial motion to dismiss; (4) grants in part and denies in part plaintiffs' and other counterclaim defendants' motion to dismiss the Knights of Columbus' counterclaims; and (5) denies the Knights of Columbus' motion to dismiss for lack of standing, or alternatively, for partial summary judgment.

## FACTS

I provided a detailed overview of the facts in an order dated July 28, 2017.[1] The facts remain the same subject to a few developments since that order was issued. Plaintiff List Interactive, Ltd., frequently referred to by its d/b/a UKnight Interactive or just UKnight, is a small company that designs web systems. Plaintiff Leonard Labriola is the manager of UKnight. I will refer to the plaintiffs collectively as "UKnight." UKnight alleges that in September 2011 defendant Knights of Columbus promised to announce to the broader Knights of Columbus fraternity of lodges and agents ("the Order") an agreement whereby UKnight would be the designated vendor for the Order's life insurance business. The promised announcement never occurred, and litigation followed.

UKnight's core claims, as I see them, are that the Knights of Columbus breached an oral contract when it reneged on its agreement to make UKnight its designated vendor, and that the Knights of Columbus stole trade secrets from UKnight before doing so. UKnight has also asserted two other creative claims that are the subject of one of the pending motions. For its part, the Knights of Columbus has struck back with an assortment of counterclaims, which this order also addresses. I will explain each of the pending motions as I get to them.

---

[1] *List Interactive, Ltd. v. Knights of Columbus*, No. 17-CV-00210-RBJ, 2017 WL 3217817 (D. Colo. July 28, 2017).

## STANDARD OF REVIEW

To survive a 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plausible claim is a claim that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the Court must accept the well-pled allegations of the complaint as true and construe them in the light most favorable to the plaintiff, *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002), conclusory allegations are not entitled to be presumed true, *Iqbal*, 556 U.S. at 681. However, so long as the plaintiff offers sufficient factual allegations such that the right to relief is raised above the speculative level, he has met the threshold pleading standard. *See, e.g.*, *Twombly*, 550 U.S. at 556; *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008).

## ANALYSIS

As mentioned above, there are five pending motions. I will address each motion in turn.

A. **UKnight's Emergency Motion for a Temporary Restraining Order, Preliminary Injunction, and Sanctions for Witness Intimidation. [ECF No. 76].**

Plaintiff UKnight filed a motion for a temporary restraining order to enjoin the Knights of Columbus from engaging in behavior during discovery that UKnight described as "witness intimidation." ECF No. 76 at 1. The Court heard argument regarding this discovery issue on September 25, 2017, and I issued an Order that same day addressing and effectively granting the requested injunctive relief. *See* ECF No. 79. Now five months have passed and no further discovery issues of the sort have arisen. Thus, the Court sees no live issue remaining in this

motion, and tellingly UKnight did not argue that this motion is still ripe at the hearing before this Court on February 6, 2018 when asked. Therefore, ECF No. 76 is DENIED.

**B. <u>Knights of Columbus' Motion for Protective Order</u>. [ECF No. 77]**.

This motion focused immediately on the plaintiffs' September 22, 2017 email to local councils, which the Court addressed in its order of September 25, 2017, and to that extent it is moot. To the extent the motion seeks protection against any discovery concerning membership information, it is DENIED for reasons discussed *infra* in connection with defendants' motion to dismiss for lack of standing, etc. ECF No. 107.

**C. <u>Knights of Columbus' Partial Motion to Dismiss</u>. [ECF No. 100].**

The Knights of Columbus filed a motion to dismiss the First and Second Claims in UKnight's Second Amended Complaint. ECF No. 100. UKnight's First Claim alleges that the Knights of Columbus violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") and that it continues to violate RICO through an alleged insurance fraud enterprise. ECF No. 98 at 28. UKnight's Second Claim seeks a court order requiring David J. Kautter, the Acting Commissioner of the Internal Revenue Service, to invalidate the Knights of Columbus' tax-exempt status due to the alleged insurance fraud activity. *Id.* at 46. For the following reasons, I GRANT the Knights of Columbus' motion to dismiss both claims.

**1. <u>UKnight's RICO Claim</u>.**

RICO vests a private citizen with substantive rights to avoid injuries to his business or property caused by a pattern of racketeering activity. 18 U.S.C. § 1964(c). It outlaws four types of racketeering activities which, as relevant here, include "conducting the affairs of an enterprise through a pattern of racketeering" or conspiring to do so. *Id.* at §§ 1962(c–d). In the Tenth Circuit, a plaintiff asserting a RICO claim must plausibly allege that "a person (1) conducted the

affairs (2) of a distinct enterprise (3) through a pattern (4) of racketeering activity." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 882 (10th Cir. 2017) (internal quotation marks and citations omitted).

UKnight alleges that the Knights of Columbus, the insurance ratings agency AM Best, and a software company called IDI make up the "Insurance Fraud Enterprise."[2] ECF No. 98 at 29. With the Knights of Columbus at the helm, the alleged objective of this enterprise is to perpetuate the Knights of Columbus' insurance fraud scheme by allowing the Knights of Columbus to (1) inflate its reported membership numbers without detection, and (2) use these inflated membership numbers to bolster the Knights of Columbus' insurance business reputation to make more money. *Id.* According to UKnight, this played out in the following ways. First, the Knights of Columbus provided AM Best with false membership numbers and demographic data so that AM Best would, in turn (and unknowingly), generate fraudulent insurance ratings for the Knights of Columbus' insurance products. This bolstered the Knights of Columbus' insurance business reputation and allowed it to attract business under false pretenses, including business relationships like the one between UKnight and the Knights of Columbus. *Id.* at 30–31.

---

[2] In my July 2017 order, I dismissed without prejudice UKnight's original RICO claim because it failed to establish the existence of an "enterprise" distinct from the Knights of Columbus "person." ECF No. 54 at 31. In its amended complaint, UKnight asserts a new RICO claim and defines the "enterprise" in two ways. First, it again defines the "enterprise" as being comprised of the various subparts of the Order. ECF No. 98 at 27. Though UKnight attempts to show the distinct functions and the purported "legal separateness" of the Order's subparts from the Knights of Columbus—*e.g.*, the Knights of Columbus are the sole issuer of insurance policies while the local councils are mainly volunteer/fundraising entities— this formulation still fails under the dictates of my previous order and the cases cited therein. *See* ECF No. 54 at 31 (noting that despite the Knights of Columbus' attempt to distinguish the subparts of the organization, the "constituent parts of the fraternity – including thousands of local councils, assemblies, field agents, and general agents – merely carry out the Knights of Columbus' business of selling insurance."). Simply put, the Knights of Columbus organization cannot simultaneously constitute a "person" and "distinct enterprise" for the purposes of RICO. *See, e.g.*, *George v. Urban Settlement Servs.*, 833 F.3d 1242 (10th Cir. 2016) ("[A] defendant corporation, acting through its subsidiaries, agents, or employees typically can't be both the RICO 'person' and the RICO 'enterprise.'"). As such, I will review the adequacy of UKnight's pleading under its alternative enterprise formulation in which the enterprise is comprised of the Knights of Columbus, AM Best, and IDI.

After this scheme was up and running, the Knights of Columbus then used its relationship with IDI, a software company, to ensure its fraudulent scheme went undetected. *Id.* at 31. This allegation requires some additional background. According to UKnight, from 2011 until approximately 2013 the Knights of Columbus were gung-ho about working with UKnight to develop a new web platform for the Order's insurance business. ECF No. 54 at 6. All was well until sometime in 2013, when the Knights of Columbus "realized that broad deployment of the UKnight system would necessarily reveal their fraudulent inflation of membership numbers." ECF No. 98 at 40. Wishing to have its cake (the functionality of the UKnight web platform) and eat it too (not have information regarding its fraudulent inflation of membership numbers fall into the wrong hands), the Knights of Columbus allegedly hatched a plan whereby it dispatched the software company IDI to surreptitiously acquire knowledge about UKnight's web platform so that the Knights of Columbus could replicate the UKnight system in-house. *Id.* Based upon these alleged events and the involvement of IDI and AM Best in them, UKnight alleges that the Knights of Columbus therefore "conduct[ed] the affairs of an enterprise through a pattern of racketeering" in violation of RICO. 18 U.S.C. § 1962(c–d). Because UKnight's failure to sufficiently plead the third and fourth elements of its RICO claim (a "pattern of racketeering activity") is dispositive, I assume without deciding that UKnight has satisfied the first two elements of the RICO cause of action.

A "pattern of racketeering activity" requires at least two predicate acts of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 n.14 (1985). "The implication is that while two acts are necessary, they may not be sufficient." *Id.* Thus, in order for UKnight to successfully plead a "pattern," it must demonstrate not only the existence of two or more predicate acts perpetrated by the enterprise, but also that the alleged predicate acts are related and

pose at least a threat of continued criminal activity. *H.J. Inc. v. NW. Bell Tel. Co.*, 492 U.S. 229, 238–39 (1989). In the Tenth Circuit, courts interpret this holding from *H.J.* to require a showing of (1) "relationship" and (2) "continuity." *Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545, 1555 (10th Cir. 1992).

UKnight alleges the existence of seven predicate acts underlying this racketeering scheme: extortion (on the part of the Knights of Columbus), theft of trade secrets (on the part of both the Knights of Columbus and IDI), interstate transport of stolen goods (Knights of Columbus), wire fraud (Knights of Columbus and AM Best), receipt of stolen funds obtained by fraud (Knights of Columbus), financial institution fraud (Knights of Columbus), and witness tampering (Knights of Columbus). ECF No. 98 at 33–44.

a. *"*Relationship*"*

Under *Boone*, UKnight must first show how these predicate acts are related. The relationship test "is not a cumbersome one for a RICO plaintiff." *Boone*, 972 F.2d at 1555 (internal citation removed). A showing that predicate acts "'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events'" is all that is needed. *Id.* (quoting *H.J.*, 492 U.S. at 240). Here, UKnight has pled that the Insurance Fraud Enterprise had a shared purpose "to artificially inflate the membership ranks and artificially skew the demographic structure of the Knights of Columbus risk-pool, and to wrongfully bring under the control of Defendant the tools developed by UKnight to prevent this system from revealing their fraud and to enhance their ability to effectively continue this fraud." ECF No. 98 at 44. UKnight further argues that the predicates have the same participants and victims and that they all serve to "protect the financial position of and enrich[] the [Knights of Columbus]." *Id.* at 45.

I find that even in viewing the record in the light most favorable to UKnight, the alleged relationship between the acts is attenuated, and the predicate acts seem to be "isolated events" rather than calculated parts of a racketeering scheme. *See Boone*, 972 F.2d at 1555. The participants, victims, and methods of commission used by IDI to allegedly steal UKnight's trade secrets are quite different than those allegedly used by the Knights of Columbus to mislead AM Best. Thus, I am unconvinced that UKnight has met its burden on the relationship prong of establishing a "pattern."

b. "Continuity"

However, even if UKnight met its burden to show a relationship between the predicate acts, it has failed to sufficiently allege "continuity" of the alleged racketeering activities. As the Supreme Court has explained,

> Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where what must be continuous, RICO's predicate acts or offenses, and the relationship these predicates must bear one to another, are distinct requirements.

*H.J.*, 492 U.S. at 241–42. The Supreme Court has determined "that when Congress said predicates must demonstrate 'continuity' before they may form a RICO pattern, it expressed an intent that RICO reach activities that amount to or threaten long-term criminal activity." *Bixler v. Foster*, 596 F.3d 751, 761 (10th Cir. 2010) (citing *H.J.*, 492 U.S. at 243 n.4). As such, UKnight must show that the alleged Insurance Fraud Enterprise's activities "amount to or threaten long-term criminal activity." *Id.*; *see also Gotfredson v. Larsen LP*, 432 F. Supp. 2d 1163, 1174–76 (D. Colo. 2006) (to satisfy the continuity element in RICO, one must sufficiently allege "a clear threat of future criminal conduct."). UKnight has failed to do so.

UKnight argues that the scheme has existed for at least five years—since the time that UKnight's trade secrets were allegedly stolen—and presents a "clear threat of future criminal conduct" because the Knights of Columbus "shows no intention of stopping this practice of fraudulently inflating its insurable membership numbers" and "is actively seeking a new vendor to implement an internal system using UKnight's stolen trade secrets." ECF No. 98 at 45. However, UKnight's hodgepodge framing of who and what this enterprise is comprised of makes it exceedingly unlikely that the enterprise poses a real threat of future harm. While there remains the possibility that the *Knights of Columbus* will continue to fudge its membership numbers, it is implausible to assert that *this enterprise* poses a threat of future criminal conduct as required under RICO. The alleged criminal actions of this enterprise involving more than just the Knights of Columbus are isolated—lying to a national insurance ratings agency, stealing the trade secrets of a web program developer—and any risk of their reoccurrence or ability to cause future harm is purely hypothetical. Like the schemes in *Gotfredson*, *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir. 1990), and other cases where courts have dismissed RICO claims based on continuity, the Insurance Fraud Enterprise's alleged actions amount to a narrowly-focused scheme conducted in the past with no risk of future criminal conduct. *See Giese v. Giese*, No. 16-CV-01032-RBJ, 2017 WL 1407037, at *4 (D. Colo. Apr. 17, 2017). This kind of "narrowly-focused, albeit allegedly illicit behavior is not the kind of extensive, continuing racketeering activity that RICO was meant to cover." *Id.*

Thus, the objectives of RICO would not be served by recognizing a RICO claim in this instance. *SIL-FLO, Inc.*, 917 F.2d at 1516. Accordingly, the Court finds that UKnight's First Claim in the amended complaint is DISMISSED with prejudice.

**2. <u>UKnight's Claim for Injunctive Relief to Remove the Order's Tax-Exempt Status</u>.**

UKnight's Second Claim requests that this Court order the IRS to strip the Knights of Columbus of its tax-exempt status. ECF No. 98 at 46. The Second Amended Complaint was filed on January 11, 2018. I do not find a return of service in the file, but just yesterday the United States filed a motion to dismiss the claim. ECF No. 117.

The Knights of Columbus moves to dismiss this claim, asserting that UKnight does not have standing under Article III of the Constitution or the Internal Revenue Code to seek such relief. In its response to the motion UKnight does not attempt to show that it does have standing. Rather, in a one-paragraph response, UKnight asserts that the Knights of Columbus does not have standing to raise the standing argument because the Second Claim seeks relief against the IRS, not against the Knights of Columbus. UKnight suggests that if the IRS moves to dismiss for lack of standing, then the Knights of Columbus can file an "amicus brief," and UKnight will address the merits of the standing issue at that time. "However, in the event the Court rejects this request, Plaintiff requests [that] the Court grant it leave to address these arguments on the merit[s]." ECF No. 102 at 1-2.[3]

As for whether the Knights of Columbus can raise the issue, "it is well established that any party, including the court *sua sponte*, can raise the issue of standing." *New England Health Care Employees Pension Fund v. Woodruff*, 512 F. 3d 1283, 1288 (10th Cir. 2008); *see also Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (lack of standing raised by the court despite not being raised by either party). It seems to me that the Knights of Columbus should be able to raise the issue, since the relief requested – revocation of its tax-exempt status –

---

[3] I decline that request. Plaintiffs' opportunity, and obligation, to respond to the argument was in its response to the motion.

would presumably have a significantly adverse impact on the Knights.  Regardless, the Court elects in this instance to address the standing issue *sua sponte,* as it goes directly to the Court's jurisdiction.

"Constitutional standing derives from Article III of the U.S. Constitution, which restricts federal courts' jurisdiction to suits involving an actual case or controversy."  *Bd. of Cty. Comm'rs of Sweetwater Cty. v. Geringer*, 297 F.3d 1108, 1111 (10th Cir. 2002).  To establish Article III standing a party must, at a minimum show (1) an injury in fact, (2) causation, and (3) redressability.  *Hutchinson v. Pfeil*, 211 F.3d 515, 521 (10th Cir. 2000) (internal citation and quotation omitted).  An injury in fact is "a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical."  *Id.*  Causation requires "a fairly traceable connection between the plaintiff's injury and the complained-of conduct."  *Id.*  And finally, redressability is "a likelihood that the requested relief will redress the alleged injury."  *Id.*

Therefore, to establish Article III standing here, UKnight must show: (1) that it suffered an injury in fact; (2) that this injury can be traced to the Knights of Columbus' tax-exempt status; and (3) that this Court can redress the harm through the requested mandatory injunction.  *Id.*

UKnight asserts in its Second Amended Complaint that it has suffered an economic injury due to the Knights of Columbus' tax-exempt status because the Knights of Columbus is a "direct competitor with UKnight to provide web platform services to the local councils . . . [and] UKnight has suffered a concrete and particularized injury by [the Knights of Columbus'] ability to leverage its wrongful tax-exemption to unfairly obtain a competitive advantage."  ECF No. 98 at 47.  Assuming for the sake of argument that this is a sufficient injury, UKnight fails to establish standing on the second constitutional requirement of causation.  Article III's causation requirement "at least [demands] proof of a substantial likelihood that the defendant's conduct

caused plaintiff's injury in fact." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir.

2005) (internal quotations and citation omitted). Where "[s]peculative inferences are necessary

to connect [the plaintiff's] injury to the challenged actions," the plaintiff's burden of

demonstrating causation is not satisfied. *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426

U.S. 26, 45–46 (1976)).

Here, UKnight's theory of causation is too speculative and attenuated to survive even a

motion to dismiss for failure to state a claim. UKnight alleges that the Knights of Columbus

needed a web platform provider, and thus it had two choices: contract with an outside party such

as UKnight or develop a web platform in-house. *See* ECF No. 98 at 47. The Knights of

Columbus initially chose the former option because the "local councils would bear the vast

majority of the cost of UKnight's services." *Id.* However, when the Knights of Columbus

realized that the UKnight platform would expose its fraudulent insurance scheme, it decided to

change course and instead opted for the costlier option of developing and replicating the web

platform in-house. *Id.* This is where the Knights of Columbus' tax-exempt status as it relates to

UKnight apparently becomes significant. "[A]s a direct result of the tax-free profits from its

insurance sales it was able to retain due to its tax-exempt status, KC was able to afford to

replicate these services itself, which allowed it to breach its obligations with and promises to

UKnight." *Id.* Therefore, UKnight posits that the Knights of Columbus could financially afford

to breach its contract with UKnight and instead develop the web platform in-house because of

the money that the Knights of Columbus had retained by virtue of its tax-exempt status.

At a minimum, UKnight has not satisfied its burden as it relates to causation because its

theory relies on "speculative inferences" to connect its alleged injury—the loss of business due

to the breach of contract—to the Knights of Columbus' use of funds derived from its tax-exempt

status to pull off this breach. *Nova Health Sys.*, 416 F.3d at 1156; *see also Simon*, 426 U.S. at 42–43 (finding that plaintiffs did not have standing because "[i]t is purely speculative whether the [injuries] specified in the complaint" resulted from the IRS's assignment of tax-exempt status). There is nothing plausibly showing that the Knights of Columbus' ability to breach this contract was directly or even partially linked to its tax-exempt status. Needless to say, I find that UKnight's claim fails for insufficiently alleging facts that would plausibly support the causation prong.

Moreover, as it relates to the third requirement for constitutional standing, it is unclear how this Court's granting of the requested mandatory injunction would redress the alleged harm suffered by UKnight. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."). The alleged breach of contract and UKnight's attending loss of business have already occurred, and plaintiff has not plausibly alleged that the Knights of Columbus is likely to be able to use profits retained due to its tax-exempt status to deprive UKnight of additional business opportunities in the future.

Finally, I note that UKnight also promotes a second theory of harm whereunder UKnight claims that it was injured by the tax-exempt status assigned to the Knights of Columbus because "this status has permitted [the Knights of Columbus] to avail itself of the person-enterprise distinction defense in successfully arguing for dismissal of Plaintiff's RICO claim in the First Amended Complaint." ECF No. 98 at 48. UKnight therefore argues that if the Knights of Columbus' tax-exempt status is not removed, "UKnight will be prospectively injured as KC will be able to avoid RICO liability for the racketeering injury suffered by UKnight . . ." *Id.* Because I have already determined that I must dismiss UKnight's RICO claim against the Knights of

Columbus, there is no likelihood that my ordering the IRS to strip the Knights of Columbus of its tax-exempt status would remedy UKnight's "prospective[] injury" of having its RICO claims fail based upon the Knights of Columbus tax status. *See Simon*, 426 U.S. at 45–46. As a result, this alternative theory also fails to establish redressability.

Frankly, it is difficult for me to conceive of a circumstance where I would order the Commissioner of the IRS to revoke a company's tax-exempt status at the request of the company's competitor. Regardless, the facts alleged in the Second Amended Complaint provide no plausible basis for this Court to consider such an order. I intended to finish and issue this order before the IRS became needlessly embroiled in the lawsuit. In any event, this order now renders the government's motion moot. This claim strikes me as a "throw everything at the wall and see what sticks" claim. It doesn't stick. The Second Claim is dismissed without prejudice. *See B.L. Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006).

**D. Counterclaim-Defendants' Motion to Dismiss Counterclaims. [ECF No. 103].**

As noted above, the Knights of Columbus asserts seven counterclaims against plaintiffs UKnight and Mr. Labriola, as well as against counterclaim-defendants WebsInc.com, Inc., Stephen Michlik, Jonathan Michlik, and Terry Clark (collectively the "counterclaim-defendants" or "UKnight"). ECF No. 101. The seven counterclaims are: (1) trademark infringement in violation of 15 U.S.C. § 1114; (2) false designation of origin in violation of 15 U.S.C. § 1125(a); (3) trademark dilution in violation of 15 U.S.C. § 1125(c); (4) cybersquatting in violation of 15 U.S.C. § 1125(d); (5) common law trademark infringement; (6) surreptitiously recording telephone conversations in violation of Connecticut General Statute § 52-570d; and (7) civil conspiracy to infringe and dilute the Knights of Columbus' trademark rights. *Id.* Counterclaim-defendants move to dismiss all counterclaims. ECF No. 103.

Before addressing the counterclaims individually, I will first address UKnight's

arguments made collectively in relation to the "trademark-related" claims, claims 1–5 and 7.

1. **UKnight's Arguments with regard to the "Trademark-Related" Claims.**

UKnight groups claims 1-5 and 7 under the broad category of "trademark-related" claims

because they all involve allegations the UKnight misused the Knights of Columbus' trademarks

on various UKnight webpages. ECF No. 101 at 47–48. These trademarks are: KNIGHTS OF

COLUMBUS® (registered under both Nos. 1596950 and 1634365), K OF C® (registered under

No. 4178223), and the official emblem of the Knights of Columbus (registered under both Nos.

1589315 and 1589563). *Id.* UKnight makes three arguments as to why all of the trademark-

related claims should fail, which I will address each in turn.

a. **Failure to State a Claim.**

UKnight first argues that the Knights of Columbus' trademark-related claims fail to state

a claim against the individually named defendants under Fed. R. Civ. P. 12(b)(6). ECF No. 103

at 3. It asserts that "the members of a limited liability company are not personally liable for the

acts of a company" under Colorado Revised Statute § 7-80-705, and that the Knights of

Columbus have pled no facts to "pierce the corporate veil" as required to hold individuals liable

for the actions of their limited liability company. As a result, UKnight contends that "claims for

relief numbers one through five and seven against [the individuals] must be dismissed." *Id.* at 4.

I disagree.

Under Colorado law, a corporate officer or agent can be held personally liable for his

individual tortious acts, "even though committed on behalf of the corporation, which is also held

liable." *Holloway v. Briller, Inc.*, No. 15-CV-01337-RBJ, 2016 WL 915752, at *7 (D. Colo.

Mar. 10, 2016) (*citing Hoang v. Arbess*, 80 P.3d 863 (Colo. App. 2003), *cert. denied*, 2003 WL

22838733 (Colo. Dec. 1, 2003)).  As explained by the *Hoang* court, there are circumstances under which personal liability can be exacted against officers of a corporation without piercing the corporate veil:

> To be found personally liable to third persons for a tort, the officer of a corporation must have participated in the tort.  However, courts vary in their views as to the necessary level of participation.  *At a minimum, personal liability attaches to a defendant who was directly involved in the conduct through conception or authorization.*  Other direct involvement, such as active participation or cooperation, specific direction, or sanction of the conduct, also may be sufficient. Whether defendant approved of, directed, actively participated in, or cooperated in the negligent conduct is a question of fact for the jury.

*Hoang* at 868 (emphasis added).  At this stage in the pleading, I find that the Knights of Columbus has sufficiently pled the liability of each named individual counterclaim-defendant. In its counterclaim, the Knights of Columbus allege that each counterclaim-defendant, including the individuals named above, was directly involved in the wrongful conduct that forms the basis of these trademark counterclaims because they created the UKnight webpages and thus authorized the illicit use of the trademarks.  ECF No. 101 at 27–29; *see also* ECF No. 110 at 3 (Knights of Columbus describing UKnight as "a unitary business enterprise directed by four individuals through two closely held entities (UKnight and WebsInc).").

Though each trademark-related counterclaim does not explicitly define the involvement of each individual actor as it relates to that claim, the Knights of Columbus' overarching allegation that each member of UKnight made directorial decisions in creating the webpages and authorizing the wrongful trademark conduct was pled at the beginning of the counterclaims section, and each specific counterclaim indicates that "[t]he Order incorporates all allegations of this counterclaim as if fully set forth within."  *See* ECF No. 101 at 48.  The Knights of Columbus asserted that the counterclaim defendants "are business partners, and together own and manage a web template business through LiST Interactive, Ltd., a Colorado LLC. . . . The entire business

is predicated both on the unauthorized use of the Order's protected marks ('Marks') in website products and domain names, and on false representations to customers that the business is sponsored by or affiliated with the Order." *Id.* Therefore, I find that the Knights of Columbus has sufficiently pled enough facts to expose the individuals named in the counterclaims to personal liability. *See Hoang*, 80 P.3d at 864. I accordingly DENY UKnight's motion to dismiss counterclaims 1–5 and 7 on the basis of this veil-piercing argument.

**b. Permission to Use Trademarks.**

UKnight next argues that the trademark-related counterclaims must be dismissed because "UKnight's alleged actions were expressly requested, authorized, and in many cases actually performed by [the Knights of Columbus]." ECF No. 103 at 2. This argument fails because even if UKnight's use of the Knights of Columbus' trademarks was sanctioned by the Knights of Columbus at the beginning of the entities' working relationship, UKnight was put on notice that the continuing use of these trademarks was no longer sanctioned by the Knights of Columbus at the time this lawsuit was filed and certainly at the time the trademark-related counterclaims were filed. Because UKnight's webpages continue to feature these trademarks despite the revocation of permission, this argument must fail.

**c. Laches.**

Finally, UKnight argues that the equitable doctrine of laches bars the trademark-related claims. *Id.* I disagree. To successfully assert the defense of laches, a defendant must show that the party bringing the claim against them (1) inexcusably delayed filing the action which (2) resulted in prejudice against the defendant. *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 523 (10th Cir. 1987) (citations omitted). Here, UKnight is allegedly *still using* the trademarks, and therefore the alleged injury to the Knights of Columbus is still occurring. As such, the

Knights of Columbus has not "inexcusably delayed" the filing the action.  Further, UKnight can

point to no "prejudice" that has befallen it due to the Knights of Columbus' alleged delay in

instituting this action since the bringing of the claim has not deterred UKnight's use of the Mark.

As such, the laches argument also fails.

The foregoing discussion of the trademark claims in general resolves UKnight's motion

to dismiss counterclaims 1, 3, 4, and 5 because UKnight makes no other argument as to why

these claims should be dismissed.  I now turn to UKnight's other arguments concerning the

remaining counterclaims, numbers: 2, 6, and 7.

   **2.  <u>False Designation of Origin</u>.**

In the Second Claim within its counterclaims, which I will call the Second Counterclaim,

the Knights of Columbus asserts that UKnight has violated and continues to violate 15 U.S.C. §

1125 by falsely claiming on the UKnight web and mobile pages that "UKnight Interactive [Is]

The Most Comprehensive Web Solution For The Knights Of Columbus," and falsely claiming

that UKnight's use of the Marks is "with permission" from the Order.  ECF No. 101 at 41, 49.

To be found liable for violating 15 U.S.C. § 1125(a), a person must, in connection with their

goods or services, use any "word, term, name, symbol" or "any false designation of origin"

which "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation,

connection, or association of such person with another person, or as to the origin, sponsorship, or

approval of his or her goods, services, or commercial activities by another person."

UKnight asserts that the Knights of Columbus' Second Counterclaim fails for two

reasons.  The first of these is the veil-piercing argument which I addressed above.  Second,

UKnight asserts this counterclaim must be dismissed under Fed. R. Civ. Pro. 9(b) because the

Knights of Columbus failed to "make specific and separate allegations against each defendant." ECF No. 103 at 5.

Rule 9(b) requires that all claims involving allegations of fraud "must state with particularity the circumstances constituting fraud or mistake" and if multiple parties are alleged to be involved, "the claimant must make specific and separate allegations against each defendant." However, as the Knights of Columbus note, federal courts are split on the issue of whether Rule 9(b) applies to false designation of origin claims under 15 U.S.C. § 1125. *Id.* Without wading too deeply into this murky legal question, I simply note that even under the higher pleading standard of Rule 9(b), I find that the Knights of Columbus have sufficiently pled with specificity the liability of the four individuals and two closely-held entities involved with UKnight. Though these allegations were not pled explicitly within the Knights of Columbus' "False Designation of Origin" counterclaim on pages 48–49, they were pled at the beginning of the overarching counterclaims section, and the "False Designation of Origin" claim indicates that "[t]he Order incorporates all allegations of this counterclaim as if fully set forth within." ECF No. 101 at 48. Therefore, the counterclaim-defendants' second attack on the Second Counterclaim fails, I thus DENY the counterclaim-defendants' motion to dismiss the Knights of Columbus' counterclaim.

### 3. <u>Connecticut General Statute § 52-570d</u>.

The Knights of Columbus' Sixth Counterclaim alleges that counterclaim-defendants Leonard Labriola, Terry Clark, and List Interactive, Inc., violated Connecticut General Statute § 52-570d when they secretly recorded telephone conversations they had with employees and agents of the Order who were located in Connecticut. ECF No. 101 at 53. The statute provides that it is unlawful for a person to "use any instrument, device or equipment to record an oral

private telephonic communication" unless *all* parties consent to the use of said recording device or an automatic tone warning device signifies that a recording device is in use. *See* Conn. Gen. Stat. § 52-570d(a) (emphasis added). Because the recorded Order members were located in Connecticut during the course of the recorded conversations, the Knights of Columbus asserts that the counterclaim-defendants acted in violation of Connecticut law. ECF No. 101 at 53. As a result, the Knights of Columbus seek nominal damages and the exclusion of these recordings from evidence. *Id.*

Connecticut's recording statute differs from many states' recording statutes which provide that there is no violation of law as long as at least one of the parties to the conversation knows that the recording is being made. Federal law similarly requires the permission of only one party to the conversation for a recording to be lawful. 18 U.S.C. § 2511(2)(d). Counterclaim-defendants argue that federal law, specifically the federal Wiretap Act, preempts Connecticut law in this area and therefore contend that they cannot be liable under the Connecticut recording statute. ECF No. 103. I disagree.

Federal law can preempt state law either by an express statement of preemption or by implication. *Tarrant Reg. Water Dist. v. Herrmann*, 656 F.3d 1222, 1241 (10th Cir. 2011). Preemption analysis begins with the "presumption that Congress does not intend to supplant state law." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995). "[I]n cases like this one, where federal law is said to bar state action in fields of traditional state regulation," a finding of preemption is appropriate only if "that was the clear and manifest purpose of Congress." *Id.* (internal quotation omitted).

Counterclaim defendants argue that because Congress chose to require only one-party's permission for lawful recordings under the federal Wiretap Act, the Connecticut statute "stands

as an obstacle to the accomplishment and execution of the full purposes and objective of Congress" and is therefore preempted. ECF No. 103 at 7. Counterclaim-defendants cite two cases that support their position. *See In re Google Inc. Street View Elec. Commc'ns Litig.*, 794 F. Supp. 2d 1067, 1085 (N.D. Cal. 2011) (holding that the federal Wiretap Act preempts state wiretap statutory schemes in a case involving Wi-Fi data interception); *Bunnel v. Motion Picture Ass'n of Am.*, 567 F. Supp. 2d 1148, 1154 (C.D. Cal. 2007) (holding the same, in a case involving email system hacking). I am not persuaded. While it is true that both cited cases hold that the federal Wiretap Act preempts California's wiretap statutory scheme, neither case involved secretly recorded phone calls. Moreover, the cases are contrary to the great weight of authority across jurisdictions in answering this question. *See, e.g.*, *Leong v. Carrier IQ Inc.*, 2012 WL 1463313, at *5 (C.D. Cal. 2012) ("*Bunnell* and *In re Google Inc. Street View* reflect a marked departure from the preemption analysis of courts in this and other districts and circuits in the more than four decades since the Federal Wiretap Act was enacted."); *Valentine v. NebuAd, Inc.*, 804 F. Supp. 2d 1022, 1029 (N.D. Cal. 2011) (calling *Bunnell* "unconvincing"); *Shively v. Carrier IQ, Inc.*, No. C-11-5774 EMC, 2012 WL 3026553, at *5 (N.D. Cal. July 24, 2012) (calling *Bunnell* "fundamentally flawed because it fails to take into account the legislative history [of the Wiretap Act]"). As these cases demonstrate, the great weight of authority indicates that the federal Wiretap Act does not preempt state law. [4]

---

[4] With the exception of the two cases cited by counterclaim defendants, other courts considering this issue have determined that state law is not preempted by the Federal Wiretap Act. *See Leong v. Carrier IQ Inc.*, 2012 WL 1463313 (C.D. Cal. 2012); *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 921 (Cal. 2006); *Montemayor v. GC Servs. LP*, 302 F.R.D. 581, 586 (S.D. Cal. 2014); *Valentine v. NebuAd, Inc.*, 804 F. Supp. 2d 1022, 1029 (N.D. Cal. 2011); *Lane v. CBS Broad. Inc.*, 612 F. Supp. 2d 623, 637 (E.D. Pa. 2009); *Navarra v. Bache Halsey Stuart Shields Inc.*, 510 F. Supp. 831, 834 (E.D. Mich. 1981); *Sheppard v. Google, Inc.*, 2012 WL 6086867, at *4-5 (W.D. Ark. 2012); *State v. Williams*, 617 P.2d 1012, 1015-16 (Wash. 1980) (concluding that "the federal wiretap statute does not preempt the more rigorous Washington privacy act"); *Bishop v. State*, 526 S.E.2d 917, 920-21 (Ga. App. 1999) (no preemption because Georgia statute "provides greater protection to individual privacy rights"); *Villa v.*

Consistent with the weight of case law on this subject, I find that the federal Wiretap Act merely sets the floor for the minimum protections required (*i.e.*, *at least one party* must be aware that the conversation is being recorded), and that Congress chose to give states the latitude to make their laws even more protective if they so choose (*i.e.*, a law such as Connecticut's that requires that *all* parties to the conversation must be aware that the conversation is being recorded). My finding is based not only on the weight of precedent on the subject, but also on the spirit and legislative history of the federal wiretap statute. "Congress' overriding concern was the protection of privacy" in enacting the federal wiretap statute. *United States v. McNulty*, 729 F.2d 1243, 1264 (10th Cir. 1983) (en banc). In the 1968 Senate Report that accompanied the Wiretap Act, Congress expressly "envision[ed] that States would be free to adopt more restrictive legislation, or no legislation at all, but not less restrictive legislation." *Leong*, 2012 WL 1463313, at *3 (quoting S. Rep. No. 90-1097, at 2196 (1968)) (internal quotation marks omitted). Likewise, the 1986 Senate Report that accompanied the Electronic Communications Privacy Act (which amended the Wiretap Act) noted that "the states must enact statutes which are *at least* as restrictive as the provisions" of federal law. *Id.* (emphasis added) (quoting S. Rep. No. 99-541, at 35 (1986)) (internal quotation marks omitted).

Here, the Connecticut recording statute does nothing to "stand as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." On the contrary, it helps promote Congress' desired result of privacy protection and indeed goes a step further to

_____

*Maricopa Cnty.*, 865 F.3d 1224, 1230 (9th Cir. 2017) (holding, in context of law enforcement wiretaps, that Wiretap Act's requirements "are a floor, not a ceiling" and "[s]tates may choose to enact wiretapping statutes imposing more stringent requirements," and citing numerous cases); *see also* James G. Carr et al., *Law of Electronic Surveillance* § 2:39 (Mar. 2017 update) ("The legislative history of Title III clearly indicates that Congress intended to permit state electronic surveillance laws to be more restrictive than the federal provisions, and therefore more protective of individual privacy. . . . Thus, state laws which are more protective of the right to conversational privacy, by . . . requiring consent of all parties to the recording . . . are enforceable by state and federal courts." (footnote omitted)).

protect privacy by making its law even more protective than the federal baseline. As such, I find that Connecticut's recording law is not preempted by the federal Wiretap Act. Additionally, I find that under the terms of the Connecticut statute, the Knights of Columbus has sufficiently pled UKnight's liability at the motion to dismiss stage. I DENY counterclaim-defendants' motion to dismiss the Sixth Counterclaim.[5]

### 4. **Civil Conspiracy.**

Finally, the Knights of Columbus' Seventh Counterclaim asserts that UKnight engaged in a civil conspiracy to "infringe and dilute the trademark rights of the Order for their own personal and collective business gain."[6] ECF No. 101 at 54. This claim fails. In order to establish a claim of civil conspiracy, Colorado law requires "(1) action of two or more persons; (2) common object to be accomplished; (3) meeting of the minds on the object or course of action; (4) one or more unlawful acts; and (5) damages as a proximate result thereof." *Kerstien v. McGraw-Hill Co., Inc.*, 7 F. App'x 868, 875 (10th Cir. 2001). I find that the Knights of Columbus' claim fails on the third requirement because it failed to plead plausible facts showing that the counterclaim-defendants had a "meeting of the minds" to achieve a common and unlawful object in creating List Interactive (and therefore the UKnight product).

Both UKnight and the Knights of Columbus concede that the UKnight platform was developed in large part based on the Knights of Columbus' express specifications. Oftentimes the parties worked together (by phone or in person) to develop the UKnight platform. Indeed, the essential issue in this case is the underlying contract dispute where UKnight alleges that it finalized the UKnight product for the Knights of Columbus *in accordance with the Knights of*

---

[5] UKnight did not address whether the Connecticut statute creates a private right of action for damages.
[6] As noted above, counterclaim-defendants sought to dismiss this claim as part of their trademark-related arguments. I denied those arguments but now address UKnight's alternative argument made with regard to this claim.

*Columbus' specifications* and was merely waiting for the Knights of Columbus to announce to its councils that UKnight was the designated vendor for the Order. There is simply nothing that indicates that the counterclaim-defendants created UKnight for the illicit purpose of committing unlawful acts of trademark misuse. Therefore, the Knights of Columbus fails to sufficiently plead a case of civil conspiracy. For this reason, I GRANT counterclaim defendants' motion to dismiss the Sixth Counterclaim.

    **E.  The Knights of Columbus' Motion to Dismiss for Lack of Standing or, in the alternative, Motion for Partial Summary Judgment – Both with regard to Allegations Related to Membership Status.  [ECF No. 107].**

    Despite the cumbersome hearing, the crux of this motion, like ECF No. 79, is the Knights of Columbus' continued request that this Court disallow any discovery regarding the Knights of Columbus' membership information. According to the Knights of Columbus, "membership information" includes everything from the names of Order members to data showing the number of members in each local council.

    Between the two motions the Knights of Columbus assert three arguments as to why this Court should bar discovery regarding membership information: (1) this information is irrelevant; (2) UKnight "has no standing to complain about" the Knights of Columbus' membership practices; and (3) the First Amendment protects the Knights of Columbus from such an inquiry into their membership practices. I disagree with all three arguments so long as plaintiffs' discovery is reasonably focused.

    **1.  Relevance of Membership Information to Claims at Issue.**

    UKnight has spent a significant amount of time and money investigating what it believes to be a large-scale insurance fraud operation perpetuated by the Knights of Columbus.

Specifically, as I have noted before, UKnight believes that the Knights of Columbus artificially inflates the number of members in the Order so that it can bolster its billion-dollar insurance business. As it relates to this suit, UKnight theorizes that the Knights of Columbus was eager to contract with UKnight *until* the Knights of Columbus realized that the UKnight web platform would expose its fraudulent scheme.

UKnight argues that it seeks discovery of the Knights of Columbus' membership information because of the information's probative value as it relates to UKnight's breach of contract claim against the Knights of Columbus. UKnight believes that if it can discover the actual number of members per council and compare those numbers to the Knights of Columbus' claimed membership figures, it can corroborate its theory of the Knights of Columbus' motive to breach the contract. The Knights of Columbus argues that the membership information is irrelevant to the breach of contract or other business tort claims that are the heart of this case and fervently pleads for this Court to deny any discovery on this issue.

After reading the parties' briefs and entertaining this issue at oral argument on February 6, 2018, I am persuaded by UKnight's argument that at least a narrow subset (as defined below) of membership information is relevant to UKnight's breach of contract and business tort claims. The Knights of Columbus denies the existence of a contract, denies that it breached any contract, and denies that it misappropriated information from which it would have benefitted had it gone forward with a relationship with UKnight. I find that evidence of a motive to repudiate the alleged contract is probative of the credibility of the Knights' position.

At the February 2018 motions hearing, UKnight specified the parameters of the membership-related discovery it presently seeks. I find that the discovery, as narrowed, is reasonable, and I authorize the following:

a.  UKnight is entitled to the July 1, 2017 "Council Statement – Summary and Payment Coupon" that was issued to each council.  Put differently, UKnight is entitled to one July 1, 2017 Coupon *per council*.  This coupon shows the number of members that the Knights of Columbus asserts is in each specific council and thus the number of members for which each council is charged.  An example of such a Coupon was provided to the Court at the February 6, 2018 motions hearing as Exhibit 5.

b.  UKnight is also entitled to obtain from each local membership secretary the number of membership cards that the membership secretary has issued.  These membership cards are apparently indicative of how many members are indeed active in each council because the cards are only issued if a member pays his dues.

I am not today authorizing discovery of other membership information, especially information regarding specific members' names or other personal identifiers.  The Court cautions each side not to try to find loopholes or parse these words in an attempt to expand or narrow the clear dictates of this discovery order.

## 2.  Knights of Columbus' Other Arguments Against Discovery of Membership Information.

I will quickly note why I am not persuaded by the Knights of Columbus' other arguments to prevent discovery of membership information, namely lack of standing and the First Amendment's protections.  First, the Knights of Columbus argue that UKnight does not have standing to "complain about the Knights of Columbus' membership retention practices."  ECF No. 107 at 2.  I agree but find that, as noted above, UKnight seeks discovery of the membership information to bolster its breach of contract claim, over which UKnight does indeed have standing.  Therefore, the standing argument is not persuasive.

The Knights of Columbus argues that allowing this discovery would violate several First Amendment protections. Specifically it argues that this Court cannot "decide whether the Order wrongfully retained certain members without violating the right of association, the right of a religious society, and the Establishment Clause." ECF No. 107 at 2. I first note that by allowing limited discovery regarding membership information, the Court is not "decid[ing]" anything with regard to whether the Knights of Columbus "wrongfully retained members." *See id.* Further, as it relates to the right of association, my limitations on *what* is discoverable ensures that nothing is done to "curtail[] the freedom to associate." *See NAACP v. Alabama*, 357 U.S. 449, 460-61 (1958) (holding that compelled disclosure of membership lists, including the names and addresses of members, would have the effect of suppressing legal association among the group's members.). As noted above, my order expressly disallows the discovery of any membership information that involves personal identifiers and instead only permits the discovery of two datasets involving membership totals rather than specific member details. The scope of this membership-related discovery is well outside of the First Amendment association interests contemplated in *NAACP v. Alabama* and its progeny.

The Knights of Columbus also asserts that this Court cannot make a determination concerning the Order's membership practices without violating the Order's freedom as a religious society. ECF No. 111 at 5. To allow any investigation into the Order's membership practices, the Knights of Columbus argues, would impermissibly infringe on "the Order's decision to retain members in accordance with *its* procedures and *its* values." ECF No. 113 at 4. That is not the case. By allowing the discovery described above, this Court is not assessing or making a determination about the Knights of Columbus' religious doctrine, nor is it substituting its judgment for the Knights of Columbus as a religious society. *See Kedroff v. St. Nicholas*

*Cathedral*, 344 U.S. 94, 116 (1952) (noting that established rights of religious societies exist to protect the "power [of religious organizations] to decide for themselves . . . matters of church government as well as those of faith and doctrine").  Indeed, the membership data about which I am allowing discovery is already published (albeit allegedly inaccurately) by the Knights of Columbus on its website and in connection with marketing material for its insurance business.  As such, I find that the religious freedom doctrine is inapplicable in this circumstance.

Finally, the Knights of Columbus argues that this Court's permitting discovery of membership information would violate the Establishment Clause.  I disagree.  The discovery authorized by this order allows UKnight to ascertain *how many members are in the Order*.  As previously noted, this membership number is already published widely by the Knights of Columbus itself, and UKnight's discovery will presumably show whether that headcount is accurate.  The scope of this discovery nowhere near constitutes "excessive entanglement" of this Court and religion as prohibited by the Establishment Clause.  As such, these First Amendment arguments all fail.

In sum, I find no merit in the hodge-podge of arguments the Knights of Columbus have put forth in what appears to be an almost desperate attempt to preclude any discovery concerning membership information.  For the reasons articulated in two orders I disagree with plaintiffs' effort to turn alleged membership shenanigans into a RICO case, but I do not agree that membership information is irrelevant to plaintiffs' contract and misappropriation of trade secret claims.  Unfortunately, the parties seem unable or unwilling to work cooperatively to fashion a reasonable scope of discovery in this area.  The Court will, for now, allow only the limited discovery described above and will expect the defendants' full compliance with this order.

**ORDER**

For the aforementioned reasons, I therefore:

    a.  DENY UKnight's motion for a temporary restraining order, preliminary injunction, and sanctions, ECF No. 76.

    b.  DENY the Knights of Columbus' motion for a protective order, ECF No. 77.

    c.  GRANT the Knights of Columbus' partial motion to dismiss, ECF No. 100. Plaintiff's First Claim (RICO) is dismissed with prejudice. Plaintiff's Second Claim (Revocation of Tax Exempt Status) is dismissed without prejudice.

    d.  GRANT IN PART and DENY IN PART Counterclaim-Defendants' motion to dismiss counterclaims, ECF No. 103. I GRANT UKnight's motion to dismiss counterclaim seven but DENY UKnight's motion to dismiss counterclaims one through six.

    e.  DENY the Knights of Columbus' motion to dismiss for lack of standing, or alternatively motion for partial summary judgment, ECF No. 107.

    f.  Find as MOOT the United States' motion to dismiss, ECF No. 117.

DATED this 20th day of March, 2018.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge