**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-00210-RBJ

LIST INTERACTIVE, LTD. D/B/A UKNIGHT INTERACTIVE,

    Plaintiff,

v.

KNIGHTS OF COLUMBUS,
DAVID J. KAUTTER, IN HIS OFFICIAL CAPACITY AS (ACTING) COMMISSIONER OF THE INTERNAL REVENUE SERVICE,

    Defendants.

KNIGHTS OF COLUMBUS,

    Counterclaim Plaintiff,

v.

LIST INTERACTIVE, LTD. D/B/A UKNIGHT INTERACTIVE,
LEONARD S. LABRIOLA, WEBSINC.COM, INC., STEPHEN S. MICHLIK,
JONATHAN S. MICHLIK, AND TERRY A. CLARK,

    Counterclaim Defendants.

---

**DEFENDANT/COUNTER-PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT ON PLAINTIFF'S FIFTH CLAIM FOR RELIEF
(MISAPPROPRIATION OF TRADE SECRETS)**

---

Defendant/Counter-Plaintiff Knights of Columbus ("K of C") moves for summary judgment on Plaintiff/Counter-Defendant LiST Interactive, Ltd. d/b/a UKnight Interactive's ("UKnight") Fifth Claim for Relief for misappropriation of trade secrets. This claim fails as a matter of law for two independent reasons. First, even assuming UKnight possessed trade secrets, it ceded protection for any of its alleged secrets when it shared that information without safeguards or restrictions, even publishing the "secret" information on the world wide web for all

1

to see. UKnight's failure to preserve the secrecy of its information is fatal to its claim as a matter of law. Second, the claim also fails as a matter of law because UKnight plainly conceded in its Rule 30(b)(6) deposition that it has no evidence that K of C ever misappropriated any information at all.

A trial of the trade secret claim will needlessly complicate this case by requiring additional witnesses, including expert witnesses on website technology. With UKnight patently lacking evidence to support two essential elements of its misappropriation claim, the claim should be resolved by summary judgment.[1]

### I.    UNDISPUTED FACTS

1.   K of C is a fraternal benefit society founded to provide charitable outreach and financial support to members and their families. K of C members are organized into approximately 15,000 councils worldwide. Through roughly 1,400 independent insurance agents, K of C offers life insurance, annuity, and long-term care programs to its members. (Ex. A, Affidavit of Matthew St. John ¶3; Compl. ¶¶ 12-13.)[2]

2.   UKnight is an independent software company that created a website platform for use by K of C councils and agents. (Compl. ¶11.) UKnight was created without the knowledge or permission of K of C. (Ex. A, St. John Aff. ¶4.) In September 2011, UKnight sought K of C's

---

[1] K of C has a pending Motion to Dismiss filed December 10, 2018 (ECF No. 146) seeking dismissal of UKnight's claims based on UKnight's litigation misconduct. This motion is filed to comply with the January 25, 2019 deadline for dispositive motions, in the event the Motion to Dismiss is not granted.

[2] All citations and references to the "Complaint" in this Motion are references to the operative, Second Amended Complaint (ECF No. 98), filed by UKnight on January 11, 2018.

endorsement and requested that K of C require all of its 15,000 councils to use UKnight's product. (Compl. ¶20.) K of C never gave UKnight its approval. (Ex. A, St. John Aff. ¶4.)

3. Over the next several years, K of C conducted a thorough investigation of the UKnight product. K of C hired information technology expert and independent contractor Ian Kinkade to evaluate a proposed relationship between K of C and UKnight. (Ex. B, June 16, 2015 Investigation Report on UKnight ("Kinkade Report") at 4) (downloaded from and available at www.uknightlitigation.com) (last viewed Jan. 24, 2019.) Mr. Kinkade was CEO of IDI Middleware, his own technology company. (*Id.*)

4. In connection with the investigation, K of C required UKnight to sign a non-disclosure agreement in which UKnight agreed to not disclose K of C confidential information. (Ex. C, Clark Tr. 140:4-142:8; Ex. D, Acknowledgement of Non-Disclosure Obligations.) But, significantly, UKnight did not require Mr. Kinkade or any K of C representative to sign a non-disclosure agreement to keep UKnight's information confidential. (*Id.*; Ex. A, St. John Aff. ¶5.)

5. On his first visit to Texas to meet with UKnight's principal, Terry Clark, Mr. Kinkade traveled alone and was not shown anything proprietary by UKnight. (Ex. C, Clark Tr. 112:19-21.) Instead, Mr. Kinkade worked on his own laptop while Mr. Clark worked on his own, and the two only viewed the public-facing UKnight product. (*Id.* at 110:10-113:5.) Mr. Clark explained that he did not show Mr. Kinkade anything that UKnight considered proprietary. (*Id.* at 112:19-21.) During Mr. Kinkade's second visit to Texas, several K of C employees accompanied Mr. Kinkade. All parties attended a first day of business meetings, but neither Mr. Kinkade nor the K of C employees saw any non-public portion of the UKnight product on this day. (*Id.* at 146:1-8; *see also* Ex. A, St. John Aff. ¶6.) While the K of C employees departed after

the first day, Mr. Kinkade stayed for a second day to help UKnight meet requirements that would be necessary for K of C to do business with UKnight because Mr. Kinkade felt it was "the right thing to do." (Ex. C, Clark Tr. 148:9-149:15.) Only Mr. Kinkade would have seen the UKnight product at this time. (*Id*. at 166:2-7.)  Mr. Kinkade documented both the information he received from Mr. Clark and his conclusions in a series of lengthy reports. (*See, e.g.* Ex. B, Kinkade Report at 19-20).

6. Despite Mr. Kinkade's efforts, the UKnight product remained unsuitable for roll-out to K of C councils. (Ex. A, St. John Aff. ¶7.) For example, the Kinkade Report concluded:

- The UKnight website was "very limited and the staff are equally limited" (Ex. B at 7);
- The current design "illustrates a lack of understanding of database design" (*id*. at 7);
- UKnight's outdated ASP technology had the potential for future instability (*id.* at 7);
- UKnight's plans to update the technology "could be a disaster." (*id*. at 9);
- Significant upgrades in data security were required (*id.* at 20-21, 33-34);
- UKnight did not have the personnel or technology to scale the product for all of K of C's councils (*id*. at 20, 27-28); and
- The website did not have sufficient disaster recovery infrastructure (*id.* at 25).

7. Ultimately, K of C informed UKnight that it would need to consider other potential vendors. (Ex. A, St. John Aff. ¶8.) K of C issued a Request for Proposal ("RFP") and even invited UKnight to respond to that RFP. (*Id.*) However, UKnight's principals refused to submit a response to the RFP and later filed this lawsuit. (*Id.*)

8. UKnight principal Leonard Labriola then created a new website solely dedicated to publicizing this lawsuit, frequently posting court filings, letters, and commentary for public viewing. Mr. Labriola posted Mr. Kinkade's in-depth reports on this website, detailing all of UKnight's allegedly proprietary information. (*See* Ex. B, Kinkade Report.)

4

## II. ARGUMENT

### A. UKnight Failed to Keep Its Information Secret.

It is black letter law that information can only be protected as a trade secret if it is actually secret. Colo.Rev.Stat. § 7-74-102(4). To have a protectable trade secret, UKnight must have taken reasonable precautions to guard the secrecy of its information. *See Hertz v. Luzenac Group*, 576 F.3d 1103, 1112 (10th Cir. 2009). Thus, secrecy is a prerequisite to trade secret protection. 1 Milgrim on Trade Secrets § 1.03, at 1-271 (2017); *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984). Even if UKnight possessed information that could be protected as a trade secret, any protection for that information evaporated when it shared that information with K of C and Mr. Kinkade without restriction, and when UKnight openly published the information online for anyone to see.

Where, as here, two parties have signed a "one-way" confidentiality agreement protecting the *defendant's* confidences but not the *plaintiff's*, the plaintiff cannot claim trade secret protection for information it has disclosed. *BDT Products, Inc. v. Lexmark International, Inc.*, 274 F. Supp. 2d 880, 891-92 (E.D. Ky. 2003) is illustrative of this point. In *BDT Products*, the trial court concluded that Plaintiff BDT's execution of agreements to protect the Defendant's information, "but that did not afford any protection for information disclosed by [Plaintiff] BDT, **is the antithesis of 'reasonable efforts' to maintain secrecy**." *Id.* at 892 (emphasis added). The Sixth Circuit affirmed. *See* 124 F. App'x 329, 331-32 (6th Cir. 2005) (holding that, "even when read in the light most favorable to BDT, . . . the agreements were one-way and did not require these companies to keep BDT's information confidential," (quoting 1 *Milgrim on Trade Secrets*

§ 3.03 (2003) (internal quotation marks omitted)).[3] As in *BDT*, UKnight's failure to preserve the secrecy of its information is fatal to its claim. Any protection that UKnight had for its information was extinguished when it shared that information with Mr. Kinkade without restriction and signed a one-way confidentiality agreement protecting only K of C's information. (Ex. D.)

In addition to UKnight's unrestricted disclosure of information to K of C and Mr. Kinkade, UKnight purposely disclosed its allegedly secret information to the world. The crux of UKnight's trade secret claim is unsubstantiated allegations that K of C sent Mr. Kinkade to Texas to acquire UKnight trade secrets, which UKnight provided to Mr. Kinkade. (Compl. ¶¶ 55, 59, 62, 92-95, 98-100.) Yet, UKnight posted Mr. Kinkade's 60-page analysis of UKnight's technology – including a detailed discussion of the allegedly secret UKnight structure and database schema – on UKnight's litigation website at www.uknightlitigation.com. (Ex. B, Kinkade Report.) UKnight posted at least one other report by Mr. Kinkade on the same website.[4]

### B. UKnight Has No Evidence of a "Misappropriation" of Its Alleged Trade Secrets.

Summary judgment on the misappropriation of trade secrets claim is proper for a second reason: there is no evidence of any misappropriation of UKnight's information. To defeat

---

[3] *See also Fail-Safe, LLC v. A.O. Smith Corp.*, 674 F.3d 889, 894 (7th Cir. 2012). (Fail-Safe signed a confidentiality agreement protecting A.O. Smith's information but Fail-Safe "failed to take any steps to maintain [the] secrecy" of its own information.)

[4] Mr. Kinkade's reports have been produced at least 24 different times during discovery in this litigation, including four times by UKnight. UKnight has never designated the reports as confidential or attorneys' eyes only and did not designate Mr. Clark's testimony concerning the reports as confidential or attorneys' eyes only. As a result, several versions of the reports have been filed publicly and remain public in court records. (*See, e.g.* ECF No. 88-2; ECF No. 88-5.) UKnight has never sought to restrict access to those documents pursuant to D.C.COLO.LCivR 5.2 or in accordance with the confidentiality agreement executed by the parties in this case.

summary judgment, UKnight not only must show that it possessed trade secrets—which it cannot—it also must submit admissible evidence demonstrating that those alleged secrets were "misappropriated." Fed.R.Civ.P. 56(c). The testimony of UKnight's developer and designated Rule 30(b)(6) witness, Terry Clark, confirms that UKnight has no evidence of misappropriation.

Under Colorado's Uniform Trade Secrets Act, a trade secret can be "misappropriated" in two basic ways. Colo.Rev.Stat. § 7-74-102. The first is when the misappropriating party knows or has reason to know the trade secret was acquired through "improper means." *Id.* § 7-74-102(2)(a). The second is when a party who has a duty to maintain the secrecy of the information improperly "uses" or "discloses" it. *See id.* at 102(2)(b). The record confirms that K of C neither acquired any alleged trade secrets through improper means, nor did it use or disclose UKnight's information. Therefore, summary judgment should be entered against UKnight.

### 1.      Any Information K of C Acquired Was Obtained Properly.

It is undisputed that UKnight freely disclosed information about the UKnight product to K of C. Terry Clark, UKnight's Rule 30(b)(6) designee, testified that independent contractor Ian Kinkade visited UKnight's Plano, Texas office twice. On the first visit, Mr. Clark showed Mr. Kinkade only the public facing version of the UKnight product:

> Q.    Did [Mr. Kinkade] look at anything that you would consider proprietary to UKnight?
>
> A.    In that meeting?  I don't think so.

(Ex. C, Clark Tr. 112:19-21.) Mr. Kinkade was accompanied by K of C employees on his second visit to Plano, which spanned two days. K of C employees attended the first day of the meetings only, and Mr. Kinkade attended both days. Mr. Clark confirmed that only Mr. Kinkade would have seen the UKnight product during this second visit:

> Q. Just to confirm, on the first day you said you did not show the UKnight product to anybody who was in attendance? So during the Plano trip the only person who would have seen any aspect of the UKnight product would have been Ian Kinkade?
>
> A. That's correct.

(Ex. C, Clark Tr. 166:2-7.) Critically, UKnight freely gave whatever information it chose to Mr. Kinkade without restriction. UKnight did not require Mr. Kinkade or K of C to sign a confidentiality agreement, and UKnight did not ask Mr. Kinkade or K of C to keep any information confidential. (Ex. A, St. John Aff. ¶5; Ex. C, Clark Tr. 139:20-142:7.) Any allegedly "secret" information that K of C acquired, was acquired by proper means and with the knowledge and permission of UKnight.

### 2. UKnight Has No Evidence That K of C Used or Disclosed Its Trade Secrets.

There is also no genuine dispute as to whether K of C used or disclosed UKnight's information to anyone. Colo.Rev.Stat. § 7-74-102(2). Without support, UKnight's Complaint accuses K of C of misappropriating a laundry list of information. (Compl. ¶ 172.) But when asked the basis for that claim, Mr. Clark wasn't sure. (Ex. C, Clark Tr. 166-167.) After he was reminded that he had been designated by UKnight to testify concerning UKnight's trade secret misappropriation claim and shown UKnight's Interrogatory responses, Mr. Clark still didn't know, wasn't sure, or actually denied that K of C used or disclosed UKnight's alleged trade secrets. (*Id.* at 166-180.)

For example, although UKnight's Complaint accuses K of C of misappropriating UKnight's code (Compl. ¶ 172), Mr. Clark conceded that he never gave the code to K of C or to Mr. Kinkade. (Ex. C, Clark Tr. 169:16-172:11.) He also testified that he did not believe K of C

had given UKnight's code to a third party "yet." (*Id.* at 171:24.) Obviously, if K of C never had the code, it could not have used it, and K of C could not have given it to anyone.

As a second example, UKnight's Complaint accuses K of C of disclosing unidentified UKnight trade secrets in a Request for Proposal that K of C issued to potential web vendors (Compl. ¶ 95). Yet when shown the RFP, Mr. Clark could not identify *anything* proprietary to UKnight that was disclosed by the RFP. (Ex. C, Clark Tr. 182:1-24.)

As a third example, UKnight accuses Matthew St. John of asking Mr. Kinkade to acquire specifications for two of UKnight's proprietary systems. (Compl. ¶59.) But Mr. Clark firmly declared that he never gave this information to Mr. Kinkade, Mr. St. John, or to anyone else at K of C:

> Q. And you're saying in this e-mail Mr. St. John was asking Mr. Kinkade to get the software?
>
> A. Correct.
>
> Q. Did Mr. Kinkade get that?
>
> A. No, not that I know of.
>
> Q. Do you think Mr. Kinkade -- did you give it to Mr. Kinkade?
>
> A. No, because he said they didn't want to do that.
>
> Q. All right. Mr. Kinkade showed you this e-mail and said he didn't want to do it and you didn't give it to him?
>
> A. Correct.

(Ex. C, Clark Tr. 158:6-23.) In fact, UKnight's Complaint concedes that when Mr. St. John allegedly asked for this proprietary information, UKnight "declined this request." (Compl. ¶ 60.)

It follows that if K of C never acquired the information, there is no possible way K of C could have misappropriated it.

Put simply, after nearly two years of discovery, UKnight's designated Rule 30(b)(6) representative authoritatively testified that UKnight has no evidence whatsoever that K of C misappropriated any of UKnight's alleged trade secrets.

### III.   CONCLUSION

Based on the foregoing, UKnight's Fifth Claim of Relief for misappropriation of trade secrets has no factual basis and must fail as a matter of law. The Court therefore should enter summary judgment on this claim.

Respectfully submitted this 25th day of January, 2019.

*s/Joy T. Allen Woller*
Edward A. Gleason
Joy T. Allen Woller
Hermine Kallman
LEWIS ROCA ROTHGERBER CHRISTIE LLP
90 S. Cascade Ave., Suite 1100
Colorado Springs, CO 80903
(719) 386-3000
egleason@lrrc.com
jwoller@lrrc.com
hkallman@lrrc.com

L. Martin Nussbaum
Ian Speir
NUSSBAUM SPEIR PLLC
90 S. Cascade Ave., Suite 400
Colorado Springs, CO 80903
(719) 357-4447
martin@nussbaumspeir.com
ian@nussbaumspeir.com

*Attorneys for Defendant / Counterclaim Plaintiff*

## **CERTIFICATE OF SERVICE**

On January 25, 2019, I filed this **DEFENDANT/COUNTER-PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S FIFTH CLAIM FOR RELIEF (MISAPPROPRIATION OF TRADE SECRETS)** with the Clerk of the Court using the CM/ECF System, which will send notification to:

G. Stephen Long
Christopher Mills
Blaine Bengston
Jones & Keller, P.C.
1999 Broadway
Denver, CO 80202
slong@joneskeller.com
cmills@joneskeller.com
bbengston@joneskeller.com
*Attorneys for Plaintiff/Counterclaim Defendant*

Jeremy Nolan Hendon
U.S. Department of Justice-DC-#683
P.O. Box 683
Tax Division
Ben Franklin Station
Washington, DC 20044-0683
Jeremy.Hendon@usdoj.gov

        s/*Dana Quintana*
        Dana Quintana