IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 17-cv-00210-RBJ

LIST INTERACTIVE, LTD. d/b/a Uknight Interactive,

    Plaintiff,

v.

KNIGHTS OF COLUMBUS,
DAVID J. KAUTTER, IN HIS OFFICIAL CAPACITY AS (ACTING) COMMISSIONER OF
THE INTERNAL REVENUE SERVICE,

    Defendants.

KNIGHTS OF COLUMBUS,

    Counterclaim Plaintiff,

v.

LIST INTERACTIVE, LTD. D/B/A UKNIGHT INTERACTIVE,
LEONARD S. LABRIOLA, WEBSINC.COM, INC., STEPHEN S. MICHLIK,
JONATHAN S. MICHLIK, AND TERRY A. CLARK,
    Counterclaim Defendants.

---

ORDER

---

    This matter is before the Court on two motions of defendant Knights of Columbus: (1) its motion for summary judgment and permanent injunction on its counterclaim, ECF No. 148, and (2) its motion for summary judgment on plaintiff's fifth claim for relief – misappropriation of trade secrets, ECF No. 153. For the reasons discussed herein the first motion, ECF No. 148, is MOOT and the second motion, ECF No. 153, is DENIED.

1

## I.     BACKGROUND

I have described the factual background of this litigation in prior orders. *See e.g.* ECF Nos. 54, 90, 118; *List Interactive, Ltd. v. Knights of Columbus*, No. 17-CV-00210-RBJ, 2017 WL 3217817 (D. Colo. July 28, 2017). Briefly here, plaintiff in this action is List Interactive, Ltd., d/b/a UKnight Interactive ("UKnight")—a Colorado-based web design company. This dispute arises out of a web system it developed for defendant Knights of Columbus, a religious and charitable fraternity registered in Connecticut with subsidiary councils all around the world. As a 501(c)(8) tax-exempt organization, the Knights of Columbus must provide life insurance for its members and be organized under the "lodge system." *See* 26 U.S.C. § 501(c)(8)(A)-(B). The latter qualification means that the organization must have a parent organization along with subordinate branches that are chartered by the parent organization but nonetheless self-governing. I use the term "Knights of Columbus" to describe the parent organization headquartered in New Haven that effectively runs the fraternity's insurance business in the United States. I will refer to the broader organization that is comprised of this parent company, the chartered branches (known as councils, assemblies or chapters), local members, and insurance agents as "the Order."

UKnight was created in 2011 by a Knights of Columbus insurance agent, Steve Michlik, and his son Jonathon Michlik in an effort to build a website to promote his insurance business and communicate with other Knights of Columbus members in the Dallas/Fort Worth area. ECF No. 153-2 at 12. They met with various entities of the Order - agents, councils, chapters and assemblies - to further grow and develop their web platform for these entities.

In August 2011, UKnight contacted the Knights of Columbus to outline a proposal for providing a unified online platform for purchases of life insurance and management of membership activities across the Order. ECF No. 167-3. Following a series of meetings, UKnight alleges that it reached an agreement with the Knights of Columbus whereby it would designate UKnight as its web platform vendor for the fraternity's members-only life insurance business. In the following year, UKnight made modifications to the platform incorporating data files sent from the Knights of Columbus. ECF No. 167-6. However, UKnight asserts that over the next few years, the Knights of Columbus delayed announcing UKnight as its exclusive vendor. The relationship ultimately soured and disintegrated without such an announcement. UKnight contends that the Knights of Columbus was running its life insurance business fraudulently and reneged on the deal because it realized UKnight's web system would expose this fraud. ECF No. 58-1 at ¶52. The Knights of Columbus assert that there was never a deal, and that it declined to do business with UKnight because its web system was inadequate. ECF Nos. 153 at 4, 153-1 at ¶7.

UKnight asserted a number of claims against the Knights of Columbus, ECF No. 58-1 (Second Amended Complaint), and at issue here is its claim for misappropriation of trade secrets. It contends that the Knights of Columbus solicited information about its web platform under the guise of preparing to implement the system across the Order, but instead used its trade secrets to seek out other vendors or replicate the system itself. The events underlying this alleged misappropriation began in February 2014 when UKnight partner and technology manager Terry Clark met with a consultant hired by the Knights of Columbus, Ian Kinkade, over two days. ECF No. 167 at 5. Based upon information shared in these meetings, Mr. Kinkade prepared a

series of reports for the Knights of Columbus describing the web platform and its technological capabilities and shortcomings. ECF Nos. 167-12, 153-2. The parties dispute what was shared in these meetings and the "trade secret" status of the information Mr. Kinkaid shared with the Knights of Columbus.

In early 2015, members of the Knights of Columbus, including Matt St. John, the Director of Insurance Marketing, and Mr. Kinkade traveled to Dallas, Texas to meet with Mr. Clark about the UKnight platform and its roll-out. At the conclusion of these meetings, Mr. Kinkade stayed behind an additional day to continue discussions with Mr. Clark. During that meeting, Mr. Kinkade shared with Mr. Clark an email from Mr. St. John that directed him to report the functions that UKnight custom-designed for the Knights of Columbus. Mr. St. John's email explained that such information could help the Knights of Columbus seek out another vendor. ECF Nos. 167-15 (169-12 unrestricted version), 167-21 ¶16.

In early 2016, the Knights of Columbus informed UKnight that it would consider other potential vendors, and the parties' relationship ended. ECF No. 153-1 at ¶8. According to UKnight, Mr. St. John directed it to cease using the Knights of Columbus's name in any of its business solicitations. ECF No. 58-1 at ¶61.

After UKnight filed suit, the Knights of Columbus asserted counterclaims against UKnight and its principals Leonard Labriola, Stephen Michlik, Jonathan Michlik, and Terry Clark for UKnight's continued use of the Knights of Columbus name and trademarks. ECF No. 101 (Answer to Second Amended Complaint). These "cybersquatting" claims were also brought against WebsInc.com, Inc., a listed registrant of several "domain names" that UKnight allegedly

has registered unlawfully. ECF No. 101 at 29. I will refer to these parties collectively as the "UKnight defendants."

At issue here are the Knights of Columbus's claims for trademark infringement, false designation of origin, cybersquatting and common law trademark infringement. The Knights of Columbus asserts that the UKnight defendants are using Knights of Columbus trademarks to promote UKnight's website business on UKnight's primary website, council websites, agent sites, and in marketing presentations; and that UKnight continues to own infringing domain names. ECF No. 148 at 3-4.

## II. STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id*. at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## III. ANALYSIS

### A. The Trademark Counterclaims.

The Knights of Columbus moves for summary judgment against all UKnight defendants on its counterclaims for (1) trademark infringement under 15 U.S.C. § 1114, (2) false designation of origin under 15 U.S.C. § 1125(a), (3) cybersquatting under 15 U.S.C. § 1125(d), and (4) common law trademark infringement. ECF No. 148. It also requests a permanent injunction prohibiting infringement by the UKnight defendants and requiring them to transfer all the infringing domain names, particularly KOFCKnights.org, to the Knights of Columbus. It further requests statutory damages under 15 U.S.C. § 1117(d) and attorney fees and costs under 15 U.S.C. § 1117(a).

At the time of the filing of this motion, UKnight had not filed an answer to the Knights of Columbus's counterclaim. Thus, the Knights of Columbus treated all allegations to the counterclaim as admitted and used the counterclaim allegations to comprise its statement of undisputed facts. However, I have since granted UKnight leave to file an answer out of time, ECF No. 178, and in that answer UKnight denies many of the counterclaim allegations, ECF No. 158-1. Thus, the allegations, now contested, do not suffice to meet the Knights of Columbus's burden of demonstrating an absence of any material fact dispute. Accordingly, this motion, ECF No. 148, is moot, but the Knights of Columbus may refile a motion for summary judgment on its counterclaim and support it with competent summary judgment evidence.

Though this motion is moot, I have reviewed it and in the interest of judicial economy make a few comments for the parties to consider should the motion be renewed. First, to the discussion about whether UKnight has permission from the Knights of Columbus to use the

trademarks, I direct the parties to my March 20, 2018 order, ECF No. 118. I ruled on this issue, stating that

> [t]his argument fails because even if UKnight's use of the Knights of Columbus' trademarks was sanctioned by the Knights of Columbus at the beginning of the entities' working relationship, UKnight was put on notice that the continuing use of these trademarks was no longer sanctioned by the Knights of Columbus at the time this lawsuit was filed and certainly at the time the trademark-related counterclaims were filed. Because UKnight's webpages continue to feature these trademarks despite the revocation of permission, this argument must fail.

ECF No. 118 at 17. I expressed this conclusion again in a January 10, 2019 hearing, ECF No. 148-1 at 4, and my decision will not change in summary judgment: any authorization the Knights of Columbus may have given UKnight in the past no longer justifies UKnight's use of any trademarks. Upon this Court's attempt to access online the links to the infringing domain names described in the Knights of Columbus's counterclaim, it became apparent that the domain names are no longer functional. Perhaps UKnight has agreed on this point since briefing on the motion occurred, and the injunctive remedies sought by the Knights of Columbus have become moot. The Court asks the parties to describe what infringing activities, if any, continue to be an issue if the motion is renewed.

However, UKnight makes a new argument for its use of the trademarks on the local websites of specific agents and councils that continue to be UKnight customers. The parties agree that Knights of Columbus members, including insurance agents, may use the trademarks to promote the Knights of Columbus's financial products. These councils and agents can also authorize third-party vendors to use the trademark to identify the council, agent, or Knights of Columbus itself. ECF Nos. 148 at 3, 101 at ¶¶50-56. UKnight argues that even if the Knights of Columbus as the leadership organization in Connecticut did not authorize UKnight's use of

7

trademarks, some local councils and agents have authorized, and continue to authorize despite the pending lawsuit, UKnight's use of the trademarks. Thus, it asserts that it is a third-party vendor pursuant to the Knights of Columbus's policy using these trademarks on websites it hosts and maintains for local councils and agents. ECF No. 156 at 11.

This argument raises questions not addressed in the briefings. Are local agents or councils still able to authorize the use of the trademarks in the face of the Knights of Columbus's withholding of authorization to that specific vendor? And what competent summary judgment evidence demonstrates continuing permission from the agents or specific councils? Moreover, the policy, as the Knights of Columbus describes it, permits subordinate units to use the trademarks "as a source identifier for K of C, not for the vendor." ECF No. 148 at 3. How is the trademark used, if it is in fact still being used, on the local council or agent websites? It would be helpful for the parties to address these questions if this issue is presented again in a motion for summary judgment.

### B. The Knights of Columbus's Motion for Summary Judgment on UKnight's Claim of Misappropriation of Trade Secrets.

The Knights of Columbus makes two arguments for summary judgment on UKnight's trade secrets claim: (1) UKnight failed to keep its information secret, and (2) there was no misappropriation of UKnight's information. ECF No. 153 at 5-6. Because I find that there are genuine disputes of material fact as to both issues, I deny the Knights of Columbus's motion for summary judgment.

#### 1) The Secrecy of UKnight's Information.

A trade secret is "the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or

financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value." Colo. Rev. Stat. § 7-74-102(4). Factors considered in determining whether information constitutes a trade secret include:

> (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1108 (10th Cir. 2009) (citing *Colorado Supply Co. v. Stewart*, 797 P.2d 1303, 1306 (Colo. App. 1990)). The Knights of Columbus's motion addresses the first three factors.

UKnight describes its product as a web platform supporting various functions it developed to serve the Knights of Columbus organization following years of in-depth discussions with its members, agents, and councils. ECF No. 167 at 3. The trade secrets are the technology it developed to provide these functions. *Id.* UKnight describes this technology as "work-flow knowledge, and a relational database that integrates the vertical relationships between members, local councils, chapters, district deputies, state councils and supreme, with the horizontal relationships between local councils, college councils, military councils, assemblies, field agents and general agencies." *Id.* at 4. It also states that its system includes an SQL server database and designs and processes that use database tables to enable the UKnight web platform to function for thousands of Knights of Columbus entities. *Id.*

From UKnight's perspective, it shared these trade secrets with Mr. Kinkade, who then shared them with the Knights of Columbus and was subsequently hired as a Knights of Columbus employee from his role as the outside consultant. ECF No. 167 at 5-8. At the request of the Knights of Columbus's Director of eBusiness, Denise Serafini, Mr. Clark met with Mr. Kinkade on February 18-19, 2014. After these meetings and at Mr. Kinkade's request, Mr. Clark sent Mr. Kinkade a 526-page "schema." This consisted of representations of the tables used in the relational database and information about how they related to each other. ECF Nos. 167-9, 167-10, 167-21 at ¶ 11. Mr. Kinkade's billing invoices show that he also spent 26 hours reviewing UKnight's code, though Mr. Kinkade denies receiving code from UKnight. ECF No. 180 at 2-3. Mr. Kinkade documented the information he received from Mr. Clark and his conclusions about the UKnight platforms in a series of reports for the Knights of Columbus. ECF Nos. 153 at 4, 167 at 6. A March 14, 2014 report included 13 pages of table descriptions from this schema, stating that the entire scheme was too large at "200+ pages" to include with the report. ECF No. 167-12. Though the entire schema was not included in the reports, Mr. Kinkade shared this document with the Knights of Columbus as part of his investigation. ECF No. 174-1. In his deposition, Mr. Kinkade agreed that the data tables, information about how these tables interface and function, and UKnight's code would constitute proprietary trade secret information. ECF No. 180-1 at 90-91, 98-99.

The Knights of Columbus argues that UKnight did not take reasonable precautions to safeguard this information. *See* Colo. Rev. Stat. § 7-74-102(4) ("to be a 'trade secret' the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes."). Mr. Clark asserts

that UKnight did take such precautions: it limited access to its trade secrets to one principal and two internal associates, required those internal associates to sign non-disclosure agreements, and kept the material password protected. ECF No. 167-21 at 3. Despite these measures, the Knights of Columbus asserts that UKnight posted its alleged trade secrets online on a website it created to publicize the litigation, uknightlitigation.com. ECF No. 153 at 6. UKnight disputes this assertion. Instead, it states that it published two of Mr. Kinkade's reports dated June 16, 2015 and November 4, 2015, and that these reports did not contain the schema reflecting UKnight's trade secrets. ECF Nos. 167 at 8, 153-2. It asserts that the full 526-page schema has never been published on the internet or filed publicly in the case. ECF No. 167 at 8. The Court was unable to access this litigation website as it seems to have been taken down since briefing occurred, and the extent of the information shared online remains a material fact dispute.

The parties also dispute the relevance of the fact that UKnight shared its database schema with a third party, Mr. Kinkade, without a confidentiality agreement. ECF Nos. 153 at 3, 167 at 13-16. UKnight asserts that the parties had a confidential relationship, creating a duty of confidentiality that did not need to be reduced to a written agreement. The Knights of Columbus asserts that a lack of a confidentiality agreement demonstrates UKnight's failure to keep its information secret, ECF No. 153 at 5, and that this failure is especially significant because the Knights of Columbus required UKnight to sign a nondisclosure agreement protecting the Knights of Columbus's confidential information. ECF No. 153 at 3. UKnight counters that the Knights of Columbus did not transmit a nondisclosure agreement to Mr. Clark until April 27, 2015, months after UKnight had shared information with Mr. Kinkade. ECF Nos. 167 at 6, 153-5. To support its theory of the confidential relationship, UKnight points to Ms. Serafini's deposition

showing that prior to that, in December 2011, she transferred sensitive membership data to UKnight without a confidentiality agreement in place. ECF Nos. 167 at 3, 167-6.

Moreover, the absence of a confidentiality agreement prior to the sharing of trade secrets with a prospective customer is not dispositive of whether UKnight took reasonable precautions. *Hertz*, 576 F. 3d at 1113 ("Just because there is something else that [the claimant] *could* have done does not mean that their efforts were unreasonable under the circumstances.")(emphasis in the original)). This is especially so when the plaintiff contends that it was exchanging information in the context of a confidential relationship with the Knights of Columbus. Because a duty of confidence "may also be inferred from the relationship between the parties and the circumstances surrounding the disclosure," Restatement (Third) of Unfair Competition § 41, cmt. b (1995), the nature of UKnight and the Knights of Columbus's relationship and whether UKnight took reasonable precautions are fact intensive inquiries for a jury to resolve.

**2) Misappropriation.**

In addition to showing that it possessed trade secrets, UKnight must also demonstrate that its alleged secrets were "misappropriated." Under Colorado law, a trade secret can be misappropriated when (1) the misappropriating party knows or has reason to know the trade secret was acquired through "improper means," Colo. Rev. Stat. § 7-74-102(2)(a); or (2) a party who has a duty to maintain the secrecy of the information improperly uses or discloses it, *id.* § 7-74-102(2)(b). The Knights of Columbus argues that the information about the UKnight product was obtained properly because UKnight freely disclosed it to Mr. Kinkade without restriction. ECF No. 153 at 7-8. However, this is not dispositive of whether the information was properly

obtained – as just discussed, it may have been disclosed in the context of a confidential relationship or for a limited purpose.

UKnight asserts that it provided its product information to Mr. Kinkade for the limited purpose of evaluating the product and technical issues that may arise in rolling it out across the organization. ECF No. 169 at 15-16. It offers emails that could support an inference that the Knights of Columbus misrepresented its intentions for seeking information about the UKnight product. For example, an email from Ms. Serafini in February 2014 to Mr. Clark described the purpose of the upcoming meeting with Mr. Kinkade as an "assessment" to "get us where we need to be." ECF No. 167-7. She also listed technical aspects of the UKnight product for Mr. Kinkade and Mr. Clark to review, asking for short and long-term recommendations for improvements to each aspect. ECF No. 167-8. In contrast, during the second set of meetings in June 2015, Mr. St. John sent Mr. Kinkade an email asking him to catalogue the systems that Mr. Clark had custom-built for the Knights of Columbus. ECF No. 167-15 (169-12 unrestricted version). He described them as having "tremendous value" and things that the Knights of Columbus would want to include in an RFP if it proceeds that way. *Id.* Mr. Clark stated that when Mr. Kinkade shared this email with him it was the first time UKnight had any indication that the Knights of Columbus was contemplating other vendors. ECF No. 167-21. Following these meetings, the Knights of Columbus issued a request for proposal that UKnight asserts described in detail its platform's functionality, ECF No. 167-20. Though the parties dispute whether the underlying information is a trade secret, this evidence suffices to send the issue of misappropriation to a jury.

**ORDER**

The Knights of Columbus's Motion for Summary Judgment and Permanent Injunction on the Counterclaim, ECF No. 148, is MOOT and its Motion for Summary Judgment on Plaintiff's Fifth Claim for Relief (Misappropriation of Trade Secrets) is DENIED.

DATED this 24th day of May, 2019.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge