IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 17-cv-00210-RBJ

LIST INTERACTIVE, LTD. d/b/a UKnight Interactive,

      Plaintiff,

v.

KNIGHTS OF COLUMBUS, et al.,

      Defendants.

KNIGHTS OF COLUMBUS,

      Counterclaim Plaintiff,

v.

LIST INTERACTIVE, LTD. d/b/a UKnight Interactive, et al.,

      Counterclaim Defendants.

---

## ORDER

---

Plaintiff moves for a new trial on damages only and, depending upon whether a new trial is ordered, for an award of prejudgment interest on either the damages awarded by the jury or to be awarded in a new trial. The Court denies the motion to the extent it seeks a new trial but grants it in part regarding prejudgment interest.

## BACKGROUND

Steve Michlik is a general insurance agent for the Knights of Columbus ("KOC") and a member of a KOC local council in Plano, Texas. In late 2009 Mr. Michlik, frustrated by

difficulties he was having contacting other council members to whom he hoped to sell life insurance, decided that the council needed a web-based software platform to improve data management and communications functions.  With the help of his son and an acquaintance, Terry Clark, both of whom were experienced in website design, Mr. Michlik was able to develop a program that worked and substantially improved his insurance sales in 2010.

Mr. Michlik shared his program with other nearby councils and found that they too were happy with it.  Mr. Michlik and Mr. Clark realized KOC's thousands of local councils nationwide presented an attractive business opportunity, particularly if they could enlist the support of KOC's upper management.  They therefore contacted a gentleman with a business background, Leonard Labriola, and the three of them as equal partners and owners formed LiST Interactive, Ltd. (the initials coming from Leonard, Steve and Terry), to do business as UKnight Interactive, or as it was commonly called in this case, simply UKnight.

Messrs. Labriola and Clark (with Mr. Michlik remaining in the background) set about the task of trying to convince KOC to designate UKnight as its preferred website vendor.  UKnight claims that in September 2011 UKnight agreed that it would do that.  However, there were various delays over the next couple of years until, again according to UKnight, KOC's senior management orally agreed that KOC's Supreme Knight (chief executive officer) would announce UKnight as its preferred or designated vendor during an International State Deputy Meeting in Quebec on November 13, 2013.  UKnight in turn agreed to prepare to rollout its platform across the entire KOC order in a matter of months after the announcement.

However, the announcement was not made at the Quebec meeting.  Instead, in 2014 and again in 2015 KOC sent its own software consultant, Ian Kincaid, to Texas to meet with Mr.

Clark, ostensibly to better understand UKnight's platform and make sure it was technically capable of providing website development and support on a large scale. However, according to UKnight, KOC's real purpose was to gain access to UKnight's technology so that KOC could create its own equivalent or hire a different vendor it could completely control to create it.

After it became apparent that KOC would never designate UKnight as its preferred vendor, UKnight filed this lawsuit. Initially UKnight asserted claims for violation of RICO, breach of contract, promissory estoppel, misappropriation of trade secrets, intentional interference with prospective business relations, fraudulent misrepresentation, negligent misrepresentation, and defamation. ECF No. 1. By the time the case went to trial (August 26 to September 12, 2019) plaintiff's claims were reduced to breach of the alleged oral contract to announce UKnight as its preferred software vendor (alternatively promissory estoppel); interference with prospective business relations; and misappropriation of trade secrets.

KOC denied that there was a contract, and KOC elected not to proceed with UKnight because of concerns about UKnight's capability to service large numbers of councils and concerns about Mr. Labriola as a business partner. KOC insisted that it never stood in the way of UKnight's attempts to market its program to local councils, but it would not endorse UKnight as a preferred vendor. KOC also denied that UKnight had any trade secrets or, if it did, that KOC stole them.

The jury found in plaintiff's favor on its breach of contract claim and awarded $500,000 in damages. ECF No. 234 at 1-2 (redacted jury verdict). It therefore did not address the promissory estoppel claim. The jury resolved the interference with prospective business relations and misappropriation of trade secrets claims against the plaintiff. *Id.* at 3. Plaintiff now

seeks a new trial on damages and, if a new trial is not granted, an award of prejudgment interest on the verdict amount.

## MOTION FOR NEW TRIAL

Plaintiff argues that the Court improperly (1) instructed the jury on "reliance damages;" (2) permitted KOC to offer previously undisclosed testimony of its damages expert; and (3) instructed the jury that in determining damages it could consider a list of factors that were not supported by the applicable law.  I address each argument in turn.

### A.  **Damages Instruction**.

Plaintiff's damages claim was that if KOC had honored its agreement to announce UKnight as its preferred software vendor, UKnight would have been able to sell its software to thousands of KOC local and state councils and earn profits ranging up to more than $100 million.[1]  Plaintiff argues that, because it sought only lost profits on an "expectation" or benefit of the bargain theory, the Court erred in including in the damages instruction a sentence indicating that the jury could also consider what plaintiff calls "reliance" damages.  Plaintiff claims that it suffered prejudice because if the Court had not permitted the jury to consider "reliance" damages, it would have had a better opportunity to be awarded the "expectation" damages it sought.

---

[1] Plaintiff's damages expert, Kevin H. Call, made various assumptions as to the number of KOC councils that would purchase UKnight's product (up to 85% of the 13,000 or so councils); the period of years over which lost profits on those sales could be projected (5.67 years to 11 years); and whether councils would purchase a "market center" feature (that arguably would be precluded by KOC rules).  Depending on the combination of assumptions one uses, Mr. Call's range of lost profits, summarized in Trial Ex. 194, was between $15 million on the low end to nearly $110 million on the high end.

I begin by quoting the subject instruction, bolding the paragraph that is the focus of

plaintiff's motion:

INSTRUCTION NO. 15

If you find that the Knights of Columbus is liable to UKnight for breach of
contract or for promissory estoppel, then you must determine the amount of
money to award UKnight as damages.

**Any damages you award on the breach of contract claim or
promissory estoppel claim should be designed to place the plaintiff, so far as
can be done by money, in the same position as it would have been in had the
contract or promise been fully performed.  Here, UKnight seeks damages in
the form of profits it lost because of the Knights of Columbus's breach.
Although UKnight does not request damages other than lost profits, as a
matter of law, you may award any other damages based on losses incurred
by UKnight because it relied on Knights of Columbus to perform the
contract or promise.**

UKnight must prove that it is reasonably certain that UKnight would have
earned those profits but for the Knights of Columbus's breach.  UKnight cannot
recover for the mere possibility of making a profit.  In addition, the evidence must
afford you a sufficient basis for estimating the amount of profits with reasonable
certainty.  UKnight also claims lost profits for the future.  The time period for
awarding future lost profits must be reasonable and supported by the evidence.

In order to recover UKnight must prove that it sustained damages as a
direct and proximate result of the Knights of Columbus's breach.  UKnight cannot
recover damages that the Knights of Columbus did not have reason to foresee as a
probable result of the breach at the time the contract or promise was made.

UKnight must prove by a preponderance of the evidence the amount of
any damages to be awarded for the breach.  The evidence must give you a
sufficient basis to estimate the amount of damages to a reasonable certainty.
Damages may be based on reasonable and probable estimates, and need not
necessarily be based on historical data.  However, you may not award damages on
the basis of guess, speculation or conjecture.

ECF No. 230 at 19-20 (emphasis added).

I disagree with plaintiff's argument for several reasons:

First, the jury <u>was</u> instructed consistently with plaintiff's benefit of the bargain theory and

damages claim.  As noted above, the instruction stated,

Any damages you award on the breach of contract claim or promissory estoppel claim should be designed to place the plaintiff, so far as can be done with money, in the same position as it would have been in had the contract or promise been fully performed.  Here UKnight seeks damages in the form of profits it lost because of the Knights of Columbus's breach.

The problem is not that plaintiff did not have an opportunity to establish its "expectation" claim.  Rather, if one accepts plaintiff's assumption that the $500,000 awarded by the jury was not for lost profits, then it follows that plaintiff did not prove its claim.

Second, the instruction was consistent with Connecticut law (which the parties agreed was applicable to this case).  It informed the jury that although UKnight was not seeking damages other than for lost profits, "you may award any other damages based on losses incurred by UKnight because it relied on Knights of Columbus to perform the contract or promise."  The language was submitted by the defendant and was based generally on § 4.5-9 of Connecticut's model jury instructions which states:

4.5-9 Damages-Reliance

Any damages you award on the [_____] count should compensate the plaintiff for any losses that (he/she/it) incurred because (he/she/it) relied upon the defendant to perform the contract.  These damages should put the plaintiff in a position as if the plaintiff had never entered into a contract.  The plaintiff must establish the fair and reasonable value of (his/her/its) loss that (he/she/it) sustained.

Connecticut Judicial Branch Civil Jury Instructions (Oct. 1, 2018 ed.), accessible online at

http://www.jud.ct.gov/JI/Civil/Civil/pdf/.

Third, plaintiff has provided no authority that lost profits and out-of-pocket costs cannot both be considered by the jury in the same case.  An unpublished decision of the Second Circuit, applying Connecticut law, tends to suggest the contrary.  *See Brookridge Funding Corp. v. Northwestern Human Resources, Inc.,* 170 F. App'x 170, 172 (2nd Cir. 2006) (unpublished)

(rejecting in a promissory estoppel case defendant's argument that plaintiff's damages must be limited to out-of-pocket costs rather than including plaintiff's expected benefit of the bargain). Likewise, plaintiff has pointed to no authority indicating that just because plaintiff prefers lost profits, a jury cannot consider out-of-pocket costs.

Plaintiff suggests that it was prejudiced because if the jury hadn't been given an option for awarding damages other than lost profits, it would have/might have awarded lost profits damages in a much larger amount. That is speculation at best.

The bottom line is that the Court has an obligation to instruct the jury in a manner that embraces both sides' claims and defenses, not just plaintiff's, so long as the evidence supports it. The opinion of defendant's expert (discussed below) was that plaintiff's claim for lost profits was unfounded, and that if UKnight sustained any provable loss, it was its out-of-pocket expenses. It was appropriate for the defendant to suggest that if any damages were to be awarded, it should not be speculative lost profits but what plaintiff calls "reliance" damages. The instruction properly permitted the jury to consider both sides' positions on damages.

**B. Undisclosed Expert Testimony.**

Plaintiff claims that the Court improperly permitted Robert Levis, defendant's expert in accounting and economic damages, to provide undisclosed expert opinions concerning UKnight's out-of-pocket costs, and that plaintiff was prejudiced as a result. I disagree.

First, Mr. Levis's opinions that plaintiff's lost profits claim (as set forth in the report of plaintiff's expert Kevin H. Call) was unfounded, and that plaintiff's out-of-pocket costs would be an appropriate measure of plaintiff's actual loss, were not undisclosed. These issues were addressed in his written report issued approximately three months before trial. Report dated June

19, 2019, ECF No. 251-3, at 3-5.  Specific to the out-of-pocket costs measure of damages, Mr.

Levis's report stated, "In my opinion as an economic damages expert, some type of out-of-

pocket costs methodology would be a more appropriate manner of estimating economic damages

given the facts of the case and Plaintiff's claims.  I believe Plaintiff's economic damages using

an out-of-pocket costs methodology would be less than $100,000."  *Id.* at 5.

It is true that Mr. Levis prepared a new exhibit shortly before trial – Trial Ex. 503, filed

as an exhibit to plaintiff's motion at ECF 251-4.  However, that exhibit simply reconstituted

numbers taken from UKnight's tax returns, which in substance were already before the jury in

Trial Ex. 369.  Those numbers led Mr. Levis to increase his opinion of UKnight's out-of-pocket

costs from $100,000 to "just shy of $300,000."  The numbers were obviously known to UKnight,

and UKnight's out-of-pocket costs were also known to UKnight's damages expert, as I discuss

later in this order.

As for prejudice, UKnight argues that it was "denied a fair opportunity to secure rebuttal

witnesses or cross examine Mr. Levis on the new calculations and explanation."  ECF No. 251 at

9.  That makes no sense because the numbers were taken from UKnight's own tax returns and

were known to its own expert.  Moreover, having objected to Ex. 503 and related testimony as

"undisclosed" expert testimony, UKnight then cites the total expense figure in Ex. 503 in the

pending motion to suggest that it might explain the jury's verdict in UKnight's favor.  As I

discuss later in this order, this information also has contributed to my decision in this order to

award prejudgment interest to UKnight.  The bottom line is that, in my judgment, the exhibit and

Mr. Levis's testimony about what UKnight's tax returns show benefitted UKnight, whether or

not they are willing to admit that.  I repeat that plaintiff's claim that without these numbers the jury might have made a much higher damages award as "lost profits" is speculative at best.

**C.  Inapplicable Factors.**

Plaintiff objects to Instruction 26 which was as follows:

INSTRUCTION NO. 26

Under its claims for breach of contract, promissory estoppel, and intentional interference with prospective business expectancy, UKnight seeks to recover damages for its actual loss measured as lost profits.  Lost profits recoverable are lost net profits.  Net profits are the value of what benefit UKnight would have received after deducting the expenses UKnight would have been reasonably expected to incur over the same time period.

In determining whether UKnight has proved lost profits, the factors that you may consider include, but are not limited to, the following:

1.  UKnight's prior experience in the same business;
2.  UKnight's experience in the same enterprise subsequent to the breach or interference;
3.  The experience of UKnight and that of third parties in a similar business;
4.  The average experience of participants in the same line of business as UKnight; and
5.  Prelitigation projections, particularly if prepared by the Knights of Columbus.

Plaintiff states that neither these factors nor any other factors are included in Connecticut's Model Jury Instruction for lost profits damages, § 4.5-8; and that inclusion of the factors was prejudicial because "the instruction encouraged the jury to consider only factors that UKnight would have difficulty meeting because UKnight's product and market are unique and UKnight's historical experience is not particularly relevant since it reflects circumstances in which there was no announcement of the anticipated vendor status."  ECF No. 251.

Again, I disagree with plaintiff.  The factors are supported by Connecticut law, even if they were not included in the model instruction.  *See Beverly Hills Concepts, Inc. v. Schatz &*

9

*Schatz, Ribicoff & Kotkin,* 717 A.2d 724, 737-38 (Conn. 1998). Plaintiff's attempt to distinguish that case because it involved a bench trial is unpersuasive. The law is the law, whether tried to the court or to a jury. The factors provided were those often considered by triers of fact.

Moreover, with the possible exception of factor 4, the factors are reasonable as a matter of common sense, and they fit the evidence in this case. The first factor, UKnight's prior experience in the same business, is obviously relevant to the likelihood that it would be able successfully to market its product to other councils. Indeed, evidence that UKnight had provided its product to other local councils in Texas, and that most of them were pleased with it, would seem to weigh in UKnight's favor. One must also bear in mind that the Court – at plaintiff's request – instructed the jury in Instruction No. 15 that "[d]amages may be based on reasonable and probable estimates, and need not necessarily be based on historical data."

As for the second factor, UKnight's experience in the same enterprise after the breach, this is also a reasonable factor to consider. The evidence was that UKnight did not preclude local councils from purchasing UKnight's website program after the breach, even to the present day. The extent to which UKnight did or did not continue to market its website to other KOC councils after the breach (or the extent to which UKnight did or did not attempt to modify the website platform and market it outside the KOC fraternity) was a reasonable factor for a jury to consider.

The third factor, UKnight's experience in a similar business, is largely duplicative of the first factor, and again, it can be seen as favorable to UKnight. I do not recall evidence relevant to the fourth factor as such. UKnight surely cannot complain about the fifth factor, as it relied heavily on its own prelitigation projections in its lost profits claim. As a matter of common

sense, any projections that KOC did (or did not) make concerning the number of councils that might be expected to purchase UKnight's product would be particularly relevant to a reasonable estimate of lost profits.

Finally, the instruction simply specified that the jury may consider, but was not limited to, the five factors. I conclude that giving the instruction was not erroneous, nor is there any basis for plaintiff's contention that it was unfairly prejudiced by the giving of the instruction.

## PREJUDGMENT INTEREST

Connecticut law provides that "interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes public." Connecticut General Statutes § 37-3a. "The purpose of § 37-3a 'is not to punish persons who have detained money owed to others in bad faith but, rather, to compensate parties that have been deprived of the use of their money.'" *Sikorsky Financial Credit Union, Inc. v. Butts,* 108 A.3d 228, 233-34 (Conn. 2015) (quoting *Sosin v. Sosin,* 14 A.3d 307, 323 (Conn. 2011)). Plaintiff seeks an award of interest of 10% per year, adding that "[i]f the current judgment stands, which is should not, that would amount to $293,561.64 in interest through the date of the judgment." ECF No. 251 at 14.

UKnight opposes an award of prejudgment interest. It argues that there was no amount of money due and payable under the contract. KOC did not owe any money to UKnight on November 13, 2013, and it therefore could not have wrongfully withheld or deprived the plaintiff of money. By plaintiff's theory, KOC's obligation under the contract was to announce UKnight as its preferred vendor on that date, and plaintiff's claim for damages was for lost profits on sales that were to be made starting in 2014 but never occurred. ECF No. 254 at 10-11. In my view,

11

this argument misses the point.  Plaintiff's argument for an award of prejudgment interest on the jury's verdict is based on the premise that the $500,000 awarded was not lost profits but instead was reimbursement of out-of-pocket costs.  If so, then KOC deprived UKnight of the use of the money which was spent negotiating and preparing to perform a contract that KOC breached.

KOC argues, however, that it is speculation to assume that the award was not lost profits. I agree that we cannot know with certainty how the jury reached that number.  However, the number does not square with any lost profits calculation presented at trial; it is far, far below even the low end of plaintiff's expert's lost profits numbers.  The verdict does, however, have some support in the record as a measure of out-of-pocket costs.  As I have noted, defense expert Levis testified that if he excluded payments to the two shareholders, Labriola and Clark, he would calculate UKnight's out-of-pocket costs at "just shy of $300,000," which he considered to be an appropriate measure of damages if liability were established.  If one includes payments to Mr. Labriola and Mr. Clark his number apparently would be $511,998, as Trial Ex. 503 reflects. ECF No. 251-4.

That is the number that plaintiff, in the course of complaining that the Court allowed the jury to consider out-of-pocket costs, described as "remarkably close to the jury's $500,000 verdict."  ECF No. 251 at 10.  And here is what KOC itself says about UKnight's out-of-pocket costs in another section of its response brief:

> The amount of UKnight's out-of-pocket costs was not in dispute.  Notably, the jury's $500,000 award reasonably could have been based on testimony of UKnight's damage expert Mr. Call, who stated on cross-examination that the total of UKnight's expenses from its inception through April 2019 was 803,000, of which $335,000 was salaries paid to UKnight's owners.

ECF No. 254 at 10.

In short, both sides agree that the jury's verdict reasonably could have been based on UKnight's out-of-pocket costs, and neither party points to any evidence in the record that reasonably correlates the number with evidence of lost profits. Based on my knowledge of the evidence, I find that the $500,000 verdict more likely than not was based on out-of-pocket costs.

It is a fact that UKnight incurred costs beginning in 2011 in meetings and negotiations with KOC. By September 2011 UKnight believed KOC had agreed that it would eventually announce UKnight as its preferred vendor. UKnight continued to meet, negotiate, and modify its software at the request of KOC home-office personnel. Plaintiff's evidence was senior officers of KOC agreed that UKnight would be announced as its preferred vendor at the November 13, 2013 meeting in Quebec. That did not happen, ostensibly due to a typhoon in the Philippines that diverted KOC's attention to humanitarian efforts. UKnight continued to spend money in meetings, modifications to its software, and general preparation for the still-anticipated announcement. This included the two visits of KOC's technical consultant, Ian Kincaid, to UKnight's facility in 2014 and 2015. It was during the 2015 visit that Mr. Kincaid received an email from Matt St. John in KOC's home office that, for the first time, indicated that KOC was considering going with another vendor (a development that Mr. Kincaid admitted left him "aghast"). All the while, Mr. Labriola and Mr. Clark were taking very modest compensation, as the tax returns confirm, while they waited for what they believed to be the reward for their efforts after the announcement was made. At least by the end of 2016 it was apparent that the announcement would never come. But all those costs had been incurred.

As I have said, the purpose of Connecticut's prejudgment interest statute is to compensate parties who have been deprived of the use of their money. Ultimately, the Court must exercise

its discretion in an equitable manner consistent with the facts and law.  I find that this is an

appropriate case to compensate UKnight for the loss of the use of their money, and that to award

prejudgment interest running November 13, 2013 to the date of judgement would do equity.

      KOC also disputes the 10% interest rate.  It notes that the Connecticut Supreme Court has

held that "'37-3a(a) provides for a *maximum* rate of interest of 10 percent, with discretion

afforded to the trial court to order interest at a lesser rate.'"  *Riley v. Travelers Home & Marine*

*Ins. Co.,* 163 A.3d 1246, 1271 (Conn. 2017) (quoting *Ballou v. Law Offices Howard Lee Schiff,*

*P.C.,* 39 A.3d 1075, ___ (Conn. 2012) (emphasis in original)).  In *Riley* the court affirmed a trial

court's decision to award prejudgment interest at the rate of 3 percent.  *Id.*  The trial court had

observed that during the period in question in that case (roughly 2009 to 2014) interest rates were

lower than 10 percent, and that its survey of representative Superior Court decisions indicated

that most courts found that plaintiffs would be appropriately compensated for the deprivation of

their money by prejudgment interest in the 3 to 6 percent range.  *Id.*

      Neither party has provided the Court with any information about interest rates or rates of

return on investments in Connecticut or elsewhere in the 2013 to 2019 time frame.  The range of

3 to 6% compiled by a Connecticut state court judge in the *Riley* case from his survey of what he

considered to be representative Superior Court decisions as reported by the Connecticut Supreme

Court in that case appears to me to be reasonable.  I believe I can take judicial notice that the

degree of risk that an investor accepts affects the expected yield on the investment.  Here, the

shareholders of UKnight "invested" in what had to be viewed as a risky undertaking.  They

ultimately received no return on their money, and they only got what amounts to their money

back after enduring a long and stressful lawsuit.  Exercising my discretion, I find that it is

equitable to award prejudgment interest at 6 percent per annum (simple) on $500,000 from November 13, 2013 through September 24, 2019.  By my calculation that totals $175,890.41.

## ORDER

1.  Plaintiff's motion for a new trial and for an award of prejudgment interest, ECF No. 251, is GRANTED IN PART AND DENIED IN PART.  It is denied insofar as it sought a new trial.  However, it is granted to the extent that it sought an award of prejudgment interest.  Prejudgment interest is awarded at 6 percent per annum (simple) from November 13, 2013 through September 24, 2019.

2.  An Amended Final Judgment will issue reflecting the jury's verdict, an award of prejudgment interest to the plaintiff in the amount of $175,890.41, and an award of costs in the amount of $75,000 (as taxed by the Clerk and stipulated by the parties).  Post judgment interest will run from September 25, 2019 at the then-applicable rate under 28 U.S.C. § 1961 (1.86%) until the judgment is satisfied, with the exception that post-judgment interest ceases to run on any portion of the judgment deposited in the registry of the court from the date of deposit forward.  Pursuant to the parties' stipulation, there will be no post judgment interest on the costs portion of the judgment.

DATED this 6th day of December, 2019.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge